**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**FORT MYERS DIVISION**

**UNITED STATES OF AMERICA,**

**vs.**                                    **Case No.: 2:25-cr-131-SPC-NPM**

**JOHN JAMES ADDUCCI,**
**Defendant.**

_____/

**DEFENDANT'S SENTENCING MEMORANDUM**

Defendant John Adducci, by and through undersigned counsel, files this Sentencing Memorandum pursuant to the Court's Sentencing Scheduling Order (Doc 63).

**THE DEFENDANT**

John Adducci is a 41 year old autistic man[1] with no prior criminal convictions.[2]  Mr. Adducci has successfully completed over eight months of home incarceration under the supervision of Pretrial Services since his detention hearing on June 25, 2025 without any notices of violation.  PSI para. 9.

---

[1] *See* Psychological Evaluation of Amanda Keating, Psy.D., attached to the Final PSI Report.  Ms. Keating's CV is attached as Exhibit 1.
[2] The charges against John Adducci resulting from his having consensual sexual contact with a fellow student at St. John's Northwestern Military Academy in Wisconsin in May 2001 were dismissed with prejudice in October 2004 pursuant to Mr. Adducci's successful completion of a deferred prosecution agreement.

Before his arrest in this case, Mr. Adducci had been employed in hospitality jobs on Sanibel Island for close to eight years. He moved to Ft. Myers in 2017 from the Chicago suburbs where he grew up and where his parents still live.

Mr. Adducci started and finished high school at Homewood Flossmoor High School in Flossmoor, Illinois where his class rank was 585 of 650 students.[3] He attended St. John's Northwestern Military Academy in Delafield, Wisconsin for two semesters during high school where his class rank was 67 of 75 students.[4]

Since his arrest, John Adducci has accepted responsibility for his criminal conduct through multiple types of concrete action. For example, Mr. Adducci waived grand jury indictment and pled guilty to the two counts of the Superseding Information. He also participated in a proffer interview with the FBI Task Force to attempt to assist the Government in other investigations. In addition, Mr. Adducci is selling the only assets he owns (his car and some Disney stock) in order to be able to pay the proceeds.

Furthermore, for the past seven months John Adducci has voluntarily and continually attended therapy sessions with Licensed Mental Health

---

[3] *See* Homewood Flossmoor High School transcript attached as Exhibit 2.

[4] *See* St. John's Northwestern Military Academy transcript attached as Exhibit 3.

2

Counselor Ana Allen, initially once per week and later at his request twice per week.[5] Ms. Allen states that John Adducci "has been amenable to treatment" by "demonstra[ing] motivation for change, participat[ing] in sessions, and complet[ing] assigned homework." According to Ms. Allen, Mr. Adducci "has demonstrated progress ... by stating a greater understanding of and concern for the harm caused to the victims" of his offenses. Furthermore, Ms. Allen reports that Mr. Adducci "has addressed a variety of other factors during the therapeutic process" including "understanding his offense cycle, relapse prevention, recognition and communication of needs, understanding of the impacts of his behavior on others, exploration of trauma, and development of coping skills."

John Adducci was adopted by his parents Jim Adducci and Elizabeth Adducci when he was seven weeks old. Jim Adducci is a 74-year-old commercial litigator who became an in-house counsel and graduated from Harvard Law School in 1976, while Elizabeth Adducci is a 74-year-old retired nurse. As noted in PSI paragraph 61, Jim Adducci suffers from prostate cancer and heart issues (including a heart attack and stents) while Elizabeth Adducci has kidney cancer that is in remission. Video statements of Jim Adducci and Elizabeth Adducci (with accompanying transcripts) are attached

---

[5] See March 2, 2026 letter from Ana Allen, LMHC, attached to the Final PSI Report.

as Exhibits 4 and 5. A character letter written by John Adducci's uncle Dominic Adducci is attached as Exhibit 6.

## JOHN ADDUCCI'S AUTISM AND ITS CONNECTION TO HIS OFFENSE CONDUCT

Amanda Keating, Psy.D.'s psychological evaluation confirms that John Adducci has a diagnosis of Autism Spectrum Disorder. This is a "neurodevelopmental disorder" that is "a lifelong neurological and developmental condition whose effect is permanent."[6] Keating Evaluation at 4. Mr. Adducci's autism led him to "experience[] bullying and social difficulties throughout his childhood." *Id.*

Due to his autism, Mr. Adducci "is less skilled than a typical three-year-old" in "abstract thought, social perspective taking, social communication … and Theory of Mind concepts". *Id.* at 12. These deficits mean that "[i]n Mr. Adducci's case, he has lacked an awareness of the real-world abuse that child pornography supports." *Id.* at 10.[7]

_____

[6] Dr. Keating noted that a 2014 neuropsychological evaluation by Michelle Delehant, Ph.D. "indicated the presence of autism characteristics", despite Ms. Delehant's diagnosis of ADHD rather than autism. Keating Evaluation at 18, 11. The Delehant evaluation report is attached to the Final PSI Report.

[7] The deficits of John Adducci quantified in the Keating evaluation are very similar to those of other autistic defendants who received large downward variances in child pornography cases. *See United States v. Castle,* 2025 U.S. Dist. LEXIS 140830, *16 (M.D. Ala., July 23, 2025) (variance to time served and three years probation where defendant's "age-equivalent levels of functioning in the areas of receptive communication, expressive

4

John Adducci's autism "has significant obsessive-compulsive features" which "include the excessive focus on specific topics and the collecting of items, including pornographic material", as well as other things such as canned goods and survival materials. *Id.* at 9-10, 14, 20.[8]  This is unsurprising because "[i]t's not uncommon for individuals with autism to have perseverative or obsessive characteristics sometimes leading them to spend excessive time in such activities." *Id.* at 9.  "In Mr. Adducci's case, the volume of pornographic material on his devices, illegal and otherwise, is directly related to characteristics of autism." *Id.* at 12.

---

communication and interpersonal relationships are 3 years 4 months, 3 years 7 months, and 4 years 4 months respectively"); *United States v. Knott,* 638 F.Supp.3d 1310, 1317-18 (M.D. Ala.) (variance from 27 months to 27 months home detention where "in the areas of functioning which are most relevant to understanding whether [defendant] was understanding that actual children were being abused (receptive communication and interpersonal relationships), [defendant] demonstrates the level of skills we would expect in someone who is 2 years, 10 months and 3 years of age, respectively"); *United States v. Huseth,* 2021 U.S. Dist. LEXIS 203827, *21 (D. Kan., October 22, 2021) (variance to probation where "Huseth's ability to intuit unexpressed but implicit societal rules is impaired" based on defendant "scor[ing] at an age equivalent of 8 years and 8 months in 'making inferences' on a social problem-solving evaluation").

[8] During the COVID pandemic, Mr. Adducci "began collecting a range of disaster preparation supplies, including hand sanitizer, toilet paper, flash lights, irrigation and water sanitation supplies, power station solar cells, and food", including "over 1,000 canned foods." Keating Evaluation at 20.  Mr. Adducci even told Amanda Keating that he was "hopeful that his parents will get a storage unit for the cans" while he is incarcerated. *Id.*

## ARGUMENTS AGAINST APPLYING THE PATTERN OF ACTIVITY FIVE LEVEL ENHANCEMENT PURSUANT TO USSG § 2G2.2(b)(5)

A. Background Law on the "Pattern of Activity" Enhancement under USSG § 2G2.2(b)(5)

Application note 1 to USSG § 2G2.2 limits the "pattern of activity" enhancement to conduct described in any of nine specified federal statutes. The Eleventh Circuit has cautioned that "only conduct that falls within one of the statutory sections referenced … can justify a 'pattern of activity' enhancement." *United States v. Alberts,* 859 F.3d 979, 984 (11th Cir. 2017). The Government bears the burden of proving the "pattern of activity" enhancement by the preponderance standard. *United States v. Desorbo,* 770 Fed.Appx. 979, 981 (11th Cir. 2019) (unreported and per curiam).

B. The M.B.A. incident does not qualify as a "pattern of activity" predicate because for multiple reasons it does not constitute a violation of 18 U.S.C. § 2242(3) as alleged in PSI paragraph 42.

Under 18 U.S.C. § 2242(3), it is a federal crime in specified federal settings to "knowingly … engage[] in a sexual act with another person without that other person's consent, to include doing so through coercion." PSI paragraph 42 alleges that that the M.B.A. incident constituted a violation of Section 2242(3) both "because a minor cannot consent to the sexual act" and because M.B.A. "participated after being coerced."

6

This allegation does not constitute a violation of Section 2242(3) for the following reasons:

1. As is clear from PSI paragraphs 42 and 57, there is absolutely zero evidence that M.B.A. "participated after being coerced", as U.S. Probation alleges. To the contrary, M.B.A. never claimed he had been coerced when he was interviewed by a Delafield, Wisconsin police officer. Moreover, even though Mr. Adducci allegedly wanted M.B.A. to "go all the way", M.B.A. ended the oral sex after only a minute or two without ejaculating – demonstrating by conduct that M.B.A. was not in fact coerced by John Adducci.

2. For multiple reasons, Section 2242(3) cannot be interpreted as a statutory rape statute criminalizing sexual acts with anyone under 18, as Probation does:

   A. There are no reported or unreported cases on LEXIS in which Section 2242(3) has been applied based on the statutory rape theory proposed by Probation.

   B. It makes no sense to interpret Section 2242(3) in the manner proposed by Probation because a companion statute, 18 U.S.C. § 2243(a), already penalizes knowingly engaging in a sexual act with another person

who (1) has attained the age of 12 years but has not attained the age of 16 years; and (2) "is at least four years younger than the person so engaging." Congress could not have intended Section 2242(3) to be a statutory rape provision that criminalizes all sexual contact with anyone under 18 when its companion Section 2243(a) penalizes only sexual contact in which the victim is at least four years younger than the defendant.

C. Section 2242(3)'s statutory language prohibiting engaging in a sexual act "without that other person's consent" indicates that the consent in this provision refers to the subjective consent of the alleged victim, not any legal prohibition against consent by minors.

D. Nothing in Section 2242 refers to minors at all. Therefore, it makes no sense to interpret Section 2242(3) as establishing a blanket federal statutory rape crime.

3. Even if Probation's interpretation of Section 2242(3) is correct, there is no record evidence that John Adducci had oral sex with M.B.A. "knowingly", as required to violate Section

8

2242(3), meaning that Mr. Adducci knew that M.B.A. could not consent because he was a minor. *See United States v. Bruguier,* 735 F.3d 754 (8th Cir. 2013) (en banc) (holding that "knowingly" in Section 2242(2) "requires that [the defendant] knew [the victim] was "incapable or appraising the nature of the conduct" or "physically incapable of declining participation in, or communicating unwillingness to engage in, that sexual act").

4.  Probation's position is barred by the Ex Post Facto clause of Article I, section of the United States Constitution. According to the Eleventh Circuit, "[t]wo elements must be present before a court can find an ex post facto violation: 'First, the law "must be retrospective, that is, it must apply to events occurring before its enactment"; and second "it must disadvantage the offender affected by it." *United States v. Lozano,* 138 F.3d 915, 916 (11th Cir. 1998), *quoting Miller v. Florida,* 482 U.S. 423, 430 (1987). Here, Section 2242(3) was added to Section 2242 in 2022 as part of Public Law 117-103 (March 15, 2022, 136 Stat. 924). Probation's attempt to apply Section 2242(3) to the M.B.A. incident which occurred 20 years before § 2243(3) was enacted in 2022 is clearly retrospective

and it could disadvantage Mr. Adducci by close to an additional 10 years of prison time.  Consequently, the Ex Post Facto clause bars Section 2242(3) from being used as a "pattern of activity" predicate based upon the underlying M.B.A. incident.

C. The B.D. and S.H. images alleged in PSI paragraph 42 do not qualify as "pattern of activity" predicates because there is insufficient proof by the preponderance standard of the interstate commerce element and the knowledge of interstate commerce element required to violate 18 U.S.C. § 2251(a), the child pornography production statute.

In *United States v. Moran,* 57 F.4th 977, 984 (11th Cir. 2023), the Eleventh Circuit in a published opinion stated "[w]e hold that in a prosecution for producing child pornography under § 2251(a), the government must prove that the defendant knew that, if produced, the pornography he sought would travel in interstate commerce."  The Eleventh Circuit very recently reiterated this knowledge-of-interstate-commerce element in an unpublished per curiam opinion issued on February 6, 2026. *United States v. Regis,* 2026 U.S. App. LEXIS 3793, *10 (11th Cir., Feb., 6, 2026) (unreported and per curiam) ("To establish guilt on Count Five for production of child pornography, the government had to prove: (1) Regis knowingly and intentionally employed, used, persuaded, induced, enticed, or coerced (2) a minor (3) to engage in 'sexually explicit conduct' (4) for the purpose of producing a visual depiction of such conduct (5) ***knowing that the***

10

*__depiction would be transmitted using any means or facility of interstate commerce__*) (emphasis added).

The factual basis for the B.D. and S.H. predicates for the "pattern of activity" enhancement are contained in PSI paragraphs 23, 28 and 42. However, none of these paragraphs establish that the oral sex images described in PSI paragraph 42 moved in interstate commerce as required for a Section 2251(a) violation.

Moreover, even if those images did move in interstate commerce, there is absolutely no proof that John Adducci also knew that those images "would travel in interstate commerce", as required by the Eleventh Circuit's 2023 *Moran* opinion. For example, the B.D. images described in paragraphs 23 and 42 were assertedly taken in John Adducci's bedroom when he was 18. Similarly, S.H. recalled having sex with Mr. Adducci "at his home." PSI paragraph 27. But Mr. Adducci continued to live in that same family home in Illinois until he was 26 or 27 and then continued to reside in the Chicago area until he was 33. PSI paragraph 64. Consequently, Mr. Adducci would have had no reason to know that the B.D. and S.H. images described in PSI paragraph 42 "would be transmitted using any means or facility of interstate commerce" as required by the Eleventh Circuit's *Moran* opinion when those images were taken in his family home where he continued to live for an additional 8 or 9 years.

11

Accordingly, the Court cannot use the B.D. image or the S.H. image in PSI paragraph 42 as Section 2251(a) predicates for the "pattern of activity" enhancement because there is insufficient proof by the preponderance standard of the interstate commerce element and the knowledge of interstate commerce element required to violate 18 U.S.C. § 2251(a).

D. The B.D. and S.H. oral sex images alleged in PSI paragraph 42 do not qualify as "pattern of activity" predicates because there is insufficient proof by the preponderance standard that John Adducci's oral sex with S.H. and B.D. occurred "for the purpose of" producing visual depictions of that sexually explicit conduct.

The plain language of 18 U.S.C. § 2251(a) requires that the recorded sexually explicit conduct must have been done "for the purpose of producing any visual depiction of such conduct ...." However, the Eleventh Circuit holds that Section 2251(a) "require[s] the Government prove ... that [only] one purpose of the sexually explicit conduct was to produce a visual depiction." *United States v. Lebowitz,* 676 F.3d 1000, 1013 (11th Cir. 2012) (per curiam). "The use of the indefinite article 'the' in § 2251(a) does not require that the 'single-minded' purpose of the sexual activity be the production of a visual depiction." *United States v. Hughes,* 798 Fed.Appx. 388, 389 (11th Cir., December 26, 2019) (unreported and per curiam). "The government [is] not required to prove that making explicit photographs was [the defendant's] sole or primary purpose for enticing the minor to engage in sexually explicit conduct. It [is] enough to show that it was 'a purpose' for

doing so." *United States v. Miller,* 819 F.3d 1314, 1316 (11th Cir. 2016) (per curiam).

Defendant Adducci recognizes the Eleventh Circuit precedent discussed above. However, those cases are wrongly decided because they cannot be squared with the plain "the purpose" statutory language of § 2251(a). "Distinguishing between 'the' and 'a' is not nit picking … here, there is a fundamental difference between the definite and indefinite article." *United States v. McCauley,* 983 F.3d 690, 695 (4th Cir. 2020). "The difference is whether the accused's alleged purpose carries some predominant weight, as required by the plain statutory language, or whether filming was one among many, potentially much more significant purposes. Indeed, 'a purpose' could be merely one in ten … without considering any relative weight amongst these varying purposes." *Id.* "But the language 'the purpose' requires that the filming be at the very least a significant purpose in the sexual conduct itself, not merely incidental." *Id.*

Instead of the Eleventh Circuit's wrongly decided standard of "a purpose", this Court should use the "dominant motive" standard of the Second, Eighth, and D.C. Circuits (*United States v. Sirois,* 87 F.3d 34, 39 (2d Cir. 1996); *United States v. Raplinger,* 555 F.3d 687, 693 (8th Cir. 2009); *United States v. Torres,* 894 F.3d 305, 312 (D.C. Cir. 2017)) or the Fourth Circuit's "significant or motivating purpose" which "was not merely incidental

to the sexually explicit conduct" (*United States v. Hoover,* 95 F.4th 763, 774-75 (4th Cir. 2024).[9]

Even under the Eleventh Circuit's "a purpose" standard, however, "[c]ases considering the question of 'for the purpose of' [under Section 2251(a)] are fact specific." *United States v. Depine,* 2023 U.S. Dist. LEXIS 177946, *22 (N.D. Fla., August 21, 2023). "Whatever form it takes, … evidence of purpose is essential." *United States v. Torres,* 894 F.3d 305, 312 (D.C. Cir. 2017). As the D.C. Circuit said in *Torres,* "[w]e do not believe – so do not hold – that 'the purpose' element of § 2251 is proven by the mere fact that the Defendant personally took a photo of … a minor engaging in sexually explicit conduct.'" *Id.*

"[A] defendant must engage in the sexual activity with the specific intent to produce a visual depiction; it is not sufficient simply to prove that the defendant purposefully took a picture." *United States v. Palomino-*

_____

[9] *See also United States v. Deschambault,* 2023 U.S. Dist. LEXIS 134717, *29 (D. Me., August 3, 2023) ("The second element of the offense is that Mr. Deschambault used the minor to engage in sexually explicit conduct for the purpose of producing a visual depiction of the conduct. To prove Mr. Deschambault's purpose, the Government must show beyond any reasonable doubt that he engaged in the sexual activity with the specific intent to produce a visual depiction. It is not sufficient simply to prove that he recorded a video…. To prove its case, the Government must prove beyond a reasonable doubt that producing the visual image was at least a significant motive for his engaging in the sexual conduct").

14

*Coronado,* 805 F.3d 127, 131 (4th Cir. 2015). "[T]he voluntary act of taking the picture" cannot be wrongly conflated "with the specific intent required under the statute." *Id.* at 133. "Accordingly § 2251(a) does not criminalize a spontaneous decision to create a visual depiction in the middle of sexual activity without some sufficient pause or other evidence to demonstrate that the production of child pornography was at least a significant purpose. Adducing 'a purpose' arising only at the moment the depiction is created erroneously allows the fact of taking an explicit video of a minor to stand in for the motivation that animated the decision to do so. It is for this reason hat while the image itself can be probative of intent if the prosecution makes a sufficient connection, it cannot be the only evidence. That would impermissibly reduce the statute to a strict liability offense." *United States v. McCauley,* 983 F.3d 690, 696-97 (4th Cir. 2020).

In this case, nothing in the PSI report proves that the oral sex depicted in the B.D. and S.H. images discussed in PSI paragraph 42 occurred "for the purpose of" producing those images – as required to establish Section 2251(a) violations. To begin with, the two oral sex images listed in PSI paragraph 42 are just single images, not videos which continue for some period of time and which may also contain audio. These single images do not tell any kind of story about what preceded these images and also what followed these

15

images.  Nor do these images contain any audio that might provide explanatory context to either or both of these images.

In addition, according to PSI paragraphs 22 and 26-27, both B.D. and S.H. were involved in ongoing sexual relationships with John Adducci when the images alleged in PSI paragraph 42 were taken.  B.D., in particular, described an ongoing sexual relationship with Mr. Adducci over a two-year period during which she and Mr. Adducci "had sexual intercourse nearly every time they met at Adducci's residence." PSI paragraph 22.  The consequence of the two oral sex images listed in PSI paragraph 42 being taken during two ongoing sexual relationships, one which lasted intermittently throughout a two-year period, is that these single images do not by themselves prove that the sexual activity during which the images were taken was "for the purpose of" producing those images.  *United States v. Palomino-Coronado,* 805 F.3d 127, 132 (4th Cir. 2015) ("In this instance, where Palomino-Coronado engaged in sexual activity with B.H. over many months, the fact that only one image was produced militates against finding that his intent in doing so was to take a picture.  The single photo is not evidence that Palomino-Coronado engaged in sexual activity with B.H. to take a picture, only that he engaged in sexual activity with B.H. and took a picture") (emphasis in original).

Furthermore, a comparison of the facts in PSI paragraph 42 with the facts in other cases shows additional reasons why there is insufficient proof here that neither the B.D. sexual activity nor the S.H. sexual activity depicted in the two oral sex images occurred "for the purpose of" depicting those sexual activities in the two images:

> *United States v. Morales-DeJesus,* 372 F.3d 6, 21-22 (1st Cir. 2004) (holding that defendant induced minor to have sex for the purpose of recording that conduct where "the defendant gave [the minor] specific instructions regarding certain positions he wanted her to assume relative to the camera, instructed her on what to say while the camera recorded their activities, and used a remote control to zoom the camera in and out while they were having sex"). None of that conduct is present here.

> *United States v. Lebowitz,* 676 F.3d 1000, 1013 (11th Cir. 2012) (per curiam) (finding sufficient evidence that one purpose of the sexually explicit conduct was to produce a visual depiction where the minor "testified that he and Lebowitz discussed videotaping a sexual encounter prior to the recording"). No such evidence is not present here.

> *United States v. Wardlow,* 666 Fed.Appx. 861, 863 (11th Cir. 2016) (unreported and per curiam) (finding sufficient evidence that defendant induced the minor to engage in sexually explicit conduct for the purpose of producing pornographic pictures where the minor testified that the defendant made her lie down while the defendant took pictures focusing on the minor's genital area). No such testimony is present here.

> *United States v. Ortiz-Graulau,* 526 F.3d 16, 19 (1st Cir. 2008) (finding that the number of over 50 pictures of sexual contact between defendant and minor or of the minor in sexually explicit positions "permit[ted] a strong inference that some of the conduct occurred in order to make the photographs"). Here, there is only one oral sex image of B.D. and one oral sex image of S.H. and therefore no such strong inference.

17

*United States v. Deschambault,* 2023 U.S. Dist. LEXIS 134718, *11 (D. Me., August 3, 2023) (finding sufficient evidence that "a significant purpose of Mr. Deschambault engaging in sexual conduct with the victim was to produce" two videos of more than eight minutes in which the defendant "guides [the victim] both physically and verbally and records her following his commands for more than eight minutes"). Here, there are no videos, only two still oral sex images, and no evidence of Mr. Adducci guiding or commanding B.D. or S.H.

Finally, the evidence presented in the Final PSI Report does not support the conclusion that John Adducci engaged in sexual activity with B.D. and with S.H. for the purpose of producing the two oral sex images described in PSI paragraph 42 for the same reasons that the Fourth Circuit cited in vacating the defendant's 2251(a) conviction in *United States v. Palomino-Coronado,* 805 F.3d 127, 132 (4th Cir. 2015):

> In both *Palomino-Coronado* and this case, "[n]o direct evidence or statements indicating intent were offered." *Id.*
>
> In both *Palomino-Coronado* and this case, "[t]here was no testimony that [the defendant] gave any instruction or direction to [the minor] as part of their sexual encounter that would indicate purpose." *Id.*
>
> In both *Palomino-Coronado* and this case, the defendant "had engaged in sexual activity with [the minor] on more than one occasion" and the minor identified the defendant in one sexually explicit picture. *Id.*

Based on analogous facts, the Fourth Circuit held in *Palomino-Coronado* that "these facts do not support the conclusion that Palomino-Coronado engaged in sexual activity with [the minor victim] in order to take a picture. To hold otherwise would eliminate the specific intent requirement

turning 2251(a) into a strict liability offense." *Id.* This Court should reach the same conclusion as the Fourth Circuit in *Palomino-Coronado.*

The Fourth Circuit also focused on the analogous small number of images compared to the length of the sexual relationship between the defendant and the minor, which is very similar to the length of the sexual relationship between John Adducci and B.D.: "In this instance, where Palomino-Coronado engaged in sexual activity with B.H. over many months, the fact that only one image was produced militates against finding that his intent in doing so was to take a picture. The single photo is not evidence that Palomino-Coronado engaged in sexual activity with B.H. <u>to</u> take a picture, only that he engaged in sexual activity with B.H. <u>and</u> took a picture." *Id.* (emphasis in original). This Court should apply the same reasoning here and draw the same conclusions as the Fourth Circuit in *Palomino-Coronado.*

## ARGUMENTS FOR A DOWNWARD VARIANCE FROM THE GUIDELINES RANGE TO A PRISON SENTENCE CLOSE TO THE MANDATORY MINIMUM 5 YEAR SENTENCE

A. USSG § 2G2.2 overrepresents the seriousness of John Adducci's crimes for multiple reasons.

The Eleventh Circuit has repeatedly stated that district courts have the discretion to vary downward from the correctly calculated advisory guidelines range based on policy disagreements with the child pornography guideline in U.S.S.G. § 2G2.2. *United States v. Cubero*, 754 F.3d 888, 900 (11th Cir. 2014);

*United States v. Schaefer,* 646 Fed.Appx. 732, 734 (11th Cir. 2016) (unpublished and per curiam); *United States v. Hester,* 627 Fed.Appx. 867, 871 (11th Cir. 2015) (unpublished and per curiam). The Court should use that discretion in this case because the § 2G2.2 guideline overrepresents the seriousness of John Adducci's offenses for several reasons. *United States v. Mitchell*, 752 Fed.Appx. 956, 957 (11th Cir., February 12, 2019) (unreported and per curiam) (affirming variance from guideline range of 324-405 months to 240 months for child pornography distribution offense because "the guideline range [was] elevated in terms of the number of enhancements that are applied" and "the guidelines overrepresent the seriousness of the conduct").

In this case, John Adducci is facing a 13 offense level increase from the base offense level for the combination of enhancements for prepubescent images, sadomasochistic conduct, use of a computer and more than 600 images. The effect of those 13 offense levels is to raise the guideline range from 41-51 months for the base offense level of 22 to 168-210 months for offense level 35.

The problem, as the Second Circuit observed back in 2010, is that "many of the § 2G2.2 enhancements apply in nearly all cases." *United States v. Dorvee*, 616 F.3d 174, 186 (2d Cir. 2010). For example, "[o]f all sentences

20

under § 2G2.2 in 2009, 94.8 % involved an image of a prepubescent minor …,

97.2% involved a computer …, 73.4% involved an image depicting sadistic or

masochistic conduct or other forms of violence …, and 63.1% involved 600 or

more images." *Id.* The consequence as the Second Circuit noted presciently

is that "[a]n ordinary first-time offender" such as John Adducci "is therefore

likely to qualify for a sentence of at least 168 to 210 months, rapidly

approaching the statutory maximum, based solely on sentencing

enhancements that are all but inherent to the crime of conviction." *Id.*

The result of applying all these enhancements to John Adducci is that

"adherence to the Guidelines results in virtually no distinction between the

sentences for defendants" like him, "and the sentences for the most

dangerous offenders who, for example, distribute child pornography for

pecuniary gain and who fall in higher criminal history categories." *Id.* Put

another way, § 2C2.2 "illogically skews sentences for 'average' defendants to

the upper end of the statutory range, regardless of the particular defendant's

acceptance of responsibility, criminal history, specific conduct, or degree of

culpability, thus blurring distinctions between the least culpable and the

worst offenders." *United States v. McGrath,* 2014 U.S. Dist. LEXIS 12304,

*29 (D. Neb., January 31, 2014).

The § 2C2.2 guideline suffers from a second serious defect of being "driven by congressional directive" that is "not grounded in any scientific, statistical, or empirical methodology." *Id.* Accordingly, the Court should not "accord a high degree of deference to the Guidelines" in this case, because "[t]he Guidelines-recommended sentence does not reflect the sort of independent expertise that characterizes the Sentencing Commission's institutional role." *Id.*

Based on these defects, the child pornography guidelines are, as Judge Merryday noted in January 2026, "the guidelines that are the most frequently departed from of all of the guidelines in the United States" because "a very clear majority of the judges think that the guidelines are not – don't take correct cognizance of some very large qualitative and quantitative differences in these offenses." Exhibit 7 at 58.[10]  In that case (*United States v. Benjamin Crawford),* Judge Merryday varied from a guideline range of 188-235 months to 78 months for a defendant who pled guilty to distribution of child pornography.

---

[10] *See* sentencing transcript in *United States v. Benjamin Crawford,* Case No. 8:24-cr-287-SDM-AEP (M.D. Fla., Tampa Division) (January 9, 2026) attached as Exhibit 7.

Numerous courts around the country, like Judge Merryday, have varied from the § 2G2.2 guideline for precisely this policy disagreement.[11] This Court should do so as well.

The requirement that the Court impose at least a 5 year mandatory minimum sentence for Mr. Adducci's receiving conviction in no way means that the Court should not vary from the § 2C2.2 guideline on policy disagreement grounds. For example, in *United States v. Grober,* 595 F.Supp.2d 382, 397 (D.N.J. 2008), after holding that "the § 2G2.2 enhancements apply just about all the time and operate exponentially" and that "the § 2K2.2 enhancements are promoting sentencing disparity," the district court departed from a guideline range of 235-298 months to the 5

---

[11] *See United States v. Doktor,* 2008 U.S. Dist. LEXIS 104737 (M.D. Fla., Dec. 19, 2008) (Presnell, J.); *United States v. Riley,* 655 F.Supp.2d 1298, 1304-05 (S.D. Fla.2009); *United States v. Diaz,* 720 F.Supp.2d 1039, 1042 (E.D. Wis. 2010); *United States v. Munoz,* 2012 U.S. Dist. LEXIS 155050 (D. Minn., Oct. 30, 2012); *United States v. C.R.,* 792 F.Supp.2d 343, 363-64 , 478-82 (E.D.N.Y. 2011); *United States v. Cameron,* 2011 U.S. Dist. LEXIS 24878 (D. Maine, Mar. 11, 2011); *United States v. McElheney,* 630 F.Supp.2d 886, 901-902 (E.D. Tenn. 2009); *United States v. Beiermann,* 599 F.Supp.2d 1087, 1100 (N.D. Iowa 2009); *United States v. Phinney,* 599 F.Supp.2d 1037, 1040 (E.D. Wis. 2009); *United States v. Grober,* 595 F.Supp.2d 382, 402 (D.N.J. 2008); *United States v. Stern,* 590 F.Supp.2d 945, 960-61 (N.D. Ohio 2008); *United States v. Johnson,* 588 F.Supp.2d 997, 1003 (S.D. Iowa 2008); *United States v. Noxon,* 2008 U.S. Dist. LEXIS 87477 (D. Kan., Oct. 28, 2008); *United States v. Goldberg,* 2008 U.S. Dist. LEXIS 35723 (N.D. Ill., Apr. 30, 2008); *United States v. Tews,* 2010 U.S. Dist. LEXIS 48182 (E.D. Wis., Apr. 20, 2010); *United States v. Howard,* 2010 U.S. Dist. LEXIS 17740 (D. Neb., Mar. 1, 2010); *United States v. Raby,* 2009 U.S Dist. LEXIS 121836 (S.D.W.V., Dec. 30, 2009); *United States v. Baird,* 580 F.Supp.2d 889 (D. Neb. 2008).

year mandatory minimum sentence required for receiving child pornography.   Similarly, in *United States v. Stark,* 2011 WL 555437 (D. Neb., Feb. 8, 2011), the court varied from a guidelines range of 235-240 months to a 7 year sentence for a defendant charged with receiving child pornography who faced a mandatory minimum 5 year sentence.   Moreover, in *United States v. Monge,* 2015 WL 787099 (C.D. Cal., Feb. 25, 2015), the court varied from the 188-235 month guideline range down to the mandatory minimum 5 year sentence required for the receiving child pornography charge despite "the Government's contention that Defendant's collection was one of the largest agents had seen..." *Id.* at 3.   The Court should follow the same approach as the *Grober*, *Stark*, and *Monge* courts.

B. John Adducci's autism reduces his moral culpability and explains the large size of his child pornography collection.

John Adducci's autism "diminished his moral culpability" since "because of the way ASD specifically impacts [Adducci], he did not have a neurologically unimpaired person's ability to understand the horrible reality behind the child pornography he encountered." *United States v. Knott,* 638 F.Supp.3d 1310, 1320 (M.D. Ala. 2022).   Although Mr. Adducci's autism "did not cause his behavior, his ASD substantially contributed to the commission of the offense because it impaired his ability to fully understand that viewing child pornography is wrong and why it is wrong.   This inability to intuit and

infer ... contributed to his commission of this offense." *United States v. Huseth,* 2021 U.S. Dist. LEXIS 203827, *28 (D. Kan., October 22, 2021).

In this case, "[t]he government's argument for a Guidelines sentence rests primarily, if not solely, on the number of images (including numerous videos) that the defendant possessed." *United States v. Mallatt,* 2013 WL 6196946, *17 (D. Neb., November 27, 2013). However, since "[e]xpert testimony establishes that the defendant's amassing of a large amount of [child pornography] material was due in part to symptoms that are characteristic of his autistic condition", "[i]t is difficult for the court to make any qualitative distinction with respect to culpability based on number of images, especially in these circumstances where the defendant's collecting behavior is affected by a neurological disorder." *Id.* Stated differently, John Adducci's "propensity for hoarding lessen[s] his culpability to some degree." *United States v. Stark,* 2011 WL 555427, *7 (D. Neb., Feb. 8, 2011).

For these reasons, courts have frequently granted downward variances for autistic defendants convicted of non-production child pornography offenses. *United States v. Castle,* 2025 U.S. Dist. LEXIS 140830 (M.D. Ala., July 23, 2025) (variance from 120 months to time served and three years supervised release where autistic defendant pled to transferring obscene material to a minor in violation of 18 U.S.C. § 1470); *United States v. Knott,*

638 F.Supp.3d 1310 (M.D. Ala. 2022) (variance from 27 months to 27 months home detention where autistic defendant pled to possession of child pornography); *United States v. Huseth,* 2021 U.S. Dist. LEXIS 203827 (D. Kan., October 22, 2021) (variance from guideline range of 78-97 months to probation where autistic defendant pled to possession of child pornography); *United States v. Shore,* 2020 U.S. Dist. LEXIS 118400 (E.D. Pa., July 7, 2020) (variance from guideline range of life imprisonment to mandatory minimum sentence of 15 years where autistic defendant was convicted of three counts of manufacturing child pornography); *United States v. Coffey,* 2016 U.S. Dist. LEXIS 158257 (E.D. Va. November 15, 2016) (variance from guideline range of 135-168 months to 48 months where autistic defendant was convicted of possession of child pornography); *United States v. Mallatt,* 2013 WL 6196946 (D. Neb., November 27, 2013) (variance from guideline range of 120 months to 6 years supervised release where autistic defendant was convicted of possession of child pornography).  This Court should do the same in this case.

C. John Adducci will be extraordinarily vulnerable in prison.

The Declaration of Robert Nagle, Psy.D., attached as Exhibit 8, is based on Dr. Nagle's 24 year career as a psychologist in the Bureau of Prisons, which included serving as chief psychologist at three prisons.  Based on his

extensive experience, Dr. Nagle concludes that John Adducci will be viewed by other inmates as "easy prey" and "will draw predatory attention." Exhibit 8 at 11, 13. Dr. Nagle believes that John Adducci will be at increased risk for both sexual assault and financial exploitation. *Id.* at 13. Furthermore, Dr. Nagle expects that Mr. Adducci "will have difficulty adapting to unwritten inmate rules" which likely will result in him spending time in the Special Housing Unit. *Id.* Dr. Nagle concludes that "[d]ue to naivete and behavioral oddities, it is probable that Mr. Adducci will subjectively experience a harsher sentence than other offenders by orders of magnitude." *Id.* at 14.

Courts sentencing autistic defendants like John Adducci have reached the same conclusions as Dr. Nagle. *United States v. Castle,* 2025 U.S. Dist. LEXIS 140830, *21 (M.D. Ala., July 23, 2025) (Watkins, J.) ("Because of his communication-processing disabilities, mental health issues, and personality traits, [autistic defendant] Mr. Castle is very likely to suffer abuse at the hands of other prisoners if incarcerated"); *United States v. Knott,* 638 F.Supp.3d 1310, 1322 (M.D. Ala. 2022) (Thompson, J.) ("Knott's ASD [autism spectrum disorder] renders him extraordinarily vulnerable to abuse in prison … by substantially increasing the risk that he will be sexually or otherwise physically assaulted in prison").

27

A defendant's extraordinary vulnerability to abuse in prison is a recognized ground for both a downward departure and a downward variance. *Koon v. United States,* 518 U.S. 81, 111-112 (1996) (affirming downward departure based on police officer defendants being especially vulnerable in prison); *United States v. Lara,* 905 F.2d 599, 602-603 (2d Cir. 1990) (affirming downward departure under 18 U.S.C. § 3553(b) based on defendant's extreme vulnerability to abuse in prison being a mitigating factor not adequately considered by the Sentencing Commission); *United States v. Spring,* 108 Fed.Appx. 116, 124-25 (4th Cir. 2004) (unpublished and per curiam) (affirming downward departure for extreme vulnerability to prison abuse but remanding for resentencing).

Departures and variances based on extraordinary vulnerability to abuse in prison have been applied in similar cases. *United States v. Shasky,* 939 F.Supp. 695, 697 (D. Neb. 1996) (granting four level departure from 15-21 month range to three years probation with six months of home detention and completion of in-patient sex offender program in a child pornography receiving case based in part on defendant's unusual susceptibility to abuse in prison because he was a state trooper); *United States v. Knott,* 638 F.Supp.3d 1310, 1320-21 (M.D. Ala. 2022) (granting downward variance from 27 months imprisonment to 27 months home detention in child pornography possession

28

case because "Knott's ASD [autism spectrum disorder] renders him extraordinarily vulnerable to abuse in prison").

In this case, John Adducci's autism, as described by Amanda Keating, will in fact make him extraordinarily vulnerable to being abused in prison, as Robert Nagle attests to in his declaration based on his decades of BOP experience. The Court should respond to Mr. Adducci's extraordinary vulnerability with a downward variance to close to the five year mandatory minimum sentence required by the receiving count.

## ARGUMENTS AGAINST AN UPWARD VARIANCE BASED ON QUANTITY OF CHILD PORNOGRAPHY IMAGES AND VIDEOS

No upward variance should be applied here based on the quantity of child pornography images and videos for three reasons.

First, the Sentencing Commission deliberately chose to cap the number of images enhancement under Section 2G2.2(b)(7)(D) at 5 levels for "600 *or more* images." The Commission's intentional choice should be respected.

Second, the current 2025 Guidelines omits the commentary language that existed in some earlier Guidelines providing for the possibility of upward variances based on the number of images exceeding 600. The Commission's decision to delete this language is further indication that the Commission no longer supports this type of ad hoc upward variance.

29

Third, no upward variance based on the quantity of images/videos should be applied here because, as explained above and below, the large size of John Adducci's child pornography collection is the result of his autism defects and therefore should not be viewed as extra culpability that merits an upward variance.

## APPLYING THE SENTENCING FACTORS IN 18 U.S.C. § 3553(a)

A. The nature and circumstances of the offenses

Receipt and possession of child pornography are obviously serious crimes, as evidenced by the five year mandatory minimum prison sentence for the receiving offense.  On the other hand, receiving/possession is markedly less damaging to both child victims and to society as a whole than distribution, production, production for profit, and actual child sexual contact crimes. *United States v. Munoz,* 2012 WL 5351750, *4 (D. Minn., October 30, 2012) ("possession of child pornography 'is the least serious of the crimes on the continuum of conduct – from possession to distribution to production to predatory abuse – that exploits children'"), *quoting United States v. Baird,* 580 F.Supp.2d 889, 895 (D. Neb. 2008).

John Adducci admittedly assembled a very large collection of child pornography.  However, the Government's fixation on the sheer size of this collection is misplaced because "[e]xpert testimony" in the form of Amanda

Keating's detailed evaluation "establishes that the defendant's amassing of a large amount of material was due in part to symptoms that are characteristic of his autistic condition." *United States v. Mallatt,* 2013 WL 6196946, *17 (D. Neb., November 27, 2013). "The nature of" Mr. Adducci's "collecting behavior is unusual only in that it reflects an obsessive preoccupation with child pornography that is characteristic of his brain abnormality." *Id.* at *18. Accordingly, "[i]t is difficult for the court to make any qualitative distinction with respect to culpability based on number of images" "where the defendant's collecting behavior is affected by a neurological disorder" and "[t]he seemingly voluminous size of his collection is also attributable to his Asperger syndrome", also known as autism spectrum disorder. *Id.*

B. The history and characteristics of John Adducci

John Adducci is a 41 year old man whose last encounter with the criminal justice system, prior to this case, was over 20 years ago.

As described in detail in the Keating evaluation report, John Adducci has dealt with many deficits throughout his entire life due to the autism condition he was born with. Two of these deficits helped cause his offense conduct here: (1) his inability at that time to feel and to comprehend how the children in the child pornography he viewed suffered; and (2) his

31

obsessive/compulsive hoarding behavior, which led directly to the extraordinarily large size of his collection.

John Adducci's last sexual contact with minors occurred over 20 years ago when he was a teenager and is entirely unconnected to the child pornography offenses in this case. Moreover, none of that underage sexual activity was forcible.

As described in the parent videos and the character letter of Dominic Adducci attached as Exhibits 4-6, John Adducci is a loving member of his family and extended family who brought joy to other family members, particularly his late grandmother.

C. The need for the sentence to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment

Congress decided that the mandatory minimum 5 year prison sentence required for the receiving offense adequately reflects the seriousness of Mr. Adducci's offense conduct, promotes respect for the law and provides just punishment. Moreover, as explained in both the Nagle Declaration and in the Keating evaluation, John Adducci will suffer significantly more during his time in prison than a neurotypical counterpart as the result of the many deficits he suffers in social communication skills and his very limited ability to comprehend unwritten rules of behavior and social cues. This increased

suffering while incarcerated means that the "just punishment" for this defendant in this case should be a sentence close to the mandatory minimum 5 year term.

D. The need for the sentence to afford adequate general deterrence

The five year mandatory minimum prison sentence required for the receiving offense is sufficient in and of itself to deter others from receiving or possessing child pornography. There is no factual basis for believing that anyone receiving or considering receiving child pornography would be deterred more if they knew John Adducci had received a prison sentence of 6, 7 or 10 years than if they knew Mr. Adducci had received a sentence of 5 years. *United States v. Shore,* 2020 U.S. Dist. LEXIS 118400, *15 (E.D. Pa., July 7, 2020) ("The mandatory 10-year sentence [for manufacturing child pornography] will serve as a sufficient deterrent. Can anyone predict that a person committing this type offense would consider not doing it because there was a potential sentence of five or ten years rather than 15 years?"); *United States v. Mallatt,* 2013 WL 619646, *18 (D. Neb., November 27, 2013) ("The mere fact of the prosecution of these [child pornography] cases arguably deters others from engaging in this sort of conduct, but much of that market is driven by compulsive behavior that arguably will not be deterred in any

event.  The deterrent effect of a prison sentence is further lessened by the international market for child exploitation offenses").

E. The need for the sentence to provide specific deterrence from further crimes of John Adducci

The five year mandatory minimum prison sentence required for the receiving offense and the accompanying extended term of supervised release is sufficient in and of itself to deter John Adducci from committing further crimes.  No additional years of imprisonment are required to satisfy the objective of specific deterrence.  As noted above, Mr. Adducci has successfully completed over eight months of home incarceration with the supervision of Pretrial Services without incident; accordingly, he can be expected to perform as well on supervised release when supervised by U.S. Probation.

F. The need to avoid unwarranted sentencing disparities

"It is not unusual for courts to vary downward from the applicable Guidelines range in sentencing defendants … who are convicted of non-production possession of child pornography.  The Sentencing Commission reports that in FY 2019, less than one-third of offenders sentenced for non-production child pornography offenses received a sentence within the Guidelines range; the majority (59%) received a downward variance." *United States v. Huseth,* 2021 U.S. Dist. LEXIS 203827, *39 (D. Kan., October 22, 2021).  Indeed, as the Sentencing Commission reported to Congress,

"defendants sentenced under the non-production child pornography guidelines have received sentences outside of the applicable guidelines more frequently than defendants in all other major types of federal criminal cases." *Mallatt, supra,* at *12, *quoting* 2012 Sentencing Commission Report to Congress at 7 (*Federal Child Pornography Offenses* (Dec. 2012), http://www.ussc.gov/Legislative_and_Public_Affairs/*Congressional _Testimony_and_Reports/Sex_Offense_Topics/201212_Federal_Child_Pornog raphy_Offenses/index.cfm/Full_ReporttoCongress.pdf*).

These national statistics are mirrored in the sentencings imposed by Middle District of Florida judges under the § 2G2.2 guideline during the ten-year period of 2015 through 2024. As shown by Exhibit 9, a ***majority*** of defendants sentenced under this guideline in the Middle District received a downward variance not requested by the Government in 9 of the 10 years between 2015 and 2024. Viewed from another angle, less than 30 percent of defendants sentenced under this guideline in the Middle District received a sentence within the guideline range during 8 of the 10 years between 2015 and 2024.[12] Consequently, varying downwards from the Guideline range in

---

[12] In fiscal years 2021 and 2022, 32.3 percent and 42.9 percent respectively of sentences imposed in the Middle District under the § 2G2.2 guideline were within the guideline range. More recently, however, in fiscal years 2023 and 2024 that percentage of "within range" sentences dropped back down to only 25.0 percent and 28.3 percent respectively.

this case would not constitute an unwarranted sentencing disparity. To the contrary, imposing a Guidelines range sentence in this case would constitute an unwarranted sentencing disparity under Middle District practice.

Furthermore, granting a substantial downward variance in this case would be consistent with variances granted in other child pornography cases to autistic defendants. *Castle, supra,* 2025 U.S. Dist. LEXIS 140830 at *24 (varying from 106 months to time served and three years supervised release for an autistic defendant in a prosecution for transferring obscene material to a minor in violation of 18 U.S.C. § 1470); *Knott, supra,* 638 F.Supp.3d at 1322 (varying from 27 months imprisonment to 27 months home detention for autistic defendant charged with possession of child pornography); *Huseth, supra,* 2021 U.S. Dist. LEXIS 203827 at *50 (varying from guidelines range to 78-97 months to probation for autistic defendant charged with possession of child pornography); *Shore, supra,* 2020 U.S. Dist. LEXIS 118400 at *1 (varying from guidelines range of life imprisonment to mandatory minimum sentence of 15 years for autistic defendant charged with three counts of manufacturing child pornography); *Mallatt, supra,* 2013 WL 6196946 at *19 (varying from guideline range of 120 months to time served and six years of structured supervised release for autistic defendant convicted of possession of child pornography); *Coffey, supra* at *3 (varying from guidelines range of 135-

36

168 months to 48 months for autistic defendant convicted of possession of child pornography).

G. The need for the sentence to provide John Adducci with needed treatment

The continued therapy recommended by both Amanda Keating and Ana Allen could be furthered during a prison sentence close to the mandatory minimum five year term. There is no treatment need for additional prison time because additional treatment can (and almost certainly will) be required as part of Mr. Adducci's supervised release terms.

## CONCLUSION

For the numerous reasons discussed above, the Court should vary from the Guideline range down to a sentence near the required 5 year mandatory minimum sentence. Mr. Adducci requests that the Court recommend he be designated to (1) FCI Coleman Low, or (2) FCI Jesup Federal Satellite Low Security (FSL).

Dated: March 19, 2026

Respectfully submitted,

*/s/ Kevin Darken*
**KEVIN DARKEN**
Florida Bar No.: 90956
kdarken@jpfirm.com
**TODD FOSTER**
Florida Bar No.: 0325198
tfoster@jpfirm.com
**JOHNSON POPE BOKOR
RUPPEL & BURNS**
400 N Ashley Drive, Suite 3100
Tampa, FL 33602
Telephone: (813) 225-2500
*Attorneys for Defendant*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that I filed the foregoing with the Clerk of Court for the Middle District of Florida on this 19th day of March 2026 by uploading it to the CM/ECF system, which will send a notice of electronic filing to all counsel of record.

*/s/ Kevin Darken*
**KEVIN DARKEN**

# EXHIBIT 1

# Amanda Keating

Licensed Psychologist
Board Certified Behavior Analyst- Doctoral
Interdisciplenary Center for Evaluation and Intervention
University of South Florida
13301 Bruce B. Downs Blvd. MHC-2113A
Tampa, FL 33612
Office: (813) 974-0968
Cell: (813) 321-9796
Fax: (813) 905-9836
AMKeatin@usf.edu

## EDUCATION

**The Florida School of Professional Psychology at Argosy University**

January 2010    Doctor of Psychology received, APA accredited program
February 2007    Master of Arts Degree in Clinical Psychology received

**Webster University**

October 2002    Master of Arts Degree in Counseling received

**Florida Southern College**

May 2000    Bachelor of Science Degree in Psychology received

## PROFESSIONAL EXPERIENCE

**University of South Florida**
Tampa, Florida
*Psychologist*
August 2011 to current

> This reoccurring state funded position includes the provision of psychological services and clinical supervision of graduate students within the regional Florida Diagnostic & Learning Resources System specialty clinic.

**Keating & Associates**
Sioux Falls, South Dakota; Tampa, Florida
*Psychologist, Board Certified Behavior Analyst-Doctoral*
November 2010 to current

> Keating & Associates is the private office of Amanda Keating PsyD, BCBA-D and clinicians working under her supervision or direction. Activities include: training professionals in behavioral parenting packages (e.g. Triple P, The Essential Tools for Positive Behavior Change, and Systematic Training for Effective Parenting), professional supervision and training in psychology and applied behavior analysis, neuropsychological and specialty evaluations, geriatric behavioral consultation, social skills training (e.g. Secret Agent Society-SAS, Program for the Education and Enrichment of Relational Skills-PEERS, Social Thinking), applied behavior analytic assessment & interventions, and psychotherapy for special populations.

**University of South Dakota**
Sioux Falls, South Dakota
*Director, Autism Spectrum Disorders Program*
*Discipline Head, LEND Program, Autism Related Studies*
*Assistant Professor, Department of Pediatrics, Sanford School of Medicine*
September 2009 to September 2011

This position within the University Center for Excellence in Developmental Disabilities at the Sanford School of Medicine includes the administration and program development of the Autism Spectrum Disorders (ASD) Program. The ASD program provides consultation, clinical services, training, and other types of assistance for families and professionals supporting individuals with an autism spectrum disorder. Duties include: program development, grant writing, administration, and budgeting; direct clinical work within the ASD specialty clinic; teaching academic courses and providing clinical training; and supervising ASD program staff.

**University of North Dakota**
Grand Forks, North Dakota
*Psychological Intern*
August 2008 to August 2009

This position was a one year pre-doctoral internship position with the North Dakota Psychological Consortium. Duties primarily included: providing psychological services to clients of the University of North Dakota, Student Counseling Center and Northeast Human Service Center, consultation and outreach, and clinical supervision of graduate students providing psychotherapy. Specialized areas of work included: sexual offenses, individuals with developmental disabilities and co-occurring severe and persistent mental illness, aviation and human factors psychology, and parenting fitness evaluations.

**University of South Florida**
Tampa, Florida
*Human Services Practitioner*
November 2003 to September 2008

This reoccurring state funded position within the Florida Mental Health Institute primarily provided technical assistance, direct assistance, information and referral, training, and project development within the Center for Autism and Related Disabilities. Duties included: supervision of other CARD consultants and graduate students in the provision of such services; collaboration with other agencies, schools, and organizations; assistance with coordinating and writing grant projects; providing regional workshops and conference lectures on autism and topic areas of interest to those populations; and providing professional development opportunities to various professionals. Duties on time limited grants included community based change management for large organizations and professional development trainings.

**Florida State Department of Children and Families**
Lakeland, Florida
*Human Services Program Supervisor*
*Human Services Counselor III*
July 2001 to November 2003

This district supervisory position of Highlands, Hardee, and Polk counties provided enrollment, training, and quality assurance activities for the Developmental Disabilities Program. Duties included: the supervision of staff, ongoing monitoring of long term residential facilities, assessment and remediation of service provision, budgetary evaluation, consultation and training related to applied behavior analysis techniques, examination of behavior modification programs and data, and interagency collaboration and coordination.

**S.A.C.C.A. Inc.**
Winter Haven, Florida
*Site Manager*
October 1998 to May 2001

This supervisory position provided oversight for before and after school care centers. Duties included: creating lesson plans, maintaining licensing standards, collecting and budgeting center monies, supervising staff, coordinated and/or conducted training for center staff, and coordinating communication between agencies.

**THRIVE Inc.**
San Francisco, California
*Staff Coordinator*
August 1996 to May 1999

This position provided coordination and supervision of staff for THRIVE Incorporated, an internet based company focused on healthy living. Duties included: creating online training classes, training other staff to implement new training methods and procedures, HTML programming, participation in public relations activities, and creating new content for the website.

# TEACHING EXPERIENCE

**University of South Dakota**
Vermillion, SD
January 2010 to August 2011

Taught in the Master's Program in Special Education.  Courses taught: Survey of Autism Spectrum Disorders, Education of Students with Autism Spectrum Disorders, Educational Assessment of Autism Spectrum Disorders

**University of North Dakota**
Grand Forks, ND
August 2008 to December 2008

Taught in the Master's Program in Counseling.  Course taught: Graduate Seminar

**University of South Florida**
Tampa, Florida
June 2007 to August 2007

Taught in the Master's Program in Applied Behavior Analysis.  Course co-taught: ABA: Theoretical Integration and Clinical Applications.

**Webster University**
Tampa Bay Area Campuses, Florida
August 2005 to January 2008

Taught in the Master's Program in Counseling. Courses taught: Human Development, Theories of Personality, Theories of Counseling, and Diagnostic Psychopathology.

# SELECTED PROJECTS, AWARDS, AND GRANTS

**Qualified ASD Educational Teams Project**
South Dakota Office of Special Education, Department of Education
*Project Director*
Submitted June 2011

This project will develop state guidelines for multidisciplinary educational evaluation teams assessing children suspected of having autism, coordinate training and consultation for school teams, and will assist in revisions to state administrative code and rule.

**Behavioral Supports for Students with Autism Spectrum Disorders**
South Dakota Office of Special Education, Department of Education
*Project Director*
Awarded May 2011

This project will provide behavioral supports using a tiered application of capacity building including large general trainings throughout the state, focused small intervention groups with in-class technical assistance, and direct application of behavioral supports for the most significant referrals received by the Office of Special Education.

**Act Early Ambassador**
Association of Maternal & Child Health Programs, Association of University Centers on Disability, Center for Disease Control
Awarded May 2011

This pilot project identified ten professionals within the United States to provide advanced training in developmental screening and identification, Autism Case Training (ACT), and implement national goals of the Learn the Signs, Act Early Campaign.

**Structured Teaching Training for Educators**
South Dakota Office of Special Education, Department of Education
*Project Director*
Awarded March 2011

This project will provide training to educators and related service personnel in Rapid City and Sioux Falls.

**Health Affairs Medical Informatics Committee Technology Grant**
Sanford School of Medicine, University of South Dakota
*Project Director*
Awarded January 2011

This project provided funding for equipment to improve the observation and recording of clinical work for graduate students and residents participating within the specialty clinics offered within the Center for Disabilities.

**Act Early State Systems Grant**
Association of Maternal & Child Health Programs
*Project Director*
Unfunded November 2010

This proposal was submitted to provide funding for the ongoing efforts of the Act Early campaign within the state of South Dakota.

**South Dakota State Supported Autism Spectrum Disorder Initiative**
State of South Dakota, Administered by the Division of Developmental Disabilities, Department of Human Services
*Project Director*
Awarded July 2010

This multi-year award provides a basis of funding for the ASD program and is used increase the capacity to support individuals with autism spectrum disorders in the state of South Dakota.

**Positive Behavioral Interventions and Supports for Students with Autism Spectrum Disorders**
South Dakota Office of Special Education, Department of Education
*Project Director*
Awarded May 2010

This project will provide behavioral supports using a tiered application of capacity building including large general trainings throughout the state, focused small intervention groups with in-class technical assistance, and direct application of behavioral supports for the most significant referrals received by the Office of Special Education.

**Autism Summer Training for Educators**
South Dakota Office of Special Education, Department of Education
*Project Director*
Awarded May 2010

This project will provide training to educators and related service personnel in Rapid City and Sioux Falls using the Structured Teaching method.

**Cross System Behavior Training Collaboration**
South Dakota Division of Developmental Disabilities, Department of Human Services
*Project Director*
Awarded April 2010

> This project is designed to increase the number of trainers in behavioral techniques within South Dakota by using a train-the-trainer model to provide competency-based behavioral training to parents, educators, direct care staff and other professionals who support individuals with developmental and behavioral disorders.

**Pre-Conference Day on Adult Services**
Florida Developmental Disabilities Council
*Project Coordinator*
Awarded October 2005

> This project provided for a pre-conference day at the annual CARD conference that focused on topics related to adults with autism and other developmental disabilities.

## RESEARCH EXPERIENCE

**University of South Dakota**
*Primary Investigator*
January 2010 to present

> *The Influence of Film on Mass Perceptions of Autism Spectrum Disorders.* This research project will identify plot themes and diagnostic consistency with DSM-IV criteria of major films that depict fictional characters with autism spectrum disorders.

**University of South Florida**
*Research Administrator*
May 2007 to August 2008

> *Family Unification thru Empowerment and Learning (FUEL) Pilot Project.* This Center for Autism and Related Disabilities (CARD) pilot project measured the impact resiliency training had on quality of life indicators for parents of children with autism. A curriculum was developed after an evaluation of the relevant literature related to factors that influence resiliency such as stress, communication, and family cohesion was used for intervention groups.

**University of South Florida**
*Research Consultant*
January 2007 to 2009

> *Using GPS-enabled Cell Phones to Improve Multimodal Planning and Facilitate Travel Behavior Change.* This Center for Urban Transportation Research (CUTR) project is evaluating the use of prompts, provided via cell phones using GPS tracking software, on travel behavior of individuals with developmental disabilities. Ongoing consultation is being provided regarding assessment measures, research design, prompt hierarchy and fading, and funding opportunities to expand the study's scope.

**Argosy University**
*Primary Investigator*
August 2006 to January 2009

> *The Impact of the Parenting Tools for Positive Behavior Change on Parental Stress and Depression.* This clinical research project evaluated a number of stress and depression measures using a community sample of parents who participated in a behavioral parent-training program.

**University of South Florida**
*Research Administrator*
June 2005 to August 2007

> *The Impact of the Behavioral Parenting Training on Stress and Depression Measures in Parents of Children Enrolled in ESE Programs.* This clinical research project included an evaluation of parental stress and depression in parents who participated in a 30-hour behavioral parent-training program who had children enrolled in exceptional student education.

**University of South Florida**
*Research Administrator*
June 2005 to August 2007

> ***Effects of Classroom and In-Home Training on Caregiver Skills Using the Tools for Positive Behavior Change***. In collaboration with Division of Applied Research and Educational Support (DARES) co-researchers, a research project was initiated that evaluated the differences in outcomes of behavioral parent training and in-home coaching.

## GRADUATE TRAINING EXPERIENCE

**Jean Mulloy, Ph.D., private practice**
Tampa, Florida
*Psychology Practicum Student*
August 2007 to July 2008

> Provided therapeutic treatment to individuals, couples, and families in a general private practice setting. Group therapy and consultation experience included grief process groups for adults and children and consultation to a local hospital's cranial-facial team.

**Neuropsychological Services of Tampa Bay**
Tampa, Florida
*Psychology Practicum Student*
December 2006 to August 2007

> Provided neuropsychological assessments to a variety of clientele including those with traumatic brain injury, dementia, disabilities impacting employability, and/or learning disabilities.

**Falkenburg Academy**
Tampa, Florida
*Psychology Practicum Student*
September 2005 to December 2006

> Completed psychological assessments of male adolescents in a level 6 correctional facility, provided recommendations to staff and educational professionals, family and group counseling, and psycho-educational groups for juveniles.

**Florida Department of Children and Families: Alcohol, Drug Abuse, and Mental Health Program**
Lakeland, Florida
January 2002 to August 2002

> Provided therapeutic treatment to individuals, couples, and families within community based mental health care outpatient units. Participation in multidisciplinary teams and coordination with other social service systems including law enforcement, education, child welfare, and disability services.

**Florida Department of Children and Families: Developmental Disabilities Program**
Lakeland, Florida
September 2001 to March 2002

> Provided applied behavior analytic interventions to individuals with developmental disabilities, trained direct care staff in behavior support plan techniques, and collaboration with the Local Review Committee (LRC).

## SELECTED PRESENTATIONS AND LECTURES
*This list provides a selection of recent state-wide, national, and international lectures given and is a small selection of the 500+ lectures and workshops presented on various topics in psychology, education, and counseling.*

**Keating, A.** *"Secret Agent Society: Providing a Platform for Emotional and Social Resilience.* Presented at the Assistive Technology Industry Association (ATIA) Conference in Orlando, Florida. February 2, 2013.

**Keating, A.** *"Meltdowns-Prevent, Teach, Reinforce."* Keynote Address. Presented at the 7th Annual Coping with Autism

Conference. Kingston, Jamaica. July 22, 2012.

**Keating, A.** *"School-wide Positive Behavior Support."* Keynote Address. Presented at the 1st Annual Autism Educators Conference. Kingston, Jamaica. July 21, 2012.

**Keating, A.**, Crosland, K., Saufley, N., & Brough, L. *"Cross System Behavioral Training Collaborative."* Presented at the ABA International Annual Conference. Denver, Colorado. May 29, 2011.

Wickerd, G., **Keating, A.** *"When Art Imitates Life: Representations of Autism in Film through the Lens of the DSM-IV-TR."* Poster presented at the Annual Combatting Autism Act Meeting. Bethesda, Maryland. January 13, 2011.

**Keating, A.** *"Infusing Behavior Analytic Training in Social and Human Service Systems."* Poster presented at the Annual Association of University Centers on Disabilities Conference. Crystal City, Virginia. November 1, 2010.

**Keating, A.** *"The Council Technique for Learning, Cooperation, and Encouragement."* Presented at the 11th Annual South Dakota School Age Care Alliance Conference on Quality Programs. Deadwood, South Dakota. October 15, 2010.

**Keating, A.** *"Social & Communication Development in Young Children with Challenging Behaviors."* Presented at the Annual South Dakota Speech, Hearing, and Language Association Statewide Conference. Sioux Falls, South Dakota. October 2, 2010.

**Keating, A.** *"Down the Rabbit Hole: Supporting Students with Autism and Other Developmental Disabilities as They Enter the Wonderland of Adolescence and Adulthood."* Presented at the Bi-Annual Autism Workshop. Sioux Falls, South Dakota. September 13-14, 2010.

**Keating, A.** *"What the Stork Didn't Tell You about Sexuality and Behavior."* Presented at the Statewide Behavior and Management (BAM) Conference. Harrisburg, South Dakota. August 4, 2010.

**Keating, A.** *"Family Resiliency."* Presented at Lighting the Way Conference. Sioux Falls, South Dakota. June 6, 2010.

**Keating, A.** *"A Guide to Environmental Sabotage."* Presented at the Annual Statewide Special Education Conference. Pierre, South Dakota. March 15, 2010.

**Keating, A.** *"Assisting Students with Asperger's Syndrome, Attention Deficit Disorders, and Other Difficulties in College Planning."* Presented at the Annual Statewide Special Education Conference. Pierre, South Dakota. March 11, 2010.

**Keating, A.** *Classroom Meetings: The Dreikurs Family Council Technique Applied to Classrooms."* Presented at the 26th Annual South Carolina Conference of Adlerian Psychology. Myrtle Beach, South Carolina. September, 28, 2008.

**Keating, A.** *"Developing Social Interest in Individuals with Autism."* Presented at the 26th Annual South Carolina Conference of Adlerian Psychology. Myrtle Beach, South Carolina. September, 27, 2008.

**Keating, A.** *"Sexuality and Social Skills: Classroom Concerns and Considerations."* Presented at the 7th Annual Autism Institute for Teachers. Tampa, Florida. July, 30, 2008.

**Keating, A.** *"Transition Planning for Adolescents with ASDs."* Presented at the 3rd Annual Coping with Autism Conference. Kingston, Jamaica. July 19, 2008.

**Keating, A.** *"Behavioral Interventions in Individuals with Autism."* Keynote Address. Presented at the 3rd Annual Coping with Autism Conference. Kingston, Jamaica. July 19, 2008.

**Keating, A.** *"Behavioral Concerns and Interventions: A Strength Based Approach."* Presented at the Sarawak Autism Society. Kutching, Malaysia. July 6, 2008.

**Keating, A.** *"Features and Traits of Children with Autism in Educational Settings."* Presented at Batu Lintang Teachers College. Kutching, Malaysia. July 5, 2008.

**Keating, A.**, Diehl, S., Doone, E., and Churton, M., *"Educating Children with Differences."* Presented at Batu Lintang Teachers College. Kutching, Malaysia. July 4, 2008.

**Keating, A.**, Crosland, K., Neff, B., and Dunlap G., *"Evaluating Alternative Valuable Outcomes Measures: Stress and Depression."* Presented at the ABA International Annual Conference. Chicago, Illinois. May 27, 2008.

Crosland, K., **Keating, A.**, Thompson, J., Boyer, E., Weiss, K., Zamora, B., Webb, K. *"Parent Training with the Tools for Positive Behavior Change: The Effects of Group Training and In Home Coaching."* Presented at the ABA International Annual Conference. Chicago, Illinois. May 27, 2008.

**Keating, A.** *"ADA Compliance for Individuals with Pervasive Developmental Disorders within our Courtrooms."* Presented at the Statewide Tele-Conference for Florida Circuit ADA Coordinators. Tampa, Florida. May 16, 2008.

**Keating, A**., Scaros C., *"Theories of Punishment."* Presented at the Family Justice Center. Tampa, Florida. April 4, 2008.

**Keating, A.** *"Promoting Healthy Sexuality in a Complex World."* Presented at the Annual joint Conference of the Florida Association for the Treatment of Sexual Abusers and Sexual Abuse Intervention Network. Tampa, Florida. March 27, 2008.

**Keating A.**, Meredith, C. *"Leadership by Encouragement in Businesses, Classrooms, and Families."* Presented at the 13th Annual Florida Adlerian Society Conference. Tampa, Florida. February 16, 2008.

**Keating A.**, Neff, B. *"Leadership by Encouragement in Businesses, Classrooms, and Families."* Presented at the 13th Annual Florida Adlerian Society Conference. Tampa, Florida. February 15, 2008.

**Keating, A.** *"The Birds and the Bees: Responding to Sexual Behavior in Young Children."* Presented at the 2007 Early Childhood Council Conference. Tampa, Florida. November 16, 2007.

**Keating, A.,** Welch, M. *"Using Classroom Meetings to Promote Learning and Cooperation: The Workshop!"* Presented at the 12th Annual Conference on Advancing School Mental Health. Orlando, Florida. October 27, 2007.

**Keating, A.** *"Family Coping Skills."* Presented at the 2nd Annual Coping with Autism Conference. Kingston, Jamaica. June 16, 2007.

Vaughn, B., **Keating, A.** *"Toilet Training."* Presented at the 2nd Annual Coping with Autism Conference. Kingston, Jamaica. June 16, 2007.

**Keating, A.** *"Shaping Behavior in Adults and Adolescents with Autism."* Keynote Address. Presented at the 2nd Annual Coping with Autism Conference. Kingston, Jamaica. June 16, 2007.

**Keating, A.,** Crosland, K., Neff, B., and Dunlap, G. *"Evaluating the Outcomes of Positive Behavior Change Training on Child Behavior and Parental Stress and Depression."* Presented at the ABA Annual Conference. San Diego, California. May 28, 2007.

**Keating, A.**, Hall, A. *"Shaping Sexual Behavior in Individuals with Developmental Disabilities"* Presented at the Annual Conference of the Florida Association for the Treatment of Sexual Abusers. Tampa, Florida. May 17, 2007.

**Keating, A.** *"Supporting College Students with Asperger's Syndrome."* Presented at the 2007 Narrowing the Gulf for Disadvantaged Students in Post Secondary Education Annual Conference. St. Petersburg, Florida. March 15, 2007.

**Keating, A.** *"Collaboration and Person Centered Planning, Using PATHs."* Presented at the 12th Annual Florida Adlerian Society Conference. Tampa, Florida. February 8, 2007.

**Keating, A.** *"Using Classroom Meetings to Promote Learning."* Presented at the 2007 CARD Conference. Ft. Lauderdale, Florida. January 20th 2007.

**Keating, A.** *"The Beat of a Different Drummer: Autism Spectrum Disorders and Music."* Presented at the Florida Music Educators' Association Annual Conference. Tampa, Florida. January 11, 2007.

**Keating, A.,** Welch, M. *"Using Classroom Meetings to Promote Learning."* Presented at the Florida Council for Exceptional Children Conference. Panama City, Florida. October 13 & 14, 2006.

**Keating, A.** *"The Birds and the Bees: Understanding Sexual Behavior in Young Children."* Presented at the 2006 TASH Conference. Baltimore, Maryland. November 11, 2006.

**Keating, A.** *"Panel Discussion on Treatment Decisions with a Patient Diagnosed with Borderline Personality Disorder."* Presented at the International Committee of Adlerian Summer Schools and Institutes. Oberstufen, Germany. July 26, 2006

**Keating, A.,** Spence-Cochran, K. *"Sex in the City."* Presented at the Family Café Conference. Orlando, Florida. June 2, 2006.

**Keating, A.,** Webb, K. *"Eliciting Communication in Young Children."* Presented at the Family Café Conference. Orlando, FL. June 2, 2006.

Crosland, K., **Keating, A.,** Neff, B., and Dunlap G. *"Evaluating the Tools for Positive Behavior Change with Parents of Children Enrolled in ESE Programs."* Presented at the ABA National Conference. Atlanta, Georgia. May 29, 2006.

**Keating, A.** *"Managing Behavior in Adults and Adolescents with Autism."* Presented at the Coping with Autism Conference. Kingston, Jamaica. April 22, 2006.

Keating, A. *"Introduction to Useful Behavior Change."* Presented at the 11th Annual Florida Adlerian Society Conference. Tampa, Florida. February 11, 2006.

## PUBLICATIONS AND CREATIVE WORKS

**Keating, A.** & Wickerd, G. (In Progress). Diagnostic Accuracy in the Depiction of Autism in Feature Films.

**Keating, A.** & Crosland, K. (In Progress). The Impact of Behavioral Parent Training on Parenting Skills and Self-Reports of Stress.

**Keating, A**. (In Progress). *Everyday Moments Training Series.*

**Keating, A.** (Ed.) (2007). *Family Unification through Empowerment and Learning Training Package.* Tampa, FL: University of South Florida

**Keating, A.** (2007). *Hurricane Preparedness for Individuals with Autism Spectrum Disorders.* Tampa, FL: University of South Florida

**Keating, A.** (2006). *Sexual Abuse in Individuals with Autism and Other Developmental Disabilities.* [Brochure]. Tampa, FL: University of South Florida

Guido, D. & **Keating, A**. (Eds.) (2005, Revision). *Self Determination Training Package.* Tampa, FL: University of South Florida

**Keating, A.** (2004, April-June). What you need to know about qualifying for Home and Community Based Medicaid Waiver Services. *CARD Quarterly Newsletter 7*(2), 8-9

## AWARDS AND HONORS

The **Tom Ulvenes Outstanding Community Service Award** presented July 26, 2008 by the Hillsborough County Alliance for Citizens with Disabilities in recognition of innovative research, practice, and collaboration in the field of disability.

**Outstanding Achievement Award** presented April 16, 2008 by the Florida Legislature and the Florida Association for Volunteer Action in the Caribbean and the Americas in recognition of work that promoted sustainable change and capacity building in Jamaica for individuals with autism.

## SELECTED TRAINING AND CERTIFICATION

Universal First Aid and Universal CPR

Attention-Deficit Hyperactivity Disorder Rating Scale-Forth Edition (ADHD RS-IV) with Adult Prompts certification for research received September 24, 2014

Profile of Mood States (POMS) certification for research received May 2, 2014

Autistic Diagnostic Observation Schedule, Second Edition (ADOS-2) certification for research attended July 18-19, 2013

Autistic Diagnostic Observation Schedule, Second Edition (ADOS-2) certification for clinical use received July 17, 2013

Secret Agent Society social skills curriculum training attended November 3-4, 2011

Triple P (Positive Parenting Program) Trainer Certification, Levels 1-5 completed February 2, 2011

Eye Movement Desensitization Reprocessing (EMDR) Clinical Training completed May 1-3, 2009

Advanced Practices in Motivational Interviewing attended February 6-7, 2009

Kempe Center Train-the-Trainer certification on Understanding and Responding to Sexual Behavior in Children received October 3, 2007

International Committee of Adlerian Summer Schools and Institutes, Oberstaufen, Germany, attended July 17-28, 2006

International Committee of Adlerian Summer Schools and Institutes, Marsascala Malta, attended July 18-29, 2005

Autistic Diagnostic Observation Schedule (ADOS) certification for clinical use received January 13, 2005

International Committee of Adlerian Summer Schools and Institutes, Cork, Ireland, attended July 26- August 6, 2004

Practitioner of Therapeutic Applications in Neuro-Linguistic Programming certification received July 11, 2004

Alternatives for Behavioral Crisis Training 24 hour course certification received August 1, 2002

Classical Ericksonian NLP Approaches to Hypnosis 50 hour course certification received July 28, 2002

Behavior Services Assistant certification received Oct. 26, 2001

## PROFESSIONAL MEMBERSHIPS

Association for Behavior Analysis International

National Association of School Psychologists

American Psychological Association

American Psychological Association, Division 46, Media Psychology

South Dakota Psychological Association

Florida Adlerian Society

North American Society of Adlerian Psychology

## COMMITTEE APPOINTMENTS

South Dakota Board of Infant and Child Mental Health, *Committee Member 2011-2011*

South Dakota Act Early Summit, *Committee Chairperson 2010-2011*

Technology Assistance Device Project at the University of South Florida, *Advisory Board Member 2006-2009*

Florida Adlerian Society, *Board Member 2002-2009*

Sexual Abuse Intervention Network, *Training Committee Chairperson 2006-2008*

STAGES Project at the University of South Florida, *Advisory Board Member 2005-2008*

University Centers for Autism and Related Disabilities, *Adult Services Committee Chairperson 2005-2008*

# EXHIBIT 2

| Student Name Adducci, John | | | |
|---|---|---|---|
| Student ID 6451 | Grade 12 | | Gender M |
| Birth Place | Date Of Birth 07/09/84 | | Ethnic Code |
| Parent Guardian **Mr & Mrs James Adducci** 1309 W 191st St Homewood, IL 60430 708-957-0008 | | | |

Transcript

| | |
|---|---|
| Enter Date: | **01/09/02** |
| Graduated: | 01/17/03 |
| Class Of: | 2003 |
| Diploma Type: | |

School Name / Address:
Homewood Flossmoor High School
999 Kedzie Ave
Flossmoor, IL 60422
Tel: 708-799-3000    Fax: 799-3081
School Alternate Number:
Counselor: **Richardson, Gail**

| Crs ID | Course Title | Mrk | Ab | Credit |
|---|---|---|---|---|
| **Homewood Flossmoor High School Grd 09 1/1999** | | | | |
| 0012 | S ENGL1 (AC) | C | | 0.500 |
| 0107 | RDG ENRICH 1 | P | | 0.500 |
| 3120 | S PRE-ALGEBRA (AC) | C | | 0.500 |
| 4122 | BIOLOGY (CP) | C | | 0.500 |
| 5314 | COMP KEYBOARD 1 | D | | 0.500 |
| 7501 | FRSHMN PE (CP) | B | | 0.250 |
| 7501 | FRSHMN PE (CP) | C | | 0.250 |
| Crd Att: 3.000 Cmp: 3.000 6 Pt Gpa: 2.500 | | | | |
| **Homewood Flossmoor High School Grd 09 6/1999** | | | | |
| 0012 | S ENGL1 (AC) | B | | 0.500 |
| 0107 | RDG ENRICH 1 | P | | 0.500 |
| 3120 | S PRE-ALGEBRA (AC) | C | | 0.500 |
| 4122 | BIOLOGY (CP) | C | | 0.500 |
| 6111 | COMP GRAPHICS | P | | 0.500 |
| 7594 | S HEALTH (AC) | B | | 0.500 |
| Crd Att: 3.000 Cmp: 3.000 6 Pt Gpa: 2.750 | | | | |
| **Homewood Flossmoor High School Grd 09 8/1999** | | | | |
| 0005 | SUM RDG ACAD | P | | 0.500 |
| Crd Att: 0.500 Cmp: 0.500 6 Pt Gpa: 0.000 | | | | |
| **Homewood Flossmoor High School Grd 10 1/2000** | | | | |
| 0053 | S RES & O C (AC) | C | | 0.500 |
| 1212 | S WESTERN CIV | C | | 0.500 |
| 3204 | FIRST YR ALG (CP) | F | | 0.000 |
| 5022 | FOODS 1 (CP) | P | | 0.500 |
| 5382 | INTRO BUS (CP) | D | | 0.500 |
| 7512 | SOPH PE (CP) | D | | 0.250 |
| 7512 | SOPH PE (CP) | W | | 0.000 |
| 9985 | S GUIDED STUDY | P | | 0.500 |
| Crd Att: 4.000 Cmp: 2.750 6 Pt Gpa: 1.273 | | | | |
| **Homewood Flossmoor High School Grd 10 6/2000** | | | | |
| 0042 | S ENGL 2 L&C (AC) | D | | 0.500 |
| 1212 | S WESTERN CIV | C | | 0.500 |
| 3204 | FIRST YR ALG (CP) | F | | 0.000 |
| 5362 | MICRO COMP APPL | F | | 0.000 |
| 7512 | SOPH PE (CP) | D | | 0.250 |
| Crd Att: 2.750 Cmp: 1.250 6 Pt Gpa: 0.727 | | | | |
| **Homewood Flossmoor High School Grd 10 8/2000** | | | | |
| 3210 | ALGEBRA 1 (CP) | C | | 0.500 |
| Crd Att: 0.500 Cmp: 0.500 6 Pt Gpa: 3.000 | | | | |

| Crs ID | Course Title | Mrk | Ab | Credit |
|---|---|---|---|---|
| **Homewood Flossmoor High School Grd 11 1/2001** | | | | |
| 0319 | AMER LIT&C (CP) | C | | 0.500 |
| 1522 | U S HISTORY (CP) | D | | 0.500 |
| 2702 | SPANISH 1 (CP) | B | | 0.500 |
| 3210 | ALGEBRA 1 (CP) | D | | 0.500 |
| 4032 | S PHYSCL SCI (AC) | D | | 0.500 |
| 5378 | COMPUTERS TR | B | | 0.500 |
| 7529 | JR PE TR | B | | 0.500 |
| Crd Att: 3.500 Cmp: 3.500 6 Pt Gpa: 2.857 | | | | |
| **Homewood Flossmoor High School Grd 11 6/2001** | | | | |
| 0319 | AMER LIT&C (CP) | D | | 0.500 |
| 1522 | U S HISTORY (CP) | D | | 0.500 |
| 2702 | SPANISH 1 (CP) | B | | 0.500 |
| 4032 | S PHYSCL SCI (AC) | D | | 0.500 |
| 5378 | COMPUTERS TR | B | | 0.500 |
| 7529 | JR PE TR | C | | 0.500 |
| 7599 | DRIV EDUC TR | P | | 0.250 |
| 7609 | DRIV ED BTW TR | P | | 0.000 |
| Crd Att: 3.250 Cmp: 3.250 6 Pt Gpa: 2.667 | | | | |
| **Homewood Flossmoor High School Grd 12 3/2002** | | | | |
| 7138 | FLHO-VB | C | | 0.250 |
| Crd Att: 0.250 Cmp: 0.250 6 Pt Gpa: 3.000 | | | | |
| **Homewood Flossmoor High School Grd 12 6/2002** | | | | |
| 0120 | S CON ISS:R/C (AC) | C | | 0.500 |
| 1712 | S ECONOMICS (AC) | D | | 0.500 |
| 5324 | MS WORD APP (CP) | D | | 0.500 |
| 5363 | MICRO/MSOFF (CP) | P | | 0.500 |
| 7146 | BAD-RQ | C | | 0.250 |
| Crd Att: 2.250 Cmp: 2.250 6 Pt Gpa: 1.857 | | | | |
| **Homewood Flossmoor High School Grd 12 1/2003** | | | | |
| 0120 | S CON ISS:R/C (AC) | B | | 0.500 |
| 1712 | S ECONOMICS (AC) | C | | 0.500 |
| 5556 | CAREER INT 1 (CP) | A | | 1.000 |
| Crd Att: 2.000 Cmp: 2.000 6 Pt Gpa: 3.750 | | | | |

**GPA Summary**

| | |
|---|---|
| 6 Pt Gpa: | 2.298    Class rank is 585 of 650 |
| 4 Point GPA: | 1.774 |

Number ranked in class varies with enrollments and withdrawals.          Please refer to the comprehensive rank information enclosed.

Transcript is unofficial unless signed by a school official
School Official          _____          Date: 10/04/13

# EXHIBIT 3

10/11/2010

# St. John's Northwestern Military Academy

**Delafield, Wisconsin 53018 (262) 646-7126**
**SECONDARY SCHOOL RECORD--TRANSCRIPT**
St. John's Northwestern Military Academy is a College Preparatory Institution.

| | |
|---|---|
| **Student Name:** Adducci, John James | **AP/Honors Grades & Quality Points: H=5.0, H-=4.7, A+=4.3** |
| **Home Address:** 1309 191st Street Homewood, IL 60430 | **Regular Grades & Quality Points** |
| **Parent or Guardian:** Mr. and Mrs. James Adducci | A = 4.0  B+ = 3.3  C+ = 2.3  D+ = 1.3  F = 0 |
| **Social Security Number:** 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   **Non-Public**   **Grades 7-12** | A- = 3.7  B = 3.0  C = 2.0  D = 1.0 |
| **Birthdate:** 07-09-1984  **Sex:** M   **School Accredited by: ISACS** | B- = 2.7  C- = 1.7  D- = 0.7 |
| **Entered:** 08-23-2000   **Graduation Date:** | **AUD=Audit: No Credit   W=Withdrew: No Credit** |
| **Withdrew:** 12-13-2001 | **P=Pass: Credit** |

| Grd/Yrs | Courses Taken | Faculty | Sem1 | Sem2 | CR |
|---|---|---|---|---|---|
| **9** | **98-99   Homewood Flossmoor HS, Flossmoor, IL** | | | | |
| | ENGLISH 1 | | C | B | 1.00 |
| | PRE-ALGEBRA | | C | C | 1.00 |
| | BIOLOGY | | C | C | 1.00 |
| | COMP KEYBOARD | | D | | 0.50 |
| | COM GRAPHICS | | | P | 0.50 |
| | HEALTH | | | B | 0.50 |
| | | | UA | GP | GPA |
| | | 1Sem | 2.00 | 3.50 | 1.75 |
| | | 2Sem | 2.00 | 5.00 | 2.50 |
| | | Year | 4.00 | 8.50 | 2.13 |
| | | Cum | 4.00 | 8.50 | 2.13 |
| **10** | **99-00   Homewood Flossmoor HS, Flossmoor, IL** | | | | |
| | WESTERN CIVILIZATION | | C | C | 1.00 |
| | *ALGEBRA 1 | | F | | 0.00 |
| | RES & ORAL COMP | | C | | 0.50 |
| | INTRO BUSINESS | | D | | 0.50 |
| | *ENGLISH 2 | | | D | 0.00 |
| | *MICRO COMP APPLY | | | F | 0.00 |
| | | | UA | GP | GPA |
| | | 1Sem | 1.50 | 2.50 | 1.67 |
| | | 2Sem | 0.50 | 1.00 | 2.00 |
| | | Year | 2.00 | 3.50 | 1.75 |
| | | Cum | 6.00 | 12.00 | 2.00 |
| **10** | **00-01   Rich Central HS, Olympia Fields, IL** | | | | |
| | ALGEBRA 1 SEM2 - SS | | | C | 0.50 |
| | | | UA | GP | GPA |
| | | 2Sem | 0.50 | 6.80 | 1.94 |
| **10** | **00-01   St. John's Northwestern Military Academy** | | | | |
| | COMPUTER-APPLICATIONS | Schoenike | B- | B | 1.00 |
| | ENGLISH2 | | C | D+ | 1.00 |
| | SPANISH1 | Perez | B | B | 1.00 |
| | *ALGEBRA1 | Vice | D | F | 0.50 |
| | JROTC1 | Proctor | B- | C | 1.00 |
| | PHYSICAL-SCIENCE | | D | D | 1.00 |
| | AMERICAN-GOVT | Byrne | D+ | D+ | 1.00 |
| | | | UA | GP | GPA |
| | | 1Sem | 3.50 | 6.85 | 1.96 |
| | | 2Sem | 3.00 | 6.80 | 1.94 |
| | | Year | 7.00 | 13.65 | 1.95 |
| | | Cum | 13.00 | 25.65 | 1.97 |
| | | Cum Rank | 67 / 75 | | |

| Grd/Yrs | Courses Taken | Faculty | Sem1 | Sem2 | CR |
|---|---|---|---|---|---|
| **11** | **01-02   St. John's Northwestern Military Academy** | | | | |
| | ENGLISH 3 | Hillier | - | | 0.00 |
| | SPANISH 2 | Perez | - | | 0.00 |
| | ALGEBRA 2 | Schmid | - | | 0.00 |
| | JROTC 2 | | | - | 0.00 |
| | CHEMISTRY | Rudy | - | | 0.00 |
| | U.S. HISTORY | Bennett | - | | 0.00 |
| | | | UA | GP | GPA |
| | | 1Sem | 2.75 | 0.00 | 0.00 |
| | | Cum | 15.75 | 25.65 | 1.97 |
| | | Cum Rank | 50 / 68 | | |

Comments
*A class that has been repeated is no longer included in the GPA.

ST. JOHN'S
NORTHWESTERN
ACADEMIES
OFFICIAL
DOCUMENT

Academic Office                Date
7/21/2025

# EXHIBIT 4

## Transcript of Elizabeth Adducci Character Video

TODD FOSTER: Today's date is March 13, 2026. My name is Todd Foster. I am here with Kevin Darken, and we are the attorneys, uh, for John Adducci, and we are speaking right now with his mother, Elizabeth Adducci. Is that correct?

ELIZABETH ADDUCCI: Yes.

TODD FOSTER: Mrs. Adducci, do you recognize that we are recording this interview?

ELIZABETH ADDUCCI: Yes.

TODD FOSTER: And do you understand that we are recording this interview for presentation to Judge Chappell, who is the judge who's been assigned to this case and who will be ultimately sentencing your son?

ELIZABETH ADDUCCI: Yes.

TODD FOSTER: So to start off, um, our understanding is that you and your husband Jim adopted John. Is that correct?

ELIZABETH ADDUCCI: Yes.

TODD FOSTER: Can you tell us how that came about and the history and where this happened in that background?

ELIZABETH ADDUCCI: Well, shortly after our marriage, I was diagnosed with a precancerous condition that rendered me infertile. I entered into an experimental program at the University of Chicago designed to correct the situation. Unfortunately for me, after two years of the doctoring, it was found that, for me, it did not work. Uh, I had a hysterectomy in February 1983. We adopted John at the end of August 1984. Okay.

TODD FOSTER: Were you living in Chicago at the time?

ELIZABETH ADDUCCI: Uh, we were living in the southern, uh, suburbs of Chicago at the time.

TODD FOSTER: Were you working at the time?

ELIZABETH ADDUCCI: No, I stopped working, uh, after we knew we were going to adopt John.

TODD FOSTER: And what type of work did you do before you stopped working?

ELIZABETH ADDUCCI: I was a Medicare fraud investigator doing, uh, desk work, uh, for the then Department of HEW Regional office, Office of the Inspector General in Chicago.

TODD FOSTER: And how long had you done that type of work before you stopped working?

1

ELIZABETH ADDUCCI: Uh, eight years.

TODD FOSTER: So did the adoption of John come to pass?

ELIZABETH ADDUCCI: Come to pass? Yes, it occurred.

TODD FOSTER: It occurred.

ELIZABETH ADDUCCI: Yes.

TODD FOSTER: And, um, how excited or what effect did that happen, you and your husband?

ELIZABETH ADDUCCI: When he came, it changed our life completely. Uh, we were ecstatic. Uh, we'd always wanted to have children, and I was totally accepting of the fact that our family would be built through adoption. And, um, you know, we made the soonest, um, appointment we could with the adoption agency and, uh, went to pick up John,

TODD FOSTER: Which was thrilling?

ELIZABETH ADDUCCI: Thrilled. Yes. That that was. Oh, through, uh,

TODD FOSTER: You and your husband were thrilled by that?

ELIZABETH ADDUCCI: Oh, absolutely.

TODD FOSTER: As John got a little older, I noted that when he became, at the age of about three and a half, he was diagnosed with, um, adhd.

ELIZABETH ADDUCCI: That's correct. By our pediatrician.

TODD FOSTER: And how did that come about? Did you notice something about him? Did the doctor notice something about him?

ELIZABETH ADDUCCI: I, um, think a bit of both. Uh, he was a very active child, uh, in a very vibrant way, but, uh, sometimes seemed out of control. Of his own activities. So we called the pediatrician and uh, that was his diagnosis.

TODD FOSTER: Do you know whether he was tested for autism at that point?

ELIZABETH ADDUCCI: He was not. Because the state of autism recognition, uh, in the late 80s, early 90s was not what it is today. Your symptoms had to be very overt, and it usually wasn't, uh, diagnosed in anyone until they were much older.

TODD FOSTER: All right, so as John got older, you stayed at home with him. Is that true?

ELIZABETH ADDUCCI: Yes.

2

TODD FOSTER: You were a stay at homeowner and.

ELIZABETH ADDUCCI: Yes.

TODD FOSTER: What type of young man did he develop into? Was he distant? Was he friendly? Was he kind?

ELIZABETH ADDUCCI: Um, from the time he was, um, an infant, he was always open, bright eyed, uh, busy, gregarious, uh, toddler and little boy. He didn't ever meet a person that he didn't like. And he talked to them readily, no matter what their age. Um, one, sometimes his busyness, um, got in his own way. Although when he was prescribed ritalin at age three and a half, uh, it did calm him down, slow him down, and, uh, he was more attentive. So, uh, you know, we knew the problem was there. Uh, the medication, you know, varied in how long it stabilized him, but, uh, he was doing much better.

TODD FOSTER: And he has a sister?

ELIZABETH ADDUCCI: Yes, we adopted his sister approximately three years later and welcomed her as eagerly as we did, John.

TODD FOSTER: Was John kind to his sister?

ELIZABETH ADDUCCI: Absolutely. Uh, you know, they were very different, uh, personalities, uh, even from infancy, but they got along well. Uh, other than maybe a few squabbles over toys now and then, I cannot recall any time where they were, uh, incompatible with each other. They were each their own person and very different from each other.

TODD FOSTER: Okay. You told a story about John. When he worked somewhere, he thought it'd be nice to bring cookies to his co workers.

ELIZABETH ADDUCCI: Yes. Well, that was as an adult after he moved to Florida. Uh, he, uh, you know, the manager often catered lunch for all the employees. And John thought that was great. And, uh, he told me when I've been bringing bakery cookies in on Mondays, uh, for everybody. And I asked him why and he explained about the Friday lunches. And, you, uh, know, it was like he just wanted to bring, uh, a little bit of brightness to Monday mornings for everybody, you know, and he was happy doing it. And I think he was happy with his co, uh, workers response. They liked it too.

TODD FOSTER: Sure. Now John has been charged with a very serious crime and he's pled guilty to that crime. And he's, he's to be sentenced later this month, as you know. Um, how does all that make

3

you Feel as his mother.

ELIZABETH ADDUCCI: Well, um, I have to say I'm his mother. He's my son, I love him, I want what's best for him. But also, um, gosh, there's a whole lot of adjectives there. I feel sad, confused, upset, angry, guilty for reasons I'm not sure of. Uh, and I find the whole situation incomprehensible.

TODD FOSTER: Has he turned to the. To back to religion for support, do you know?

ELIZABETH ADDUCCI: I'm sorry, I didn't understand. Turn to.

TODD FOSTER: Did he turn back to his religion for support, do you know?

ELIZABETH ADDUCCI: Oh, yes.

TODD FOSTER: So tell us what you know about that.

ELIZABETH ADDUCCI: Well, um, he asked us to find the closest church to his apartment so he could go to church and still fulfill the uh, requirements for his home confinement. Uh, so he did this on his own without our knowledge or, uh, encouragement. Uh, he had left going to church, uh, in his late teens. And after all this time, I never thought this was happen. So it made me happy. But I could tell it made John happy too, that he was more content with himself and has come to feel that God has a plan for him in his life.

TODD FOSTER: Do you understand him to be very remorseful for his conduct that led to this, to this crime and his blame.

ELIZABETH ADDUCCI: Yes, yes. Uh, he has frequently said if I knew everything about that I know now, I would have never done, done this. And now that I know what I know I will never do be doing this again.

TODD FOSTER: So he recognizes he did wrong?

ELIZABETH ADDUCCI: Oh yes.

TODD FOSTER: So what do you hope will occur

TODD FOSTER: after this sentencing in John's life? You know, uh, from our conversations that he's going to the penitentiary, do you not?

ELIZABETH ADDUCCI: Yes.

TODD FOSTER: So what are your hopes for him going forward?

ELIZABETH ADDUCCI: Um, I hope, I guess, that he will find some peace in that part of the

reconciliation of his, uh, crime. Uh, I hope he'll get, uh, therapy and counseling, religious reinforcement, and um, be able to become and show the truly productive person that he can be.

TODD FOSTER: You know that he's receiving counseling now, uh, from a lady in the Fort Myers area?

ELIZABETH ADDUCCI: Yes. Mhm.

TODD FOSTER: So once he is released at some future date, if he continues with the counseling, do you believe that he could adhere to the norms of society and not, uh, violate the law if he, if he were on some sort of supervision with counseling and oversight. Has he told you that?

ELIZABETH ADDUCCI: Yes.

TODD FOSTER: You believe that?

ELIZABETH ADDUCCI: Yes, I do. He has. He has said that he has learned a lot about what he has done, why it is wrong, and more about his self. And he independently said one time is weak is good. But I think that um, if I came two times A week. That might be better.

TODD FOSTER: For the counseling, you mean?

ELIZABETH ADDUCCI: Yes, for the counseling. And he, uh, has been doing that.

TODD FOSTER: And he tells you it helps him?

ELIZABETH ADDUCCI: Yes.

TODD FOSTER: All right. All right. Ma', am, is there anything else you would want to say if I were the judge interfacing with you here? Is there anything else you would want to say that, uh, we haven't covered here this afternoon?

ELIZABETH ADDUCCI: Well, I think that he has many good qualities that have, I think, become obscured through this whole situation. I mean, he's loving, he's kind. Um, not too long ago, his, uh, sister had all her belongings stolen from a storage, uh, locker in the apartment complex she was in. And he chose because he knew this was devastating to her. What he could do was he took all the pictures, um, of my daughter and her beloved deceased dog, Banjo, uh, and copied them and made also a 8 by 10 canvas print. And when he gave them to her, it brought her to tears. And me, too. So, uh, and when, now, when we have family get togethers and he's in. Was in. Is in Florida, he always makes sure he knows what time it is so he can call us and at least join us by distant communication and wish us well.

5

ELIZABETH ADDUCCI: And, uh, he's a delight, and so he does think of other people and do what he can. Uh, he gives thoughtful gifts, as I've mentioned, and there's, uh, just so much more to him than, uh, so much more good in him than what is shown by his illegal actions.

TODD FOSTER: Got it. All right, well, I, uh, appreciate, um, your candor. This is, um, going to be transcribed as well as a video given to the judge. And we appreciate your time. Uh, you're in Illinois now, and we're in Florida. That's why we're doing this by Zoom. So thank, uh, you again for your time, and we're going to conclude, uh, this recording at this time.

ELIZABETH ADDUCCI: Okay. Thank you for the opportunity to do this.

TODD FOSTER: Of course.

# EXHIBIT 5

Transcript of Jim Adducci

Character Video

TODD FOSTER: All right.

TODD FOSTER: Good afternoon. Um, my name is Todd Foster. Today is March 13, 2026, and I'm here with Kevin Darken. Uh, we are attorneys for John Adducci, and we are now speaking with his dad, Mr. Jim Adducci. Uh, good afternoon, sir.

JIM ADDUCCI: Good afternoon.

TODD FOSTER: And you're aware, sir, that this, that this interview with us is being recorded.

JIM ADDUCCI: I am.

TODD FOSTER: And that the purpose of the recording is to create some, some testimony of you to present to Judge Chappell, who is the judge who will be sentencing John later this month. Is that correct?

JIM ADDUCCI: Absolutely.

TODD FOSTER: So can you tell us a little bit about yourself, sir? Are you retired? You semi-retired. What did you do for work in the last number of years?

JIM ADDUCCI: So I just retired. I tried to retire once before, but, uh, I got pulled back in. Uh, I'm a lawyer, and, uh, I've, uh, been, uh, in private practice for most of my career. And for the last eight years, I've been general counsel of, uh, um. Um, Medical Products and Services Corporation. I was a litigator for 40 years, and I had a lot of big cases and trials. But I'll tell you, uh, right now, this is, this is. I see this one as more important than. Maybe I'm a little bit more nervous about this than anything I've done as a lawyer.

TODD FOSTER: Yeah, yeah. It's, it's, it's, it's very. It's. The circumstances of your son's case are very devastating, not only to him, but to you and your family as well.

JIM ADDUCCI: Yep.

TODD FOSTER: Yeah. So I, I, I'm, I'm sensitive to that, and I appreciate your, your doing this and being open, because some of the questions we're going to go through are, uh, are rather probing and, and, uh, but these are things that we think the judge needs to know. Can you tell us. Yes, sir. Can you tell us how John came into your life and what that decision was?

JIM ADDUCCI: Yeah. So Liz and I always wanted to have children, but, uh, we couldn't have biological children because of a medical condition she had, and she had to have a hysterectomy. So we

1

went through a lot of effort to adopt, uh, John. It was a long process, and a lot of effort went into it. Uh, when we got him, he was a child that was very welcomed by our whole family, not just us. He was the first child of his generation in our immediate family, and we named him after my father in accordance with Italian tradition. Um, he was a beautiful baby. The day we picked him up was one of the happiest days of our life. And the day we found out he was arrested was the worst day of our lives.

TODD FOSTER: Yes. And you and your wife had come down to Florida. I recall that we met, uh, you in the courtroom.

JIM ADDUCCI: Yes. Uh, for the, uh. Right. For the detention hearing. Right.

TODD FOSTER: So let's talk about when John started in school. Did he start in preschool or did he go right into kindergarten?

JIM ADDUCCI: Started preschool. And, uh, we were told that he was very active. He got along fine with the other children. There weren't any problems, but we told he was very active. So we had him checked out by our pediatrician. And he prescribed Ritalin, and he told us that, uh, that he had ADHD. Um, we sent him to a parochial school for first grade, thinking that he'd get more individualized and compassionate attention than at the public school where he had attended kindergarten. Um, he went to a private preschool, Public kindergarten. And then the. The parochial school.

JIM ADDUCCI: His treatment there.

TODD FOSTER: Okay, go ahead.

JIM ADDUCCI: Yeah, I'm sorry. Uh, not well. Not well. His treatment at the parochial school by the other students and the teachers was bad. He was humiliate, humiliated, and meant to feel that he was worthless. What he took away from that part of his education, uh, was, uh.

TODD FOSTER: Uh.

JIM ADDUCCI: He made a statement to me that broke my heart, saying, I wish God had never made me.

TODD FOSTER: That's heart rendering. But how do you know that that was his experience in school, the early school?

JIM ADDUCCI: Yeah. Well, of course he told us, and Liz was, uh, very, very. Stayed very involved with his, uh, education. Uh, and we were told the different things by teachers. So we had

2

multiple sources of information knowing to lead us to that conclusion.

TODD FOSTER: Was he humiliated because of his personality, because of his demeanor? Would you ever get to the bottom of this, just what the issue was?

JIM ADDUCCI: Yeah, he just never fit in. You know, he was different. And, uh, uh, he never made any friends. We encouraged him to do that, but he never made any friends. And he was made fun of and bullied, really, throughout his, uh, education. There's, uh, one incident, in fact, that stands out in my mind. He, uh. He had a toy, a little spaceship that he just loved. And he took it to school, and he was just playing with it out on the playground. And another student came up to him and said, oh, can I see that?

JIM ADDUCCI: And John handed it to him and the other person threw it up on the roof of the school. And it just broke John's heart. He was so fond of that toy. It just broke his heart. And that's the type of bullying that he was subjected to throughout his educational career.

TODD FOSTER: And he never acted out violently. He just took it, huh?

JIM ADDUCCI: Yeah, I pretty much, yeah. Uh, I Think that's right. I don't. I don't think. Yeah.

TODD FOSTER: So we, we or I spoke with Kevin here, spoke to your wife already. And, and she shared with us that back in the day when John was small, there wasn't really any testing for autism. It wasn't anything that you were advised by the doctors to look into, is that correct?

JIM ADDUCCI: Uh, absolutely. We tried everything we could think of in terms of finding out what was going on and how we could address it. You know, we tried the, uh, school counselors. We tried medical, um, treatment, psychological counseling. Uh, he was evaluated by his pediatrician, a neurologist, a psychologist, a neuropsychologist, a psychiatrist, and various school teachers and counselors. We tried everything they suggested. All we were told is that he had ADHD. Uh, there was no mention of autism at that time.

TODD FOSTER: So did his issues persist into the high school years?

JIM ADDUCCI: They did. And he was having academic trouble in high school. He found it hard to concentrate. Um, and so we tried sending him to, uh, military school and thought maybe that discipline would be good for him. Uh, it turned out not to be good for him. He hated it. And he engaged in inappropriate sexual conduct with another student so he could, uh, get thrown out. And which, which

3

worked. He got thrown out.

TODD FOSTER: Um, did he get, as a result of that, did he get psychological counseling?

JIM ADDUCCI: He did. Uh, he got, he was, he had court ordered psychological counseling. Uh, he had a probation period, um, and he. For a year. And, and you know, if he stayed out of trouble, they would drop the charges, which is what happened. But, um, uh, he got psychological counseling, um, for that year regularly. And he's had psychological counseling at various times in his life for various durations. And uh, he's been getting psychological counseling since he was arrested, uh, by a psychologist there in Fort Myers.

TODD FOSTER: When did you first learn of the autism diagnosis for your son?

JIM ADDUCCI: Really? Uh, it was in connection with this matter is the first time we heard that word applied to him.

TODD FOSTER: So is it fair to say that the counseling he was receiving as a teenager, as a young man, none of the docs ever came up and suggested autism and treatment for the autism?

JIM ADDUCCI: That's correct.

TODD FOSTER: What about John's work history? Was he able to work? Well, first of all, did he finish high school or.

JIM ADDUCCI: No, he did. He graduated from m. High school.

TODD FOSTER: Did he go to college?

JIM ADDUCCI: He took some courses at a couple of the local junior colleges. Uh, he's always been interested in the hospitality industry, so that's. He took courses in, uh, you know, in that uh, area.

TODD FOSTER: And did he go to work?

JIM ADDUCCI: Yeah, he did. So he had some success at some of the jobs he held. All of them were in the hospitality industry either.

TODD FOSTER: What type of jobs we talking about?

JIM ADDUCCI: Yeah, so when he was younger, you know, uh, like fast food places, uh, or uh, something, you know, where he'd be serving food, preparing and serving food for people that would come up to a counter. Um, and then later, uh, he had several positions in various hotels and resorts.

TODD FOSTER: Did he have trouble keeping jobs?

4

JIM ADDUCCI: He did. Uh, he's a good, honest worker and everyone always recognized that. But in some of the jobs,

TODD FOSTER: he

JIM ADDUCCI: couldn't do all the tasks that were required, particularly if there were sequential tasks that were required. So that, uh. And there were some jobs he just didn't keep, uh, very long. There were some he did, some he didn't. But it came to a point where, uh, we had him evaluated by a neuropsychologist because of this inability to sort of, uh, do the multiple step processes. She found that he had organizational and planning problems and that, um, uh, she suggested some coping skills, which we tried and he tried and they helped somewhat. Yeah. What.

TODD FOSTER: Can you give us an example of these sequential skills you say that he struggled with?

JIM ADDUCCI: Yeah, there was a, ah, you know, there was one place he worked at where there was a Starbucks, ah, um, sort of a mini Starbucks in the lobby. So he had to be checking in guests and he had to go and remember to make the coffee, which, you know, had three or four different steps. You had to, uh, you know, put water in the maker and put the coffee grounds and make the right settings and whatever. And then in the meantime, someone else has showed up at the front desk that you got to check in. That one. He didn't last very long. That was very challenging for him.

TODD FOSTER: Too much. What about going back to when he was a younger man? Did he engage in family activities?

JIM ADDUCCI: Yeah, he did. And a lot of them. Ah, you know, we, uh, uh, we went. We did the things that families do. We went to ball games, we went to concerts. He. We came to family gatherings, we had family vacations, went to plays, we went to Disney World. Of course he was in the Cub Scouts and he, uh, he enjoyed that. And he. The uh, one of the things he really enjoyed was the Pinewood Derby, where you make a little car and you race it.

JIM ADDUCCI: You know, he was funny and witty when he was interacting with, uh, the family and he made us laugh. Uh, any activity that he participated in was more fun because he was participating in it.

TODD FOSTER: Yeah, sure. But now he's in a pretty dire situation, having been charged and pled

5

guilty to, to the instant offense?

JIM ADDUCCI: Yeah.

TODD FOSTER: Um, does he, in his conversations with you, express remorse and regret for having done what he's charged and has admitted doing?

JIM ADDUCCI: Absolutely. He. He. He said if he knew what he knew now, he wouldn't have done it. I. I think, and this was told us by, um, his psychologist, he didn't appreciate the harm to the victims in these crimes that he participated in. And now that he does, he feels very guilty about it and he has a lot of remorse.

TODD FOSTER: Yeah.

JIM ADDUCCI: Well,

TODD FOSTER: do you think that. Well, first of all, do you recognize that he's receiving counseling? I understand now, two days a week?

JIM ADDUCCI: Yes.

TODD FOSTER: Did he request that or was that.

JIM ADDUCCI: Yeah, it started out once a week, and he asked if he could do it twice a week.

TODD FOSTER: And has he shared with you whether he's getting something from that? Whether it's a burden to him? If he thinks it's helping?

JIM ADDUCCI: Yeah, he. He does think it's helping. And actually I've spoken to the psychologist, and she thinks he's made very good progress.

TODD FOSTER: And what was. He moved to Florida? My understanding is around 2017.

JIM ADDUCCI: Yes.

TODD FOSTER: And what type of work did he do in Florida?

JIM ADDUCCI: He worked at various, uh, uh, hotels and resorts. Uh, unfortunately, uh, uh, I can't remember which hurricane. It was closed. Uh, the place where he was working there for almost a year. So that interrupted his career. Uh, and then there was the COVID of course, the COVID epidemic. So, uh, uh, he worked in two resorts that were right next door to each other. Uh, and then he had. In that, you know, that sort of down. One of those downtime periods at.

JIM ADDUCCI: I think it was after the hurricane, the place where he was working actually closed.

6

It was very badly damaged. And he did some other jobs at some other, uh, area, you know, hotels, motels, whatever. None of them for very long.

TODD FOSTER: So was that. Looking back now, do you think that was a product of his autism and his inability to adjust and to do things, which. Which we assume based upon what you've been told at that point, uh, he could do or should do?

JIM ADDUCCI: I do think that.

TODD FOSTER: Yes, that was a terrible question by, uh, me. I apologize for it. But had you known that he had autism when he was a younger man, the approach to his childhood and his levels of supervision and what you were doing with this young boy would have been different, I assume.

JIM ADDUCCI: Yeah, we tried to get him whatever treatment we could that would help him. If we had done that and we could have focused the treatment in that area, we certainly would have done it.

TODD FOSTER: And you're a successful lawyer. You certainly had the means to do that.

JIM ADDUCCI: Um, yes, I'm a lawyer. I guess I'm successful.

TODD FOSTER: So he's facing a five year minimum mandatory sentence from this judge. And in my conversations with you and with Kevin, you know, there's no minimizing what John is accused of doing and what he admitted doing. It's a significant crime.

JIM ADDUCCI: Yeah.

TODD FOSTER: Have you discussed that with him?

JIM ADDUCCI: Yeah, it's, uh. We don't minimize it. It was very wrong, and we don't minimize it. It's broken our hearts, and it's the worst thing that's ever happened to us.

TODD FOSTER: I'm sorry I spoke over you. Please continue.

JIM ADDUCCI: His arrest has changed and dominated our lives. I mean, we can't stop thinking about what he did. And we tried to do everything we could and consulted with every type of expert we could think of to help him and. But here we are.

TODD FOSTER: What are your concerns for him?

JIM ADDUCCI: I think that, uh, I'm worried about him in prison. You know, he is, uh. He's been bullied his whole life. He's naive. You know, the child asked for his spaceship, and he didn't even think about it. He just handed it over to him. I'm worried about him having, uh, coming to physical harm or

psychological harm in prison.

TODD FOSTER: Are you worried about who will be there to support him when he gets out?

JIM ADDUCCI: I am. Because, you, uh, know, I'm 74 and, uh, um. I've got prostate cancer. I've had a heart attack. I've got two stents. Um, what John did broke my heart a lot more than the physical heart problems. But, yeah, I am very worried how he will function if we're not around when he gets out.

TODD FOSTER: So assuming he gets out while you're still around and healthy and doing what you're doing, what type of support can you give to John? Can you and your wife give to John to help him transition back into some more of a mainstream life than the penitentiary?

JIM ADDUCCI: Yeah. Well, we can certainly give him emotional and financial support to help him. It's going to be hard, uh, with the charges that he's, uh, fled to, it's going to be hard for him to get his life going again when he gets out. And I'd like us to be there to render, um, emotional support and financial support if necessary.

TODD FOSTER: So here's your chance to tell Judge Chappell, what you would tell Judge Chappell if you were standing before her, uh, today as to what you would ask of, uh, her in regard to the sentencing of your son.

JIM ADDUCCI: Yeah. So I want to Stress that. I want to talk a little bit about his positive traits other than the crimes he committed, which we know are very significant. He's a good person and he's done a lot of good in the world. He's generous, he's thoughtful, he's kind, he's sensitive, he's loving. When my mother had dementia towards the end of her life, he would visit her regularly. And that wasn't easy to do. It, uh, wasn't easy to do. He likes helping people, and, um, that's what attracted him to the hospitality industry. And if I could tell you one more anecdote about that.

JIM ADDUCCI: He was working at one of these resorts, and an elderly couple came in and they were looking for a Holiday Inn next to door. There had been a Holiday Inn next door, but it had changed hands. So John directed them to the nearest Holiday Inn. And then when he got off work, he drove over there to make sure that they got there and that they found it all right. And they got settled in. The woman, uh, of the couple was sitting on a bench, and then her husband, uh, came out from the building and the three of them talked for a few minutes. They thanked him for helping them and they invited him to dinner. And he, uh, he. He politely declined it. He said, no, you don't, you know, you don't owe me

8

anything.

JIM ADDUCCI: So, um. Pardon?

TODD FOSTER: He cared.

JIM ADDUCCI: He absolutely cared. And that's very typical of him. You know, what he's done here, the bad things he's done are aberrational, from the way we've always seen them.

TODD FOSTER: For his.

JIM ADDUCCI: For his whole life. I, you know, I would respectfully ask the judge to give him a sentence at or near the statutory minimum. He's basically a good person. The autism, I know made it more likely that he would go down the dark road he took. But I believe in free will, and there's no denying that he made some very bad choices. I don't want his crime to define his whole life. There's a lot of good in him.

TODD FOSTER: Right, Got it. All right, sir. Well, um, I appreciate your time and thank you for this. And we will put this together for the judge and. And, um, I guess that's it. Thank you again.

JIM ADDUCCI: Thank you.

# EXHIBIT 6

*Dominic J. Adducci*
*17827 Tipton Avenue*
*Homewood, IL  60430*
*February 10, 2026*

Honorable Sheri Polster Chappell
United States District Judge
2110 First Street
Fort Myers, Florida  33901

Re:  John James Adducci

Dear Judge Chappell:

I am writing regarding my nephew, John James Adducci, who is before you for sentencing for child pornography charges.  I am seventy years old, a retired architect and real estate construction and development manager and have known John since he was adopted as an infant by my brother James Adducci and my sister-in-law Elizabeth Adducci.

John is the first child of his generation in my and my brother's family of origin.  Our family has always been tightly knit and deeply grounded in strong values stemming from our patriotism and faith.  John was welcomed into the circle of love in our family with open arms and great joy and was regarded from the outset as a precious gift.  As is the custom in our family, he was named after his grandfather, my father, as testimony to his connection to our family's history and legacy.

Though the charges against him are undeniably serious, there is much more to his character than his bad judgement related to the crime.  As a member of our family, he has always shown empathy, thoughtfulness, sensitivity, perseverance, and has been personable and loving.

Examples of his behavior demonstrating these virtues include John's regular visits to my mother, his grandmother, in the last years of her life, when she was suffering from dementia.  The fact that this young man made a point to visit brought her joy and peace in difficult times.  The relationship between him and his grandmother had always been close and he did not let her disability affect his efforts to maintain it.

His thoughtfulness is further demonstrated by the fact that John always seemed to find the perfect gift for family members on holidays that acknowledged their interests and tastes – thinking about others as individuals and acknowledging their unique value. Regardless of the budget restraints his income dictated, whatever small gift he could afford was always perfect for the recipient.

He is also considerate and helpful.  Much of our family time together has always involved food.  When he was growing up, John never failed to help with serving and cleaning up after family dinners.  He did not need to be asked; he just pitched in to help.  He also was consistently grateful for any of his favorite foods that were included in the menu and he made a point to compliment the cooks, making

them feel that their efforts were appreciated and their skills were special. Other young people seemed to take for granted the fact that something they especially liked was included for them; John did not.

In a family of rather serious people, he was able to make us laugh and enjoy his and each other's company. When he left the Chicago area for Florida, our family celebrations lost a bit of their energy and joy. He often called in to holiday dinners, talking by speaker phone in order to connect in the limited way he could. John frequently and characteristically ended phone calls with an expression of love. His "love you" sign-offs seemed to emerge from his being in a natural and unabashed manner uncharacteristic of his generation.

He demonstrated perseverance in several areas of his life. Though he had both social and academic difficulties in school, he never gave up. Even with a few transfers in both elementary and high school which disrupted and complicated his life, he made it through. Similarly in his employment, he gravitated early on towards the hospitality industry which is notoriously difficult and financially challenging. His personality was well suited to be hospitable, and he enjoyed working with people. John weathered layoffs, shutdowns from natural disasters, the pandemic and economic cycles, but never gave up doing what he enjoyed. In the aftermath of a Florida hurricane, when he could not work his regular job due to extensive damage to the building where he worked, he offered to help restore the facility and contributed in this way to its reopening.

The virtues he has always demonstrated and the joy he brought to our family are obviously incongruous with the crimes he has committed. Together with the positive aspects of his character, John seems, somehow, to be missing a piece of acuity related to judgement and identification of logical consequences of actions he is driven to take. Despite his affable personality, he always appeared somewhat lonely and unable to relate to people at a meaningful level. I personally believe that these missing pieces must somehow be related to an inherited biological legacy which troubled his birth parents and ultimately led to his being given up for adoption by them.

While not excusing his behavior, I respectfully ask that you consider the criminal activity as the exception to the entirety of his otherwise decent and law abiding life story – not its defining theme. I ask too that you consider the expert analysis of his personality and the formative difficulties that contributed to his wrongdoing and bad judgement as a measure of his culpability.

I am confident that John is an excellent candidate for rehabilitation. There is enough virtue and decency in the essence of his being to ensure that his behavior can be reformed and that he can become a valuable and contributing member of society. This change will require expert help and the support of his family, which we are committed to provide. It also will require that he not be incarcerated for a significant portion of his remaining life.

Sincerely,

Dominic J. Adducci

# EXHIBIT 7

IN THE UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF FLORIDA

TAMPA DIVISION

UNITED STATES OF AMERICA,                    )
                                             )
                Plaintiff,                   )
                                             )
        vs.                                  )   Criminal Docket
                                             )
BENJAMIN CRAWFORD,                           )   No. 8:24-cr-287-SDM-AEP
                                             )
                Defendant.                   )
_____             )

Transcript of Sentencing

Heard in Courtroom 15A
Sam M. Gibbons United States Courthouse
801 North Florida Avenue
Tampa, Florida 33602
Friday - January 9, 2026
8:59 a.m. - 10:57 a.m.

BEFORE THE HONORABLE STEVEN D. MERRYDAY

UNITED STATES DISTRICT JUDGE

REBECCA M. SABO, RMR, CRR
Federal Official Court Reporter
Sam M. Gibbons United States Courthouse
801 North Florida Avenue, Chambers 15A
Tampa, Florida 33602
Rebecca_Sabo@flmd.uscourts.gov
(406) 855-6410

Proceedings recorded by machine shorthand
Transcript produced by computer-assisted transcription

APPEARANCES

PRESENT ON BEHALF OF THE PLAINTIFF,
THE UNITED STATES OF AMERICA:

    **Ilyssa Spergel**
    Assistant U.S. Attorney
    OFFICE OF THE U.S. ATTORNEY
    400 North Tampa Street, Suite 3200
    Tampa, Florida 33602
    (813) 274-6000
    Ilyssa.Spergel@usdoj.gov


PRESENT ON BEHALF OF THE DEFENDANT,
BENJAMIN CRAWFORD:

    **Todd Alan Foster**
    **Melissa Marie Kwitko**
    JOHNSON POPE BOKOR RUPPEL & BURNS, LLP
    400 North Ashley Drive, Suite 3100
    Tampa, Florida 33602
    (813) 252-2500
    tfoster@jpfirm.com
    mkwitko@jpfirm.com


Also Present:  **Kaleena Roy**, United States Probation Officer

3

# I N D E X

**WITNESSES CALLED BY THE GOVERNMENT**:                           **PAGE**

**MICHELLE GONZALEZ**
Direct Examination by Ms. Spergel                              10
Cross-Examination by Ms. Kwitko                               15
**WILLIAM TIDWELL**
Direct Examination by Ms. Spergel                              26

REPORTER'S CERTIFICATE                                        74

4

PROCEEDINGS

(Open court.)

(Defendant present.)

(Court called to order.)

THE COURT:  Well, good morning.  Perhaps counsel and the defendant will step forward to the clerk's table.  Everyone else may be seated.

Well, good morning.  We are together in Case 24-criminal-287, United States of America versus Benjamin Crawford.

Who speaks for the United States?

MS. SPERGEL:  Good morning, Your Honor.  Ilyssa Spergel for the United States.

THE COURT:  Good morning, Ms. Spergel.

And who speaks for the defense?

MS. KWITKO:  Good morning, Your Honor.  Melissa Kwitko on behalf of Benjamin Crawford, and Todd Foster, who is to his left.

THE COURT:  Good morning, Ms. Kwitko, Mr. Foster.

And you're Benjamin Crawford.

THE DEFENDANT:  Yes, sir.

THE COURT:  Good morning.

THE DEFENDANT:  Good morning.

THE COURT:  Mr. Crawford, on June the 2nd of 2025, you pleaded guilty to Count One of an indictment.

THE DEFENDANT:  Yes, Your Honor.

THE COURT:  Count One charges you with distribution of child pornography, in violation of Section 2252 of Title 18 of the United States Code.  I earlier entered an order that accepts your plea of guilty and that adjudges you guilty of the distribution offense that's charged in Count One.  As of the entry of that order, your guilt was determined and it remains this morning to determine your sentence.

As you know, I'll determine your sentence by first determining an advisory sentence under the United States Sentencing Guidelines and by next inviting both the United States and the defense to direct my attention to any matter, including those at 18 U.S.C. 3553(a), that I should consider in arriving at a final and reasonable sentence in accord with applicable law.

I'll begin by asking Ms. Spergel if she's had an opportunity, on behalf of the United States, to review and evaluate the presentence report and, if so, whether the United States objects either to the factual content of the presentence report or to the application of the sentencing guidelines that is recommended by the United States Probation Office.

MS. SPERGEL:  Yes, Your Honor.  I have had the opportunity to review the factual basis and the sentencing guidelines as calculated by probation, and at this time I do not have any objections to the probation report.

THE COURT: Ms. Spergel, have you and Mr. Crawford -- excuse me. Ms. Kwitko, have you and Mr. Crawford had an opportunity together to review evaluate the presentence report?

MS. KWITKO: Yes, Your Honor, we have.

THE COURT: Mr. Crawford, I take it you've seen the presentence report and discussed it with your two counsel.

THE DEFENDANT: Yes, Your Honor. I got the original one back months ago, and then I got the addendum yesterday in the mail.

THE COURT: All right. Ms. Spergel, I know there are -- why am I doing that. Ms. Kwitko, I know there are several objections to the -- depending on how you characterize them, either to the facts or the guideline calculations, certainly the latter.

MS. KWITKO: Yes, Your Honor.

THE COURT: So why don't I just recognize you to advance your objections in the way you find most conducive.

MS. KWITKO: Thank you, Your Honor.

Yes. So I'll start, I guess -- and I'm looking at the sentencing memorandum that was filed by the defense, which is Document 125.

THE COURT: Yes. I happen to have it. Read it this morning. Thank you.

MS. KWITKO: Okay. So I would start with -- and I don't want to, you know, repeat too much of what we already

wrote in the sentencing memorandum. But just starting with, I guess, what I would call factual objections, and that would be to the inclusion of paragraphs 14 through 16 in the amended PSR, which is -- Doc. 123 is the document that I'm going off of.

THE COURT: Yes.

MS. KWITKO: And, Your Honor, we just -- as we explain in our sentencing memorandum, the Kik chats that are referenced in those paragraphs, it's our position that the government hasn't proven by a preponderance of the evidence that Mr. Crawford committed those offenses.

I believe in the probation officer's addendum, there's some language that seems to indicate that this -- I'll call it the New York investigation into this "bryguykat" chat name on Kik somehow led to the "Bjameson" Kik account, which is the account that Mr. Crawford did plead guilty to. That's not correct. They were two completely independent investigations.

There is some evidence that we were provided about IP logs, but those IP logs were for a different time frame. They weren't for the time frame that these chats were to have taken place. There was no evidence on any of the devices that were seized and searched to indicate that this "bryguykat" name was on the device where the "Bjameson" account was found to be on the device.

So just summarizing the argument there, we would

object to this being included as relevant conduct.  We don't believe it is relevant conduct and it shouldn't be considered by the Court in determining a sentence.

THE COURT:  All right.  What says the United States?

MS. SPERGEL:  Your Honor, I do believe that this is relevant conduct that is appropriately included in the PSR. It's demonstrative that Mr. Crawford had a Kik account "bryguykat" in 2020, and that chat --

THE COURT:  And how is that established?

MS. SPERGEL:  And that is established through the fact that IP logs associated with that account, an IP that was used over 900 times in about a week or two after the chat that is cited in the PSR, that comes back to Mr. Benjamin Crawford's residence and his name.  So somebody utilizing an IP that lived at his home at the time was very much -- it was very much being used by this Kik account.

And, secondly, the email address of bullesq81@yahoo.com was investigated.  While it was determined that that was not a valid email address, while reviewing Mr. Crawford's electronic devices, they did find use of similar emails that begin "bullesq," and then it was "bullesq80," "bullesq77@yahoo," indicative of that is something similar in nature to what was used in this account.

And I would also argue that it is relevant under even the sentencing guidelines and 18 United States Code 3661 that

when -- in determining the sentence to impose, "the court may consider, without limitation, any information concerning the background, character and conduct of the defendant, unless otherwise prohibited by law." And this information demonstrates -- it's similar in nature to the charged offense. He's charged with distribution, he pled guilty to distribution of child pornography, and this is a different Kik account engaged in very similar type of conduct.

And I do have the agent here if Your Honor needed testimony about anything that I've just proffered to you.

THE COURT: Well, if you'd like to offer testimony from the agent, you're free to do so. That's not my decision, that's yours.

MS. SPERGEL: Yes, Your Honor. I believe that -- in order for it to, I think, remain in the PSR, it has to be proved by a preponderance of the evidence.

THE COURT: I think that's the case.

MS. SPERGEL: And so given that, with Your Honor's permission, I would call the case agent, Michelle Gonzalez.

THE COURT: You may.

MR. FOSTER: Judge, would you like us to stay here?

THE COURT: Would you rather not?

MR. FOSTER: No, no. I thought you were going to put her in the box.

MS. SPERGEL: It will be brief.

**MICHELLE GONZALEZ - DIRECT EXAM BY MS. SPERGEL**

THE COURT: Mr. Foster, whatever -- I don't know how long it is, I don't know how difficult it will be, assuming it's reasonably prompt and everyone can stand comfortably for a bit. Of course some of my colleagues say if you let them sit down and get comfortable, it just goes longer, so I'm not sure. But I'm here for the duration.

All right. Ms. Gonzalez, let me ask you to raise your right hand, please.

MICHELLE GONZALEZ,

called for examination by counsel for the government, after having been first duly sworn or affirmed to testify the truth, the whole truth, and nothing but the truth, testified as follows:

THE COURT: All right. State your name, please.

THE WITNESS: Michelle Gonzalez.

THE COURT: Ms. Spergel.

DIRECT EXAMINATION

BY MS. SPERGEL:

Q. Special Agent Gonzalez, are you an agent with the FBI?

A. I am.

Q. How long have you been with the FBI?

A. Since 2008.

Q. And can you tell us a bit about your training and experience with the FBI and the titles you've held specifically as it relates to child exploitation?

**MICHELLE GONZALEZ - DIRECT EXAM BY MS. SPERGEL**

A.    I'm the crime (indiscernible) --

THE COURT:  Ma'am, A, you have to slow down, and -- I guess I can't instruct you to remove the mask, but it does muffle you.  So you're going to need to speak slowly and distinctly and probably with a little more volume than normal just so we can all hear you.

THE WITNESS:  I'm on the Crimes Against Children --

THE COURT:  Excellent.

THE WITNESS:  -- Human Trafficking Task Force.  I've been so since approximately 2009, although the name has changed.  I'm on the Innocent Images National Initiative.  My background includes undercover activity, as well as subject -- you know, interviews, and then the numerous conferences and trainings over the years.

Q.    (By Ms. Spergel)  And did you become involved in the investigation of Benjamin Crawford?

A.    I did.

Q.    During the course of your involvement, did you learn about a Kik account called "bryguykat"?

A.    Yes.

Q.    And are you familiar with the Kik application?

A.    I am.

Q.    Can you give us a very brief definition?

A.    It is a way to connect people, more of a social media account, you know, you're able to converse with other people,

**MICHELLE GONZALEZ - DIRECT EXAM BY MS. SPERGEL**

send and receive messages, join groups to speak to one another.

Q.   Did you have an opportunity to review some of the conduct the "bryguykat" Kik account engaged in?

A.   I did.

Q.   Can you tell us briefly about that conduct?

A.   It was a group that primarily exchanged boy pictures.  The agent that did the undercover -- or the agent that was involved in it said the pictures were primarily between the ages of 6 and 16 years old.

Q.   Was there content to those conversations?

A.   Yes.

Q.   And what was the nature of that content -- the conversation?

A.   Exchanging of pictures and commenting on those pictures.

Q.   And were there references to age, for instance, in that conversation?

A.   Yes, there were.

Q.   What types of -- can you explain an example?

A.   Talked about -- one was a 14-year-old, one -- you know, they discussed how old the children were.  They talked about exposing them when they had the boys' faces, the pictures -- pictures of their penis as well as their anus.

Q.   And the time frame of this chat conversation, was that approximately June 30th, 2020, to July 1st of 2020?

A.   Correct.

**MICHELLE GONZALEZ - DIRECT EXAM BY MS. SPERGEL**

Q.   And did you review documents that assisted in the identification of who was behind the "bryguykat" Kik account?

A.   Yes.

Q.   And what did that include?

A.   There were at least two IPs that were subpoenaed.  One of the IPs came back to a Publix, a second one came back -- although it was later, it wasn't until later July of that year that they had chosen the IP address.  There is Kik language that says that not every time that you log in is an IP captured.  A lot of times if you refresh, if you open or close Kik, some other action is taken in order to do that.  But that later July of 2020 IP that was subpoenaed came back to Mr. Crawford's home, like residential address at a house.

Q.   And how frequently was that IP address used?

A.   There's a report on it.  I don't recall exactly what number it was.  A substantial amount.

Q.   Okay.  And what about the email address that was used to open that Kik account?

A.   Yes.

Q.   Do you recall information regarding that?

A.   It involved "bullesq."  For all I know, Mr. Crawford went to USF, and e-s-q is a title, you know, used by lawyers, and it was @yahoo.com.

Q.   To your knowledge, was Mr. Crawford a lawyer at the time as well?

**MICHELLE GONZALEZ - DIRECT EXAM BY MS. SPERGEL**

A.    Yes.

Q.    And are you aware that a review of his electronic devices occurred?

A.    I'm aware of that.

Q.    And are you aware of any information related to the use of emails related to "bullesq" were found within any of his devices?

A.    I'm aware that the CART examination showed that one of the accounts involved also the "bullesq."  Although I believe the numbers at the end were different, the "bullesq" was the same.

Q.    And so based upon the use of that IP address and that email, was that evidence that law enforcement considered as to the ownership of that "bryguy" account?

A.    Yes.

Q.    And I understand that defense -- there's two Kik accounts in this case; is that correct?

A.    That's correct.

Q.    The "bryguy" accounted and the "Bjameson" account?

A.    Yes.

Q.    Were those two separate tips?

A.    Yes, they were, from different offices.

Q.    So it is fair to say that one didn't lead to the other but they both led to Mr. Crawford?

A.    Correct.

          MS. SPERGEL:  Okay.  I have no further questions.

MICHELLE GONZALEZ - CROSS-EXAM BY MS. KWITKO

THE COURT:  All right.  Any questions from the defense?

MS. KWITKO:  Yes, Your Honor.  Thank you.

CROSS-EXAMINATION

BY MS. KWITKO:

Q.    Agent Gonzalez, good morning.

A.    Good morning.

Q.    Now, you mentioned that the chats took place between June 30th and July 1st, is that correct?

A.    That, I have -- yes.

Q.    The chats that we're talking about?

A.    Correct.

Q.    And you said that there were two IP addresses, and one of them was requested later in July?

A.    Correct.

Q.    Okay.  So when they were requested later, could they have been requested for the time frame in question?

A.    I did bring them, but I'm actually -- I'm not sure.  I wasn't involved in the case at that point.

Q.    So you're not the one that made the request for the IP logs?

A.    No.

Q.    Okay.  But you're aware that the IP logs did not cover June 30th or July 1st of 2020?

A.    Correct.

## MICHELLE GONZALEZ - CROSS-EXAM BY MS. KWITKO

Q.    And when you say that the person behind "bryguykat," we're talking about an IP address, not a person, correct?

A.    It is an IP address, but obviously someone would have had to --

Q.    Sure --

THE COURT:  Wait.  Don't talk over each other.

Ms. Kwitko, if you'll slow down a little bit, you won't be as tempted to do that.

MS. KWITKO:  Thank you, Your Honor.

Q.    (By Ms. Kwitko)  Now, you mentioned that Kik says that an IP address is not always captured.  Is that correct?

A.    Correct.

Q.    Is it possible that it wasn't captured because it didn't occur at that location?

A.    I'm sorry.  Can you rephrase that?

Q.    Sure.

So if we're talking about -- you mentioned that there were two IP addresses, one at a Publix, one at Mr. Crawford's residence.

A.    Mm-hmm.

Q.    And you said that -- well, let me back up.

Is the reason that there's no IP address for the June 30th or July 1st dates is because they weren't requested?

A.    I'm not aware of them being requested.

Q.    Okay.  So it's possible that they were requested but they

**MICHELLE GONZALEZ - CROSS-EXAM BY MS. KWITKO**

didn't come back to Mr. Crawford's address?

A.    Address?

Q.    Yes.

A.    Yes, it's possible that -- you know, if it's on a phone that -- you could be traveling, it could be somewhere else, but that doesn't matter as far as who actually owns the account. Obviously, like we can be in here and it would show a different IP address rather than your house.

Q.    But we don't know who owns that account?

A.    That's correct.

Q.    And regarding the "bullesq" email address, did that email address come back to Mr. Crawford?

A.    It -- no.  It came back that it did not exist.

Q.    And for the "bryguykat" Kik account, were there any search warrants that were requested regarding that account?

A.    I've only been the case agent for a year; I'm not aware of the search warrant for it.

        MS. KWITKO:  No further questions, Your Honor.

        THE COURT:  All right.  Anything further, Ms. Spergel?

        MS. SPERGEL:  No, Your Honor.

        THE COURT:  All right.  Thank you very much.

        THE WITNESS:  Thank you.

        THE COURT:  Any other evidence, Ms. Spergel?

        MS. SPERGEL:  No, Your Honor.

THE COURT: Any evidence from the defense?

MS. KWITKO: No, Your Honor.

THE COURT: All right. It is -- it is your burden here -- or your turn to argue. Anything further?

MS. KWITKO: Yes, Your Honor. I would add that although the government argues that there were IP addresses that came back to a residence associated with Mr. Crawford, they have not established evidence at this point as with the "Bjameson" account, and I think that's the easiest way to compare the two. With the "Bjameson" account, Mr. Crawford has pled guilty to. There was evidence of that Kik account on his device, and there was IP evidence associated at the exact time that -- on the March 15th date that Mr. Crawford pled guilty to. So we have multiple things that are happening that demonstrate that that occurred.

In this case, we don't have that. They have a Kik account that's not associated with an email address of Mr. Crawford's, that's associated potentially with an IP address with his residence at a later date. We don't have any evidence of that Kik account on his phone, we don't have evidence of the IP being accessed on a specific date, we don't have an email address connecting him to it.

So other than an IP address connected to his residence where any number of people could have been during the time frame that they reference here, there's no evidence

specifically connecting this Kik account to Mr. Crawford. And the fact that a later investigation identified a separate Kik account that Mr. Crawford was involved with is not evidence that this other Kik account is something that Mr. Crawford was involved with.

THE COURT: All right. Ms. Spergel.

MS. SPERGEL: I don't think our argument is that the fact that "Bjameson" Kik account comes back to Mr. Crawford means "bryguykat" should come back to Mr. Crawford. I think the standard of by a preponderance of the evidence, there is circumstantial evidence to suggest that the user of the "bryguy" account was Mr. Crawford, and that is based on the substantial use of the IP address and that is based on the use of the fictitious "bullesq@yahoo" email since that is also -- similar emails were found within his devices. And I believe, based on the preponderance standard, we have met the burden for it to remain as relevant conduct within the PSR for Your Honor to consider that he potentially used and accessed this additional Kik account for purposes related to child exploitation.

THE COURT: Well, I think I agree with that that -- I think I probably agree with you both. It's not proven absolutely, but that's not the standard. It is a preponderance of the evidence, and it is -- I think defense counsel characterized it as an offense. It's not an offense, it's not

charged offense, it's background material, and I think it's established by a preponderance, including circumstantial evidence, particularly since, given the other occupants of the house, it's a fairly strong inference of whose account this was.  So respectfully that objection is overruled.

But you have others, I know, Ms. Kwitco, so I'll recognize you for your next one.

MS. KWITKO:  Thank you, Your Honor.

I guess I'll call it the specific guidelines objection --

THE COURT:  Yes.

MS. KWITKO:  -- that we have is with regard to paragraph 44.

THE COURT:  Yes.

MS. KWITKO:  I'm just turning there now.

And, Your Honor, that enhancement is, as it says here, it's an enhancement whether or not there's offense -- I'm sorry, whether there's "material that portrays the sexual abuse or exploitation of infant or toddler."  The government's position is that there was a video that was found on one of Mr. Crawford's devices.

For a little bit of background, there were five videos that were able to be somewhat accessed during the forensic examination.  The majority of the videos and images that may have been on the phone were not able to be viewed,

they weren't able to be played.  So in this case, for those five images, what the agent was able to see was the first frame of the video.  And it's not a clear frame, it's not something that plays, it's like a still screenshot of the first frame of this video.

The government's position is that this screenshot of this video is enough to determine that this enhancement applies.  And as it notes here that apparently this video was sent to NCMEC and NCMEC somehow determined that it was part of a known series.

In the actual forensic report -- may I grab it, Your Honor?  I left it at the desk.

THE COURT:  You may.  Sure.

MS. KWITKO:  In the forensic report -- this is a report dated August 13th of 2021, and this is actually the second forensic report that we received in discovery.

When we're talking about these five videos that were able to be somewhat viewed, the agent writes that four of the files showed images of possible CSAM, and then it later says that NCMEC matched one of the images with a known victim. That's all it says.  It doesn't say how the video was identified by NCMEC as a known victim.

There's a second report -- I'm sorry.  There's a third report that's also referenced earlier in the -- in the PSR that discusses that there were certain video files found on

the device, and the agent was able to see how long the video was and for how many seconds that video was played.

THE COURT:  Yes.

MS. KWITKO:  This specific video that we're talking about does not show up in that report.  It doesn't show as being a video that was played, it doesn't show -- I think it shows -- says how long the video was, but it doesn't show it being played.

And in that report, it's actually -- it notes that the date and time of that video was after the execution of the search warrant.  So the execution of the search warrant in this case was on August 12th of 2021, and the time associated with that video says, I think, 1445, so that would be later in the afternoon.

The phone had already been seized at that point.  So whether or not that image existed on the phone at the time Mr. Crawford would have access to it, it appears from the forensic report, it was not.  If it's showing up at 4 o'clock in -- I'm sorry, 2 o'clock in the afternoon, and the search warrant was executed at 6:30, so in the morning that same day.

And, again, it doesn't show that it was played.  It doesn't show that he would have had access to it, and although it says that some of these images were identified as possible CSAM, it's just simply not clear if NCMEC matched this video.  Because it looks similar to a video that they had seen from

that first frame, it's not clear if they matched that. For some other reason, that information was not provided in the forensic report. And so accepting this forensic report as true, there's simply not enough evidence here to establish that Mr. Crawford possessed this video that, you know, shows this exploitation of an infant or a toddler.

THE COURT: And your argument that he never possessed it, distinct from the argument that he never viewed it or whatever, is that the chronology suggests -- or establishes that it came onto his device after his device was seized?

MS. KWITKO: That's the time and date listed in the forensic report. And I have a copy of it if you'd like to see it.

THE COURT: All right. Ms. Spergel, what says the United States?

MS. SPERGEL: Yes, Your Honor. I believe the evidence does demonstrate that he possessed this video that would depict a minor to satisfy the guideline enhancement. I think that is the standard, not whether he, per se, viewed it. This defendant did delete a lot of things from his device which greatly hindered the forensic investigation.

But I do have the special agent assigned to CART, the digital forensic examiner, and he can testify perhaps better to some of the defense's allegations.

And I do have a copy of that video here today for

Your Honor.  I've discussed with defense, I don't believe they have an objection to Your Honor viewing that video, if need be, for your determination.

THE COURT:  What would I be determining by viewing it?

MS. SPERGEL:  I believe that their position is also that that video, along with the other four videos that were ultimately briefly playable through CART, should not be considered as child pornography by Your Honor in an overall calculation of number of images.  So it might relate to a further objection that defense has.

THE COURT:  So would I be viewing it to determine whether someone who is depicted on that video is obviously a minor?  Is that what --

MS. SPERGEL:  I guess I would defer to defense to their specific objection if they're disputing -- exactly what they're disputing if that's necessary for your determination.

THE COURT:  You mean whether the objection includes that?

MS. SPERGEL:  Yes.

THE COURT:  That principal objection, as I understand it, is that there's no proof that he possessed -- that would be the only thing pertinent, I think, whether he possessed it, right?

MS. KWITKO:  Your Honor, that's part of it.  We would

argue that, according to the forensic report, it appears that the creation date of that video wasn't until after the execution of the search warrant, so that's certainly part of it.

THE COURT:  Well, that's the reason that you claim he didn't possess it.

MS. KWITKO:  That's the reason that -- that's how we understand it from the forensic report.

THE COURT:  Right.  So that's the issue of possession, not whether anyone might be depicted in that video is a minor.

MS. KWITKO:  Your Honor, I guess I would go one step beyond that, that the enhancement specifically applies to a sexual exploitation or abuse of an infant or toddler.  So our position is --

THE COURT:  Right.  Excuse me, an infant or toddler.

MS. KWITKO:  So our position is that there's not sufficient evidence to demonstrate the sexual abuse of an infant or toddler from this still frame.

THE COURT:  So it's a two-pronged objection.

MS. KWITKO:  Yes, Your Honor.

THE COURT:  One, he didn't possess it, for several reasons, and the other that, even if he did, the person depicted is not an infant or toddler.

Last time I checked, toddler was also undefined in

**WILLIAM TIDWELL - DIRECT EXAM BY MS. SPERGEL**

the sentencing guidelines.  We had a dispute about that in here one morning about what a toddler is.

So you have a witness.

MS. SPERGEL:  I do, Your Honor.

THE COURT:  Call your witness.

MS. SPERGEL:  If you could please bring your computer up with you as well.

THE COURT:  Good morning, sir.

THE WITNESS:  Good morning.

WILLIAM TIDWELL,

called for examination by counsel for the government, after having been first duly sworn or affirmed to testify the truth, the whole truth, and nothing but the truth, testified as follows:

THE COURT:  And state your name, please.

THE WITNESS:  William Tidwell.

THE COURT:  William Tidwell, Tid, w-e-l-l?

THE WITNESS:  Yes, sir.

THE COURT:  Ms. Spergel.

DIRECT EXAMINATION

BY MS. SPERGEL:

Q.    And are you a special agent and digital forensic examiner with the FBI, sir?

A.    Yes.

Q.    And how long have you held those positions?

**WILLIAM TIDWELL - DIRECT EXAM BY MS. SPERGEL**

A.    Special agent, a little over 18 years; digital forensic examiner, a little over ten.

Q.    And can you tell us a little bit about your background and training as it relates to forensics.

A.    Well, just for the FBI, to become a digital forensic examiner -- well, when I became certified, the process was about 18 months to two years, which included various classes and certifications with operating systems for computers, mobile devices, along with the forensics of those devices.

Q.    And were you involved in the case of Benjamin Crawford and specifically the investigation or forensic -- forensics related to Benjamin Crawford's electronic devices?

A.    Yes.

Q.    And so based on your involvement, are you aware that search warrants -- or a search warrant, I should say, was executed on August 12th of 2021?

A.    Yes.

Q.    And that an iPhone and MacBook were recovered that day?

A.    Yes.

Q.    And did you have the opportunity to review both of those devices?

A.    Yes.

Q.    I'm going to focus specifically now on the iPhone.

A.    Mm-hmm.

Q.    And when reviewing that iPhone, did you notice anything

**WILLIAM TIDWELL - DIRECT EXAM BY MS. SPERGEL**

had been deleted?

A.    Yes, applications.

Q.    Can you tell us briefly about that.

A.    There were several applications, I don't remember all of them.  I know MEGA, Kik, Telegram, a photo vault application, for instance, they were deleted.

Q.    Okay.  And based upon your involvement and your knowledge of forensics, were those applications potentially important to your forensic review?

A.    Yes.

Q.    And why is that?

A.    Well, there were -- so applications contain files, whether they're set-up files or log files contained within the application, along with other files, potentially, you know, videos or images, stored within the applications.  When the application is deleted, that's gone.  So there are references to files from the operating system referencing files either in or related to those applications.  But the files no longer exist in those applications.

Q.    And so did you take steps to -- in reviewing this device to find files that were potentially indicative of CSAM?

A.    Yes.

Q.    And for the record, CSAM is Child Sexual Abuse Material.
      And can you tell us a little bit about that.

A.    As far as looking for the --

WILLIAM TIDWELL - DIRECT EXAM BY MS. SPERGEL

Q.   I could rephrase that if it's easier.

A.   Yes.

Q.   Were there any files that you were able to recover in such a way that they were briefly playable?

A.   Yes.

Q.   Can you tell us about those files specifically?

A.   Well, they were cache files, and the location where they were stored -- in that directory, there were cache files and then essentially a manifest, a plist file, but it was a manifest of each of those cache files, and where those cache files -- where they point to on the device.  And so I was looking at those cache files and just manually reviewing them, and I noticed some of them had header signatures that would match a video.  So, yeah.

Q.   And so then what steps did you take next?

A.   So from there, I grabbed the hex, which is how a computer represents data.  Essentially data is 0s and 1s, and then it's translated into hexadecimal and ASCII.  So I grabbed that portion that started with a header that says, you know, from here on this is a video file, and I grabbed as much of that that was available within the cache file and copied it out of the cache file and then tried to open the video.

Q.   And for five files, were you successfully able to view a portion of those files?

A.   Yes.

**WILLIAM TIDWELL - DIRECT EXAM BY MS. SPERGEL**

Q.   And all of this information, that is being pulled from the iPhone; is that correct?

A.   Yes.

Q.   If it was not -- if something was not present already in some capacity on the iPhone, would you have been able to pull it out?

A.   Well, no.  I mean, if it wasn't on the iPhone, then I would not have found it.

Q.   And along those veins, nothing was added to the iPhone; is that correct?  It wasn't changed in any way by anyone from that analysis?

A.   Correct.

Q.   So if there was a file that showed the date of the search warrant and maybe a time after the search warrant execution, can you tell us, like, why that would be from a forensic perspective?

A.   If it was after the execution of the search warrant by a magnitude of hours, the only time that I've seen that is when -- in my reports, if I am using UTC time instead of local time.  I don't know specifically about this one.  I know you were talking about 1400, but there's, you know, a possibility, since I was, you know, dealing with, what, 28 pages on that document and 34 on others that I copied the wrong time and date.

Q.   Okay.  But everything included within the report was

**WILLIAM TIDWELL - DIRECT EXAM BY MS. SPERGEL**

pulled from the iPhone in the capacity of what was on that iPhone at the time it was seized during the search warrant?

A.   Yes.

Q.   And are steps taken to preserve the iPhone and the evidence contained within the search -- within the iPhone at the time of the search warrant?

A.   Yes.

Q.   And that was done in this case?

A.   Yes.  Well, and that image that we're talking about was also referenced in the deletion of the photo vault application that was deleted the morning of the search.  And the operating system tracks files and manipulation of those files, but it only does so for so long.  There are only some days that we can -- that we had access to.  So when you see that the application was deleted -- or uninstalled, you can also see through the operating system that files associated with that application are being deleted.  And one of the files -- a movie file that was removed during the application being uninstalled was that -- this --

Q.   Photo vault?

A.   Right.  It was in photo vault, and it was the video that we're talking about right now.

Q.   And the video that we're talking about, for the record to be clear, we've been focusing on a specific video that was ultimately identified as the NCMEC series "Green Carpet"; is

**WILLIAM TIDWELL - DIRECT EXAM BY MS. SPERGEL**

that correct?

A.    Correct.

Q.    And can you explain how it was ultimately identified as that NCMEC series?  If you recall.

A.    Well, I can't speak to how NCMEC does what they do.  I believe the former --

Q.    Witness?

A.    Well, the first case agent, who is now retired, I believe she submitted that to NCMEC.  So I don't know if NCMEC does a manual -- I really don't know how they do what they do.

Q.    And that's fine.  If it's beyond your knowledge, that's completely fine.

       And did you bring a copy of that with you here today?

A.    Yes.

Q.    And is that contained -- that video contained on this thumb drive?

A.    Yes.

Q.    And are all five of those briefly playable videos contained on this thumb drive?

A.    Yes.

Q.    All right.  And they are fair and accurate representations of what was recovered from the device and through your forensic search?

A.    Yes.

            MS. SPERGEL:  At this time I'd ask, then, that the

## WILLIAM TIDWELL - DIRECT EXAM BY MS. SPERGEL

videos be entered into evidence.

MS. KWITKO:  Your Honor, we don't have an objection to the specific video that we've been talking about being entered into evidence.  But we would object to the other four, because they're just not relevant to this argument.

MS. SPERGEL:  And that's fair, Your Honor.  I believe they might have further objections where they might become relevant, but we can just revisit it then if it becomes true.

THE COURT:  How is that one relevant video, at least at the moment, designated?

Q.   (By Ms. Spergel)  Do you recall what you labeled it on this?

MS. SPERGEL:  I can also delete the other videos from this thumb drive to solve the problem so what we enter would just be that one video.

THE COURT:  From my advantage, that's simpler -- from the Court's standpoint, that's simpler.  So the purpose of showing this video is to determine whether there is an infant or toddler in it?

MS. SPERGEL:  That's correct.  And that it depicts the sexual abuse of such infant or toddler to satisfy the enhancement.

THE COURT:  And does the defense deny that?  Is that a disputed --

MS. KWITKO:  Yes, Your Honor, that's disputed.

THE COURT: All right.

MS. SPERGEL: And I do have the agent's -- forensic examiner's safe computer that we can briefly show that. I'm not sure the best way Your Honor wants to handle it. I don't think there's an objection from the defense to bringing the computer up to Your Honor's bench.

THE COURT: Bring it right up and put it right there, and we'll take a look.

Ms. Kwitco, maybe you can come over here and look right here, it's easier, or we can get him to show it to you separately, Ms. Kwitko.

MS. SPERGEL: And, Your Honor, for the record, the video file is not referenced by "Green Carpet," it's reference by a series of letters and numbers. So it starts 2741 and ends in 3CB. 36B, yes.

THE COURT: Maybe I'll just make this easy.

(The Court reviewed video.)

THE WITNESS: Since it was recovered from a cache file, it's not the full --

THE COURT: Yes.

MS. SPERGEL: I don't have any further questions, Your Honor.

THE COURT: All right. What is your argument with respect to the toddler status of the person depicted in that video?

MS. KWITKO:  Your Honor, I think that I would say our argument is more to the exploitation, because the enhancement itself is the sexual abuse or exploitation of an infant or toddler.  And so if there's an image or video of an infant or toddler, that, in and of itself, is not going to be the enhancement, it has to portray the sexual abuse or exploitation of that infant or toddler.  Obviously we don't know the age of the individual in the video.  They appear to be young.

As you said, I don't know what the definition of an actual toddler would be, but I would say that the -- for our purposes, the argument is more that it doesn't demonstrate the abuse or exploitation, not the specific age that is portrayed of the individual.

THE COURT:  What says the United States?

MS. SPERGEL:  It's our position that that video depicts a toddler, nude.  There was the other male individual that was nude, and that other individual's penis appears to be in the face of the toddler where his hand was reaching out in those couple of seconds, or one second perhaps.  It's very quick.  But I do believe that that little clip satisfies the definition of a toddler being sexually abused.  And the toddler, I guess, argument is based on the size and features of reviewing it, and toddlers in real life --

THE COURT:  Well, I would say it's more probable than not that that's a toddler.  That if you had a group of

disinterested people and showed them that that perhaps all of them would agree that that would qualify as a toddler.  Perhaps it's just me, but I thought maybe Ms. Kwitko's more prominent argument was that it might not be abuse or exploitation.

Is there a statutory regulatory definition of abuse or exploitation?

MS. SPERGEL:  I think it just shows, my understanding is, just the sexual -- like the depiction is of -- sexual in nature.

THE COURT:  Well, let me ask you this.  Is there a statutory or a regulatory definition of what abuse or exploitation is?

MS. SPERGEL:  I think that would be the closest answer, Your Honor, I think would be the Dost factors of what maybe qualifies as a lewd or lascivious exhibition and the factors that you can consider in determining whether an image is exploitation, and that includes context, it includes lack of clothing, it includes positioning, it includes, like, if they're in an unnatural pose or anything of that nature.  And I think, given the positioning of the individual's depicted, the lack of clothing, and what we can briefly see of hand gestures is indicative of exploitation based on the Dost factors.

THE COURT:  Anything further from the defense on this?

MS. KWITKO:  No, Your Honor.

THE COURT: All right. I'm inclined to agree with the United States that capturing a depiction of a toddler in a sexually explicit context such as that one, although that image does not, I think -- correct me if I'm wrong, Ms. Spergel, but I don't think that depiction includes any actual physical contact between the adult and the toddler, but the toddler's face is very close to that male midsection, and capturing an image like that for purposes -- well, perhaps for any purpose but certainly for the purpose of sexual gratification or the like is exploitative and abusive. I would respectfully overrule that objection as well.

It does seem to me, by a preponderance of the evidence, that that video is attributable -- was on the iPhone when the phone was in the possession of the defendant. While there seems to be, to the extent -- is that a time and date stamp? Is that what you call that that's on there? It does seem to be odd, but there's no reasonable alternative explanation available other than the one that the agent suggests, which is a typographical error.

So given those circumstances, I persist in my ruling that the objection is overruled.

Ms. Kwitko, I believe you had one or more other objections.

MS. KWITKO: Your Honor, our -- I guess I would say our further argument that's discussed in the sentencing

memorandum, I guess I would say, is more of a policy argument with regard to mitigation and the sentencing guidelines generally.

THE COURT:  Yes.

MS. KWITKO:  I don't believe we have any more specific guidelines calculation objections.

THE COURT:  All right.  Well, I did read -- I read everything that was available to me very carefully, including your sentencing memorandum and your argument with respect to the -- what you call the policy argument.  So did you want to expound on that, either of you, at this time?

Ms. Spergel, did you want to respond at this time?

MS. SPERGEL:  Your Honor, I think the guidelines are appropriately calculated by probation.

THE COURT:  Well, let me just say this, if there are no -- it's not clear to me whether we were just reviewing the facts, but I think we resolved the facts, so I will adopt the facts as they are expressed in the presentence report.

I think I have asked the United States if they have any further objections to the guidelines, and they have said -- or any objections at all to the guidelines, and they have confirmed that they do not.

Counsel for the defense has advanced a couple of objections, both of which have been overruled.  My understanding is that the policy argument is addressable when

you address the sentence. It really goes to the question of a variance or the like.

So I think I'm subject to -- assuming the correctness in my rulings, that the offense level is 36 and the criminal history category is I.

There is no motion under 5K1 or otherwise on behalf of this defendant; is that correct?

MS. SPERGEL: That's correct.

THE COURT: I didn't see one.

And the United States, in your sentencing memorandum, I think you said you were going to ask for a 188-month sentence. Is that still the position of the United States?

MS. SPERGEL: Your Honor, I believe I asked for 216 months.

THE COURT: I'm sorry. I was looking at the presentence report when I said that.

MS. SPERGEL: Yes. I believe the guideline range is 488 months to 235 months as calculated by probation.

THE COURT: Yes.

MS. SPERGEL: And we were asking for that mid- to high-end sentence. And I can present argument when Your Honor is ready.

THE COURT: I'll come back to you on that.

So with that in mind, I'll recognize Ms. Kwitko and the defense to advance any matter in mitigation or any matter

under 3553.  When I've heard that -- after I've heard that, I'll recognize Mr. Crawford and give him an opportunity to speak in allocution if he chooses to do so.

MS. KWITKO:  Thank you, Your Honor.

So I'm just looking at the guidelines calculations, and, you know, you don't want to go step by step.  But I think it's worth noting, as we explained in our sentencing memorandum, that all of the enhancements that have been applied in Mr. Crawford's case, other than the obstruction of justice enhancement, are applied in overwhelmingly the majority of similarly situated non-production cases, such as what we have here.  And when we look at, for example, use of a computer, if we look at the prepubescent minor, if we look at number of images, the issue that we have here is that when those guidelines were put into place, somebody using a computer would have been an extraordinary thing.  Right?  People used to send things in mail or --

THE COURT:  In other words, when Foster was prosecuting these cases, opposed to the things that were --

MS. KWITKO:  Exactly.

THE COURT:  -- or cassette videos or something.

MS. KWITKO:  Yes, exactly.

THE COURT:  Exactly so.

MS. KWITKO:  And that's discussed in depth in the 2021 sentencing commission report that we note in our

sentencing memorandum.  But I do think that it's just worth noting again some of the statistics that are discussed in those -- in that report.  And, again, it's also discussed -- I know that *Yang* is a district court case from, I believe, Georgia, but I do think that the judge's discussion of the sentencing guidelines and the commission's reports is helpful to the Court, which is why we did cite that pretty broadly in our memorandum.

But finding that when we're looking at people, in a 190 cases, with people who have similar charges as Mr. Crawford, and they all received the same enhancement, again, other than that one obstruction charge which is a little bit -- the one -- the outlier in our case, there is a 20-year sentencing difference between those 190 cases; so people who are receiving probation up to people who are receiving 20 years in prison.

And so while the Eleventh Circuit has said that the sentencing guidelines and the specific offense characteristics are something that the Court can consider, it's not unreasonable to consider them.  It seems to us in this case there are more prudent characteristics of Mr. Crawford, there are more specific things about him as a person that are more relevant to the Court's consideration, and that of course would be documented under 3553 factors.

And the other thing that I just want to point the

Court's attention to is this new *United States versus Kluge* case, where the Eleventh Circuit seems to have said that a frame-to -- I think it's frame-to-image conversion may be the proper way to calculate the number of images enhancement.

Our reading of *Kluge* is not that the Court mandates that video-to-image conversion but saying that that could be a way -- and I know that in *Kluge* that is how they applied it. *Kluge* is obviously on appeal. There's been no ruling on whether or not that will be upheld or not. But that goes, again, to this severe overstatement of the facts in Mr. Crawford's case.

If the Court is considering the images from the "bryguykat" chats, the images from the "Bjameson" chats, and there was one additional video that was found on the devices -- and I'm referencing those because those are the ones referenced in the presentence report. We're talking about 14 images and five videos. Now, when we apply *Kluge* and then we use that video-to-frame analysis, now we're talking about 12,000 images. So we've gone from 14 to 12,000.

If we were looking just at the commentary where the sentencing guidelines had been applying the 75-to-1 ratio -- I think Ms. Spergel would disagree with me. But if we're looking at just those 14 images and five videos, he wouldn't qualify for that five-level enhancement. I think he would be at either a three- or four-level enhancement based on the number of

videos and based on the 75-to-1 conversion.

But, again, looking at 14 images versus 12,000 images obviously is an extreme discrepancy between the two numbers. And so I think that it's important -- regardless of what the enhancements say, it's important to look at Mr. Crawford and it's important to look at the actual facts of this case, and the actual facts of this case are that we're dealing with one date -- I guess we're dealing with three dates if we're considering the relevant conduct. But for what Mr. Crawford pled guilty to, we're looking at a single date, March 15th, 2021. There were four -- five images and four videos that were distributed on that one date.

After that execution of the search warrant in August of 2021, there's been no other conduct that's occurred, there's been no conduct that's been alleged, there's no evidence of anything happening. So almost four, five years ago at this point, when the search warrant is executed, nothing has happened since then. There was one little minor issue with Mr. Crawford having an Apple Watch during the time that he was on pretrial release, but other than that he's had no issues.

There was a three-year period between the date of the execution of the search warrant and when the indictment actually came forward, there was no illegal conduct during that time frame either. You know, Mr. Crawford continued to live his life, he was working as an attorney, he's being a father to

his children.

As we discussed in depth in the sentencing memorandum as well, Mr. Crawford is somebody who is an alcoholic and he's been working on his sobriety and -- he's been working on his sobriety for a number of years. But for anybody who knows what it's like to be an alcoholic, that's an everyday thing that he has to deal with. This isn't something that, you know, he dealt with it when he -- originally when he was Baker Acted back in 2018. He's been dealing with it every day since then. He continues to go to AA, I think, six to seven times a week. He's a sponsor for other people in AA.

You know, he has -- Your Honor can see that there's some people who have come to court with him. These are his family members, these are his friends who have continued to support him through this entire process.

Mr. Crawford has two young sons. At the time of this back in 2021, they were, you know, I think nine and 12. And throughout this entire process -- he had a search warrant, like I said, in 2021; now we're in 2026. His ex-wife, who is here today, she has -- she's supported him. His family and friends have continued to support him.

THE COURT: I saw the video that you sent me of the interview with her.

MS. KWITKO: Yes, Your Honor.

He's continued to take care of his children, despite

the fact that he had a divorce, despite the fact he's been on house arrest.  He's been spending his time with his children.

It's briefly mentioned in the presentence report, and I could get you the paragraph number, but Mr. Crawford paid his ex-wife, I think, three years in advance of child support totaling about $150,000.  So as he's been preparing himself for a prison sentence, because he knows that he's going to get at least five years, which is what we would argue to the Court is a reasonable sentence in this case, but as he's been preparing for that he's been doing everything he can to position his family to be taken care of.  He sold his house, he used the money towards that to pay off taxes, to pay -- send money to his wife, to continue just doing what he can to be the person that his family knows him to be.

Obviously there was a lapse of judgment.  There was something that caused this conduct to occur.  But as the letters have said that were provided to the Court, as his ex-wife said in the statement that was provided to the Court, that's not who he is as a person.

I suspect that the government is going to say that he somehow presents a danger to the community, that he somehow presents a danger to children.  He's been out in the community since 2021 and has had -- he hasn't posed a danger since then.

If we look to Dr. Imhof's report -- you know, lawyers can say all day long he is a danger.  He isn't a danger.  If we

look to an expert -- Dr. Imhof is, you know, at the top of his field in these types of cases. He says he's not a danger. He says he's not a pedophile. He has a very low risk of re-offending. I don't know that they can ever say a zero risk, but he says low. As Dr. Imhof would say, that he presents a low risk.

We also had him polygraphed by the former head of the FBI polygraph unit. In that polygraph, he said I've never had any inappropriate contact with minors, and there was no deception detected.

And so if we're looking at what experts in their field are saying, they're saying he doesn't pose a threat. And I think he's demonstrated he doesn't pose a threat, because he hasn't been one for many years at this point. He's been living in the community, he's been taking care of his family, he's been taking care of his children, he's been continuing to work on his sobriety.

And for all of those reasons, we would say that, while the sentencing guidelines in this case are what they are, they're at a higher range, it's because they always are. They're always at a higher range in these cases. Of course the Court can consider them, but the Court should consider more than those things; who Mr. Crawford is as a person, how he is with his family, how he supports his children.

He's given up his law license. He was a lawyer for

almost 20 years. He's a board-certified lawyer, and he gave that up. He voluntarily relinquished his license. He did it in a way that he can't reapply for it in the future.

And I think that those are all reasons to show that he has accepted responsibility for what he's done. He's shown remorse for what he's done. He came into the Court and pled guilty to something that is very hard to plead guilty to, but he came in and did it. And he's doing everything that he can to take steps to move forward with his life after the sentence is concluded.

And so for those reasons, Your Honor, which I didn't, you know, go one by one with the 3553 factors, but I think all of those factors are covered by this. He certainly doesn't present a danger to the community.

This conduct is years and years ago. And despite -- if we're looking at *Kluge*, in the grand scheme of these types of cases, we're dealing with a relatively low amount of images and videos. Of course they're still harmful, but we're not looking at somebody who's a collector of something where there's thousands or tens of thousands of these types of videos and images, and I think that's something that should be considered. We're looking at one date, we're looking at a low number of video files, image files. And who Mr. Crawford is as a person and who he has been as a person since dealing with this I think is much more important for the Court's

consideration than the sentencing guidelines.

THE COURT: All right. Mr. Crawford, as you know, you have an opportunity to speak on your own behalf. You're not required to say anything of course, but if you'd like to say something, I'd be happy to hear from you.

THE DEFENDANT: Yes, Your Honor.

I won't belabor anything that was in my personal narrative. You know, I think that was extensive explaining, you know, the things that have happened in my life at the time. That's not to excuse my conduct. My conduct was inexcusable. But, you know, I made a poor decision, and it was in the context of, you know, early recovery, going through a divorce, you know, a number of other things that had been going on.

You know, my son had been diagnosed with autism, and in fact I was dealing with the marital relationship, my father passed away; so there was a lot of things. But it doesn't excuse the things but maybe give you some context for it.

I appreciate that you came with me today. You know, my girlfriend and my stepmom, my ex-wife, one of her friends all came out, and the other people also that provided the character reference letters, and those are people that know me and know me very well.

You know, one was from Ms. Crawford, my ex-wife, who has known me for 20 plus years; and you said you saw the videos. And, you know, a number of other people that have

known me, some of them have known me before I got sober and some have been with me since I got sober, you know, they would attest to the person who I am overall.

And I think that the fact that there was such a distance in time between the search warrant and the indictment, there's no issue. You know, I was helping raise my kids, 50-50 split as far as custody. Working. I was coaching one of my sons in football, and, you know, doing the things that dads and business people do. Yeah, it was a lapse in judgment, a lapse in reasoning, and I regret it today.

The only thing that I would really add is -- and this is just policy, because I've been an attorney for 20 years. I mean, I had three years to do research on, you know, these things and everything like that. You know, two things I wanted to point out.

You know, I had a friend in the program that -- he went away a couple of years ago for DUI manslaughter. And it was interesting to me -- obviously that's a state court case -- the minimum for that is four years, the maximum is 15 years to kill somebody. And what's being asked today is more than the maximum for killing a person. You know, I think that the guidelines are, you know, very, very outdated from what I've seen and what I've read.

The only other thing I would say is Judge Casey Rodgers up in the Northern District of Florida comments on some

of the 2021 sentencing commission recommendations. There's been recommendations to change the sentencing guidelines for 15 years. But she was referencing that, you know, for a case where there's sexual abuse of a child that's 12 to 16 years old, that before -- or after enhancements are applied and no acceptance of responsibility, the recommendation is 51 to 63 months. However, in a case like this, before all of the enhancements and everything like that, it's more than twice that amount. So it just seems to be there's some mistaken congruency as far as, you know, things going on. But, you know, I understand what I did was wrong, I accept responsibility, and, you know, I'm prepared. I've done all the things I need to do to prepare for prison, and I accept that.

THE COURT: All right. Thank you.

Anything further, Ms. Kwitko?

MS. KWITKO: Not from me, Your Honor.

THE COURT: Ms. Spergel, what says the United States?

MS. SPERGEL: Your Honor, we are asking for a mid- to high-level guideline sentence in this case. The guidelines applicable in this case, Your Honor -- while there's been obviously those commentaries regarding the commonality of a lot of these enhancements being applied resulting in an overly harsh sentence, I don't believe is the case. Commonality of characteristics of what they do does not negate the seriousness or heinousness of the crimes.

The guidelines have not been amended. They are the guidelines as determined for the reasonableness of increasing somebody's guideline sentence based upon certain enhancements, conduct that they have engaged in, such as children under the age of 12 being sexually abused, such as distributing as this defendant did, such as the image, including the toddler, such as using a computer, and in fact the number of images.

To briefly stop at that point, just to reference the number of images, defense has stated this is not a case where we have someone who is a huge collector who has this abundance of images. Well, Your Honor, the, quote, outlier factor that the defense has glossed over is the obstruction at the time of the execution of the search warrant. We do not know the full extent of his criminal activity because of an intentional act that he did on that morning by taking his phone and deleting MEGA, by deleting Kik, the apps that he was distributing over, by deleting photo vault, a private app where videos and images would have been collected.

We know from the forensic review that he was constantly accessing images and videos indicative of child exploitation. We do not have those videos, because they were deleted, but they have names that include age ranges and sexual acts. And we have -- in our limited amount that we could recover demonstrate that he was constantly accessing MEGA throughout the day and, at a minimum, the week leading up to

the search warrant which demonstrates the extent of his criminal activity was extensive.  And unfortunately because of the intentional acts of obstruction, we simply don't know.  And so I don't think it is a fair characterization to say that we are looking at a simple, finite moment in time.

When you consider the nature and circumstances of this offense under the 3553(a) factors, we have his relevant conduct of the other Kik account, we have what we saw is the actual distribution, and we have the conduct leading up to the execution of the search warrant, what we could tell forensically.  That paints a small picture of what it likely was.  And so we don't know that full extent because of the defendant's actions, but what we do demonstrates that he has an interest -- a sexual interest in minors.

And dealing with mental health issues or alcoholism, considering his history and character, none of that leads to possessing, viewing, or distributing images of children being sexually abused.  Pedophilia leads to possessing, viewing, and distributing images of children being sexually abused.  And so I think the guidelines as calculated in that guideline range are appropriate to account for his criminal activity.

I'd also like to just reference one argument that defense made in their sentencing memo that they briefly touched on today as well.  It's been discussed that Mr. Crawford was a lawyer in our community.  Being a lawyer in our community is a

position of trust in the community.  Sacrificing that position of trust and his law license that he obviously worked very hard for is not an appropriate basis for a downward variance.  In fact, he's violated the community trust by engaging in actions that are dangerous to our children.

In looking at the case cited by the defense, *United States v. Howard*, 28 F.4th 180, which I think was from the Eleventh Circuit in 2022, I'd note on page 210 of that case, it discusses that "The Sentencing Guidelines authorize no special sentencing discounts on account of economic or social status. We have held that it is 'decidedly inappropriate' for a district court to rely 'on the defendant's chosen profession and status in the community' to justify a large downward variance.  Such lenient sentences 'are typically unavailable to defendants of lesser means who are convicted of economic crimes'," so albeit a different scenario in that case.  "We have 'encouraged our district court colleagues to keep in mind' that 'criminals who have the education and training that enables people to make a decent living without resorting to crime are more rather than less culpable than their desperately poor and deprived brethren in crime.'"

And so the sacrifice of his law license I don't think is an appropriate basis based on that language to vary or depart downwards but in fact demonstrates his level of intelligence, his knowledge of the law, and his deciding to

violate that anyway.  And so under the 3553(a) factors, I think a harsh sentence is necessary for deterrence as well as a just punishment and respect for the law.

THE COURT:  All right.  Thank you.

Anything further from the United States?

MS. SPERGEL:  Unrelated to argument, Your Honor, there was one additional thing in the report as it related to fines.

I believe that the presentence report states that the JVTA is applicable.  And I apologize, I'm looking to see what number that is.  But upon conferring with my office, I actually don't believe that it's applicable in this case.  It was reinstated November 12th of 2025, and it is not retroactive. And so I do believe that this case falls in that time frame, and it is paragraph 106 in the PSR.

THE COURT:  I saw it.

All right.  Thank you very much.

Any reason not to proceed to sentence?

MS. SPERGEL:  No, Your Honor.

THE COURT:  Anything further from the defense?

MS. KWITKO:  No, Your Honor.

THE COURT:  Any reason not to proceed to sentence?

MS. KWITKO:  No, Your Honor.

THE COURT:  Well, Mr. Crawford, as you know, in imposing a sentence in the district court, the judge considers

a number of matters, including the policies and guidelines of the United States Sentencing Commission, the advisory guideline range that's derived from the guidelines. I consider the applicable statutory penalties. I consider the submissions of counsel, both oral and written. Both counsel submitted sentencing memorandums ahead of the hearing today, and I read them both. As I said, I looked at the video of your ex-wife being interviewed by Mr. Foster and Ms. Kwitko and their investigator. I very carefully read the evaluation of Dr. Imhof. And I read the letters submitted in mitigation by your family and friends, I think a couple people from your AA affiliation --

THE DEFENDANT: Yes, Judge.

THE COURT: -- and I appreciated those.

And of course I consider the entire record, including the presentence report and the other matters that are available to me. I read it all very carefully and with benefit -- that, by the way, does not make sentencing in these cases a simple matter. There's one way of looking at it that says the longer that you have been sentencing and the more you know about a particular case the more difficult it is to arrive at some particular sentence to the exclusion of all others. But I considered your statement on your own behalf as well, which I appreciate. And I consider the factors at 18 U.S.C. 3553(a).

You know, there's a long list, and some of them much

more directly pertinent to identifying an exact sentence than others. They include the nature of the offense. The subject matter of this offense is one that causes a distinctive response not only among the citizenry and among law enforcement but also among legislators, probably the one leading to the other.

The notion of sexual abuse and exploitation of a minor, an infant, a toddler, anyone especially below the age of consent and, the more difficult cases, even probably below the age of recognition, is something that the community regards with as repugnant and threatening. You can see that in the elaborate array of statutes and guidelines that are promulgated and in effect; however, not all offenses that violate the statute are equal.

Dr. Imhof used the phrase contact and non-contact -- the terms "contact" and "non-contact" in dividing the offenses into two separate categories. This of course is a non-contact category. This is a case that does not involve manufacturing, for profit or otherwise, of child pornographic images. It does not involve procurement of persons who participated in those offenses, particularly the procurement of minors. It doesn't involve the distribution for profit. Those -- I think most judges regard those as qualitatively different offenses that require a qualitatively different penalty.

I believe it was the United States in their

sentencing memorandum that referred to the Eleventh Circuit's en banc opinion in *Eyre*. I think Eyre finally received 30 years. Eyre was about as gruesome and aggravated and maximal offense in that category as you'd likely find. He manufactured -- he participated in, appeared in, and, as I recall, manufactured, distributed particularly infamous series of child pornographic videos that were originated, I believe it was, in Thailand. He went back and forth regularly. The things that are depicted in those videos are -- although I negate myself -- because he obviously did imagine them, but for most of us would be outside of our imagination and how hideous and repugnant and repulsive and offense that they were, he would have had a sentence of much more than 30 years had he been charged differently. As I recall, there was some criticism in the opinion from then Chief Judge Carnes about the nature of the charge and the problems that it created.

But I will note also that Mr. Eyre managed to maintain a household, a wife, and raise children, and had a very acceptable and successful, from all appearances, place in the community, which says a lot of things, one of which is that these crimes and the people who commit them often are very complex personalities and certainly engaged in complex conduct. Very stressful to keep track of, I would imagine.

Cases like *Eyre* are just in a sphere of their own. It is a remarkable opinion in many respects and it's very

thorough, I do not advise people to read it, because, like a lot of things, once you read it, you cannot unread it because of the vivid descriptions of the material.

But this is clearly not that sort of case, and there have been -- I can't remember whether it was your counsel or Dr. Imhof or both that cited these cases -- I guess it was your counsel with respect to the cases in the Middle District.  But the Middle District's -- let me start again.

I believe that it is still the case that the guidelines that are the most frequently departed from of all of the guidelines in the United States are these -- varied from, excuse me -- the ones that are most frequently varied from are these guidelines that we're dealing with here because of the feeling by most judges, and I do believe it's the majority and a very clear majority of the judges, think that the guidelines are not -- don't take correct cognizance of some very large qualitative and quantitative differences in these offenses.

And the point that your counsel makes, which I don't really think is disputed anywhere, that, as I said in jest when Mr. Foster and I started in this business, these images were on paper or on a cassette tape, and the -- it was felt to be some sort of -- and perhaps it was at the time, I don't make a judgment about that, but to the extent that the use of a computer made it some sort of a high-tech, extraordinary, and exceptionally threatening offense compared to all others,

compared to the so-called, quote, typical, unquote, offense. It might have been -- even if it was a valid notion then, it's not a valid notion now. Not that the severity is not still there but that the comparative severity is not there. These guidelines, like many of the guidelines, have been subject to a great deal of discussion and debate.

From the standpoint of a sentencing judge, you're very aware and you're required to be aware, to avoid unwarranted disparity, of what sentences have been imposed on similarly situated offenders so that we avoid unwarranted disparity among similarly situated offenders, and, as well, we now have an option that we did not have throughout all the time of the -- throughout the life of the guidelines of a lifetime term -- up to a term of lifetime of supervised release in these cases. So there's more sentencing flexibility. I know that many judges in cases that are in a general sense similar to yours are inclined toward a lesser sentence and a longer term of supervised release. But anyway, I began that little presentation there while discussing the first of the 3553(a) factors, which is the nature of the offense.

The second that I usually discuss is the nature and characteristic of the offender. I think that until today that you and I have never met, but I did look at the material, all of it that I have, to try to know as much about you as I could for our purposes today.

If I may pause one second.  Do I understand that you have been free of alcohol since when?

THE DEFENDANT:  February 13th, 2018.

THE COURT:  I knew you could give me the day.

THE DEFENDANT:  Ingrained in my head.

THE COURT:  Substances -- you have been free of all intoxicating substances for how long?

THE DEFENDANT:  Actually, I'm not entirely sure.  I'd have to think about that.

THE COURT:  Couple years anyway?

THE DEFENDANT:  Yeah, it's been quite a while.

THE COURT:  Would that be at least two years?

THE DEFENDANT:  Oh, yeah.

THE COURT:  Is that a yes?

THE DEFENDANT:  Yes.

THE COURT:  I don't see any sense to display all of your personal history on this transcript, but I have read it, and I see that you've had a good deal of turbulence arising from a number of sources.  And I'm not a psychologist or a psychiatrist, but it looks like you responded poorly for quite some time.

THE DEFENDANT:  (Nods head.)

THE COURT:  As is often the case with substance abuse, with alcohol and with others, it just kept getting worse, and the price you were paying for your conduct just kept

getting higher, and then you had this disaster.

It looks like you've been to alcohol rehab a couple of times and successfully completed the program, but then relapsed.

THE DEFENDANT:   (Nods head.)

THE COURT:   I hope that doesn't happen again.  I think in the AA circles they say that you haven't really recovered until you've slipped once or something to that effect.  Everybody slips.  I guess maybe that's an inevitable, and, if it is, I hope that if and when it occurs, if it hasn't already, it doesn't prove to be prolonged.

But a sentencing, as much as it involves the particulars of an individual offense and the particulars of the individual that committed the offense, it also involves a lot of other factors such as the need to enhance respect for the law by imposing a sentence that is proportionate to the offense and that enhances respect for the law.  That's an easy sort of sentence to say and not so easy to explain.  I think it means that at least a reasonable, fair-minded, and disinterested person who understood the offense, the offender, and the sentence would think that it was neither unduly harsh nor unduly lenient, it was somewhere in the range of a fair and humane sentence but with a certain solemn commitment to the well-being of the community.

I consider protection for the community.  I guess

most often that's protecting the community from the offender in the events that the offender might once again resort to criminal conduct. I'm sure that your counsel has told you that whatever might happen here today, if you commit this offense again, that's likely to result in consequences much more dire than anything that happens today. So I'm sure that's not breaking news, you probably knew that before, your counsel has probably told you that, so I'm just reaffirming that that's almost certainly true.

But I am familiar with the data here, and it is not really equivocal. Dr. Imhof, I think, did a fair summary, is mildly selective in the data, but I agree with Ms. Kwitko that you can never be a hundred percent sure that any defendant will not offend, in fact you can't be sure that any of us won't offend. It's never a hundred percent. But given the totality of your circumstances and your steps that you've taken so far and the available data for people who have committed the offense that you have committed, I don't think you are a serious threat. I don't remember what term Dr. Imhof used, but it was trivial or something like that, but it was certainly less than five percent or something like that.

But there's another component to this, sort of related, and that is the concept of deterrence. As you know, having practiced law and studied law, deterrence is always debated, whether and to what extent deterrence is achieved by a

criminal sentence.  And to the extent that it -- deterrence is achieved by a criminal sentence, there are some circumstances in which it's more likely to be effective than others.

Recognizing the extent of the debate on that, I think it is the case that most people would agree that if deterrence is effective, it is more likely to be effective in matters involving persons who have both the willingness and the ability to calculate and make an intelligent and informed to -- more or less extent, but undertake an evaluation of risk and reward, to be oversimple about it.  Those often are, I think, the examples that are given sometimes, are the financial crimes, that somebody is going to engage in embezzlement.  They are more likely to engage in an intelligent evaluation of risk and reward than someone who's selling drugs in an attempt to support their own habit because their judgment is so impaired, that, even if they were able to do it, they might not be so inclined.  There's a lot of debate about that.

This is an area where certainly deterrence needs to be considered, and it cannot be the case, I think, under the present understanding of the legal scheme, that the rehabilitation, low probability of recidivism of a particular defendant relieves them of the burden of imprisonment, hence, a five-year minimum mandatory.

This offense is so repellent to the community, I think, that -- whether it's, you might say, an empirical

determination or a value-ladened determination, it is still a clear consensus determination that this is a hideous and unacceptable offense, that is, the general topic of child pornography, and it requires some penalty and a deprivation of liberty so that all who undertake it will know that if they do it a prison term will result. And I don't apologize for that. I don't apologize for the United States Congress making that determination or for the community going to that extent in an attempt to protect itself from what it considers to be some of the most base behavior that is seen.

Anyway, I consider, as I said, a number of other factors, including the avoidance of unwarranted disparity. Again, I think your counsel studiously had looked up some of my earlier sentencings and included them in the sentencing memorandum, or perhaps you found them for them, I don't know. But I have typically varied down in non-contact cases for first offenders -- someone's first offense in an offense of this sort, and I think that's very nearly uniform, certainly in this district it is.

So to the best of my ability, Mr. Crawford, I have considered all those factors. I do think the United States's request is extraordinarily high and I am inclined to sentence at a level more near to what I have done in similar cases and that I know others in this building and in this district and around the country have done in similar cases.

Ms. Spergel correctly says that there are a couple of aggravators in your case, including the deletion of -- last-minute deletion, almost surely the reason that you chose to delete those particular things was exactly the reason that she suggests, although that's something I guess no one can know.

Maybe this is a theoretical item, and I don't want to nit-pick, but I don't think the fact that you are a lawyer is much of an aggravator or a mitigator here. I guess we expect more of lawyers, although people would say we expect and get less. Lawyers never live up to their -- the expectations.

This crime was not committed in the context of your law practice. You didn't steal your trust fund, you didn't take advantage of a helpless and injured plaintiff and overcharge them or commit any other kind of offense in, around, or intimately associated with your law practice. So I don't think that's an aggravator here. It's disappointing. And other lawyers don't like it because they like all lawyers to look good, it makes them look good, but I don't think it's an aggravator here.

And there is an extent to which -- although your law -- status as a lawyer is now lost, presumably permanently, your aptitude, your ability to earn a living is still there. And people who have education, the ability, the knowledge to sustain themselves and support their family are, as established

in much data, less likely to again engage in criminal conduct.

So it's not so much that you were precisely a lawyer that might be mildly mitigating but that you had an education, the means, the ability and willingness to sustain employment, the right kind of disposition to tend to your responsibilities, at times even while engaging in this nonsense. So I don't think it's a big factor one way or the other, but I certainly don't think it's an aggravator that you're a lawyer.

And you were admitted to the bar on a conditional admission, right?

THE DEFENDANT: Yes, Your Honor.

THE COURT: And that was two years?

I was on the Board of Bar Examiners, so I remember how this works.

Was it a two-year?

THE DEFENDANT: It was two years. The whole time frame was a little bit longer than that, but I was being monitored because of my past substance abuse history and the instances of going through treatment and different things like that, and, you know, I had a DUI a couple years ago.

THE COURT: I remember how it works. They call it a two-year string is the term that they -- presumably you can pull the string.

THE DEFENDANT: I completed that without problem. You know, I went to AA.

THE COURT:  May I ask if you had completed it without deception?

THE DEFENDANT:  Yes.  But my ego was to big to allow me to admit that I had a problem.

THE COURT:  Well, this should help place your ego in proportion.

THE DEFENDANT:  Yes.

THE COURT:  All right.  As I said, I've considered all of that to the best of my ability and, like some of my colleagues in this circumstance, choose to moderate the sentence and emphasize the supervised release.

So with that in mind, pursuant to the Sentencing Reform Act of 1984, to the extent applicable after *United States versus Booker*, and pursuant to 18 U.S.C. 3553(a), Mr. Crawford is committed to the Bureau of Prisons for 78 months.  Upon release, he must serve a 25-year term of supervised release during which he must comply with the mandatory and standard conditions adopted by the Court in the Middle District of Florida and appearing at Section 5D1.3(a) and Section 5D1.3 (c) of the United States Sentencing Guidelines.  In addition, you must comply with this formidable list of special conditions.

First, you must participate in a substance abuse program and follow the probation officer's instructions with respect to that program and contribute to the costs in accord

with the applicable sliding scale and submit to random drug testing.

Second, you must participate in a mental health treatment program, and follow the probation officer's instructions with respect to the program, as well as contribute to the costs of those services in accord with the applicable sliding scale.

You must participate in a mental health treatment program specializing in sexual offender treatment, submit to polygraph testing for treatment and monitoring purposes, follow the probation officer's instructions with respect to the program and contribute to the costs in accord with the applicable sliding scale.

As you know, you must register with the state sexual offender registration agency in any state where you reside, visit, are employed, carry on a vocation, or are a student as directed by the probation officer.

Just to be clear, that registration is a proper, timely registration. It is a condition of your federal supervised release so that any failure to register and comply with the state program will be a violation of your federal program of supervised release.

The probation officer must provide state officials with all information required under the Florida sexual predator and sexual offender notification and registration statutes and

the Sexual Offender Registration and Notification Act, otherwise known as the Adam Walsh Act of 2006 at Public Law 109-248, and may direct the defendant to report personally for required additional processing, such as photographing, fingerprinting, and DNA collection.

Six, you must have no direct contact with minors, that is, those under the age of 18, without the written approval of the probation officer, and shall refrain from entering into any area where children frequently congregate, including schools, day care centers, theme parks, playgrounds, et cetera.

Let me ask the probation officer, was there any request from his ex-wife that he not be allowed contact with his own children?

MS. ROY:  No, Your Honor.

THE COURT:  All right.  Well, he should have no contact with minors under the age of 18 except your own children without the written approval of the probation officer. So I just modified that to that extent.

You're prohibited from possessing, subscribing to, or viewing any images, videos, magazines, literature, or other material depicting children in the nude or in a sexually explicit position.

Without prior written approval from the probation officer, you are prohibited from possessing or using a

computer, including a smartphone, a handheld computer device, a gaming console, or an electronic device capable of connecting to an online service or an internet service provider. This provision includes a computer at a public library, an internet cafe, your place of employment, or an educational facility. Also, you're prohibited from possessing an electronic data storage medium, including a flash drive, a compact disk, and a floppy disk -- are those still around? I don't think so. Perhaps that's a little out-of-date -- or using any data encryption technique or program. If approved to possess or use a device, you must permit routine inspection of that device, including the hard drive and any other electronic data storage medium, to confirm adherence to this condition. The United States Probation Office must conduct any inspection in a manner no more intrusive than necessary to ensure compliance with this condition. And if this condition might affect a third party, including an employer, you must notify the third party of the restriction, including the computer inspection provision.

You must refrain from engaging in any employment related to -- or that includes direct interaction with minors.

As a qualifying felon, you must cooperate in the collection of your DNA as directed by the probation officer.

You must refrain from any unlawful use of any controlled substance. You must submit to one drug test within 15 days after placement on supervision and at least two

periodic drug tests thereafter as directed by the probation officer but not to exceed 104 per year.

I will waive the imposition of a fine.

There's an order of forfeiture at Document 111 of the docket that will be incorporated into the order of judgment and commitment and becomes final. I think it's actually final already.

You must pay the special assessment of $100 to the United States, which is due immediately.

Now, you said -- which provision is not applicable in your view, Ms. Spergel?

MS. SPERGEL:  The JVTA.

THE COURT:  That's correct.

But the AVAA is?

MS. SPERGEL:  Yes, Your Honor.

THE COURT:  That's correct.

In addition, you are -- you must pay the United States a $5,000 assessment under 18 U.S.C. 2259A.

For the reasons that I have stated, I conclude that the announced sentence is sufficient but not greater than necessary to comply with the statutory purposes of sentencing. I have imposed the custodial sentence for the reasons that I stated given the seriousness of the offense, for promoting respect for the law, providing a just punishment, complying with the minimum mandatory provision is probably an important

aspect here, to afford adequate deterrence, and to protect the public.

Counts Two and Three are dismissed in accord with the plea agreement.

Does counsel for the United States or the defense object to the sentence or the manner of its announcement for any reason not already stated on the record?

Ms. Spergel?

MS. SPERGEL:  Your Honor, the government does object to the large downward variance.

THE COURT:  Ms. Kwitko?

MS. KWITKO:  No.  No, Your Honor.

THE COURT:  All right.  Was there a recommendation with respect to his residence?

MR. FOSTER:  I would recommend Coleman low so he would be closest to family.

THE COURT:  Already.  Is he ready to be remanded?

MR. FOSTER:  He's prepared.

THE COURT:  The defendant is remanded to the United States Marshal to await designation by the Bureau of Prisons. I'll recommend that he be housed at Coleman low.

In your plea agreement, Mr. Crawford, you've largely waived your right to appeal from this judgment and sentence unless I have sentenced you unlawfully, or, I believe, unless the United States appeals.  Normally you would not have a right

to appeal unless I sentenced you above the statutory maximum, above the applicable guideline range, or in some unconstitutional manner.  I don't think I did any of that, so unless the United States appeals I think you have no right of appeal.  That's for you and your counsel to discuss.  To the extent that you have a right of appeal and elect to do so, I need to tell you two things.

Number one, you always have a right to counsel on direct appeal.  If you couldn't afford counsel, I would appoint one for you at public expense.  As it stands now, your present counsel must preserve and pursue any appeal unless other counsel is substituted for them by an order of the Court.

Number two, to begin an appeal you must file with the clerk of this court a written notice of appeal that's filed within 14 days and that is accompanied by a filing fee.  If you haven't the money to pay the fee, your counsel can ask the Court to waive the fee, and if that's granted you can proceed without payment.

Anything further from the United States?

MS. SPERGEL:  No, Your Honor.

THE COURT:  Anything further from the defense?

MS. KWITKO:  No, Your Honor.

THE COURT:  All right.  We are in adjournment.

MS. KWITKO:  Thank you, Judge.

(Whereupon, the Court adjourned at 10:57 a.m.)

--ooOoo--

<u>REPORTER'S CERTIFICATE</u>

I, REBECCA M. SABO, a Registered Merit Reporter and Certified Realtime Reporter, certify that the foregoing transcript is a true and correct record of the proceedings given at the time and place hereinbefore mentioned; that the proceedings were reported by me in machine shorthand and thereafter reduced to typewriting using computer-assisted transcription; that after being reduced to typewriting, a certified copy of the transcript will be filed electronically with the Court.

I further certify that I am not attorney for, nor employed by, nor related to any of the parties or attorneys to this action, nor financially interested in this action.

IN WITNESS WHEREOF, I have set my hand at Tampa, Florida, this 12th day of February, 2026.

<u>/s/ Rebecca M. Sabo</u>

Rebecca M. Sabo, RMR, CRR
Federal Official Court Reporter

# EXHIBIT 8

**UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA**

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) |
| Plaintiff | ) Docket No: 2:25-cr-131-SPC-NPM |
| | ) |
| | ) U.S. District Judge Sheri Polster Chappell |
| v. | ) |
| | ) AFFIDAVIT OF |
| JOHN JAMES ADDUCCI | ) ROBERT NAGLE PsyD |
| | ) |
| | ) |
| Defendant. | ) |
| | ) |

**DECLARATION OF ROBERT NAGLE**

I, Dr. Robert Nagle, declare that the following statements are true:

**BACKGROUND OF DECLARANT**

1. I currently work as a Consultant/Licensed Clinical Psychologist after retiring in December 2022 from a 24-year career with the Federal Bureau of Prisons (BOP).

2. During my last 30 months with the BOP, I worked in the Central Office as the Chief of Mental Health Services with national oversight responsibilities for all agency staff and inmate mental health services. I am a consulting expert on BOP policy issues.

3. I served as the National Suicide Prevention Coordinator in the Central Office during the previous 7.5 years. I oversaw the national suicide prevention program for the BOP and was responsible for creating and implementing policy throughout the agency to enhance suicide prevention.

1

4.  I also served as Chief Psychologist at FCC Coleman, USP Atwater, and FCC Petersburg. After those assignments I was the Mid-Atlantic Region Psychology Services Administrator where I was responsible for training staff in the region as well as supervising the Regional Psychology Treatment Program Coordinator.

5.  A copy of my resume which includes my relevant work experience is attached to this report as Exhibit A.

6.  The opinions I have expressed in this report represent my true and complete professional opinions on the matter to which they refer.

### STATEMENT OF WORK

7.  I was engaged by attorney Kevin Darken, who represents Mr. John Adducci, to assess likely conditions of confinement, considering the defendant's complex neurodevelopmental, psychological, adaptive behavior and social needs, if he is committed to the BOP for service of a custodial sentence. In preparing this letter I reviewed the following documentation:

    - Presentence Investigation Report (PSR) prepared by Nick Stevens, United States Probation Officer, dated January 26, 2026
    - Psychological Evaluation by Amanda Keating, Psy.D., BCBA-D, dated November 24, 2025

### EXECUTIVE SUMMARY

8.  Mr. Adducci pled guilty to Possession and Access with Intent to View Prepubescent Child Pornography, 18 U.S.C. § 2252(a)(4)(B) and 2252(b)(2) and Receipt of Prepubescent Child Pornography, 18 U.S.C. § 2252(a)(2) and 2252(b)(1) in the Middle District of Florida.

9.  He is 41 years old and has a longstanding history of neurodevelopmental and mental health concerns. Mr. Adducci was diagnosed with Attention-Deficit Hyperactivity

2

Disorder (ADHD) in early elementary school. His developmental history indicates that symptoms strongly suggestive of ASD such as cognitive rigidity, restricted interests, compulsive behaviors, and social communication deficits were present beginning in early childhood and went undiagnosed and untreated for many years. Recently he was formally diagnosed with Autism Spectrum Disorder (ASD). Throughout his life, Mr. Adducci has experienced chronic social isolation, relational naïveté, impaired social judgment, executive functioning deficits, anxiety, and periods of depression. He has struggled with emotional regulation and adaptive functioning despite average intelligence.

10. Since August 2025, while on pretrial supervision, Mr. Adducci has participated in twice-weekly individual therapy at Sycamore Shade Counseling and Consultation in Fort Myers, Florida. He has been amenable to treatment, actively participates in sessions, and is receptive to clinician feedback. Mr. Adducci is prescribed Adderall for management of ADHD symptoms. This level of engagement is not incidental. It demonstrates Mr. Adducci's capacity for accountability and behavioral stabilization when expectations are clear and oversight is present.

## BOP DESIGNATION

11. If Mr. Adducci is ultimately sentenced to a term of incarceration, the BOP will make the decision about where he serves his time after sentencing is complete. This process is known as designating. Ms. Shannon Race, a Prisonology expert previously worked for the BOP in the Designation and Sentence Computation Center (DSCC) and was responsible for determining security classification and complex sentence computations. She concluded that Mr. Adducci's initial security classification will likely be Low security (See Exhibit B), due to the Public Safety Factor (PSF) of sex offender even

3

though he has no prior criminal history, no history of violence or escape and no additional pending charges.

## MENTAL HEALTH

12. The most enduring and clinically relevant themes reflected in both the PSR and Dr. Keating's psychological evaluation are the presence of longstanding, inadequately addressed neurodevelopmental impairments. Mr. Adducci was diagnosed with ADHD in childhood and ASD in adulthood. The historical record is clear about persistent deficits in executive functioning, cognitive flexibility, social reciprocity, perspective-taking, and emotional regulation. These are not characteristics associated with Antisocial Personality Disorder (ASPD); rather, they reflect an underlying neurodevelopmental disorder that impairs judgment, boundary comprehension, and anticipatory decision-making.

13. According to Dr. Keating,

> It is important to note that Autism Spectrum Disorder is not a mental illness. It is a neurodevelopmental disorder, that is, it is a lifelong neurological and developmental condition whose effect is permanent. While present at birth, the outward expression of these differences may vary according to life stage and circumstances. They are also heavily influenced by the environment. The degree of impairment in day-to-day life is mitigated by interventions, family involvement and assistance, co-occurring conditions, the intensity and frequency of autism features, the degree of executive functioning deficits, and the degree of communication and cognitive (i.e., intellectual) deficits.

> Mr. Adducci struggles to perceive or foresee the potential consequences even if he is verbally informed. Like many people with autism, his ability to perspective-take from a future position not yet experienced is challenging, if not impossible. As such, Mr. Adducci struggles to recognize and understand when his own behavior may be problematic or unhealthy. He is even less capable of perceiving the real-world abuse that occurs for adults and children depicted in pornographic media. Basic developmental characteristics associated with autism make compulsive engagement in some behaviors more likely, and in Mr. Adducci's case, pornography usage was a ritualized way of spending free time.

4

14. Individuals with ASD who lack early, structured interventions frequently develop maladaptive coping strategies, particularly in the domains of social connection and emotional regulation. When such vulnerabilities intersect with compulsivity and unrestricted access to digital environments, the risk for problematic behavior increases. That risk, however, is treatment responsive. ASD-associated impairments are predictable, identifiable, and amenable to appropriately designed and applied interventions.

**REOFFENSE RISK**

15. Mr. Adducci engaged in sexual misconduct-related conduct in 2002 that resulted in a deferred prosecution agreement in Waukesha County, Wisconsin. He has no adult criminal convictions and is properly classified within Criminal History Category I under the United States Sentencing Guidelines. That matter occurred more than two decades ago and did not evolve into a pattern of sustained criminal justice involvement. Aside from the instant offense, his criminal history score is zero. This distinction is important when evaluating long-term risk and criminogenic trajectory.

16. Dr Keating explains:

> Mr. Adducci has no history of engaging in directly destructive or violent behaviors. He lacks social ability, judgment, and understanding, but he does not display characteristic antisocial or psychopathic traits. In contrast to psychopaths who understand another person's discomfort or pain and either enjoys it or is unmoved by it, Mr. Adducci lacks the ability to easily recognize or anticipate other people's emotional states.

> Mr. Adducci does not differentiate his behavior when he is in different settings or with different people. He fails to understand that others do. He has limited understanding of the social nature of romantic and sexual relationships.

> In Mr. Adducci's case, he has a lifelong chronic developmental condition that will require support and management. His interventions should be matched to inherent risk with the understanding that isolation, changes in routine, and changes in mood state have the potential to result in the reemergence of inappropriate internet usage. Many of the legal concepts pertaining to Mr. Adducci's case

5

assume a level of social "age" and cognition that is, for an individual with his neurodevelopmental profile, simply beyond his capacity.

17. In my professional opinion, Mr. Adducci's risk of reoffending can be meaningfully mitigated through a structured, court-ordered outpatient framework that directly addresses all of the deficits identified in his evaluation. Treatment should focus on social communication skills, perspective-taking, emotional labeling, cognitive flexibility, impulse regulation, and boundary formation. Specialized sex offender treatment utilizing cognitive-behavioral and skills-acquisition models should target sexual self-regulation and the development of adaptive coping strategies. Strict monitoring of electronic device usage and continued supervision would provide the necessary external structure to reinforce internal behavioral controls.

18. When neurodevelopmental vulnerabilities are recognized and treated within a coordinated supervisory framework, long-term community safety is enhanced. Incarceration alone does not remediate ASD-associated deficits.

## PRISON CONDITIONS

19. There are several broad categories of prison life that can be challenging, difficult to understand and/or distressing for all people but particularly those with ASD and psychological concerns, like Mr. Adducci. These include:

  a. Elevated Risk of Death

    i. Mental health services in the BOP are seriously understaffed, and treatment is prioritized based on a combination of staff availability and/or inmate need. This results in unpredictability, under treatment or neglect. Inmates with serious conditions like Mr. Adducci are often left to their ingenuity to manage complicated psychological concerns.

6

Death by suicide is a significant concern. The number one cause of death in federal prison is suicide. Following an investigation into the causes of death in federal prisons, The Office of Inspector General found that the BOP identified a total of 344 inmate deaths at BOP institutions from FY 2014 through FY 2021 that fell into one of four categories: (1) suicide, (2) homicide, (3) accident, and (4) those resulting from unknown factors. Suicides comprised most of these deaths, with homicides the next most prevalent. Many of the deaths that occurred under accidental or otherwise unknown circumstances involved drug overdose.[1] The following is a graphic from that report:



**Inmate Deaths by Type, FYs 2014–2021**

Source: OIG analysis of BOP data

b. Sensory sensitivities
   i. Prisons are extraordinarily loud. Construction materials (e.g., concrete and steel), layout (e.g., large rooms with high ceilings) and décor (e.g., non-absorbing) result in sound amplification and echoing. Inmate conversations, arguments, homemade radio speakers, telephone calls, game playing/exercise, activities of daily living (e.g., cooking, cleaning, showering) all generate noise that is not easily ignored or dissipated.

---

[1] Department of Justice Office of the Inspector General, "Evaluation of Issues Surrounding Inmate Deaths in Federal Bureau of Prisons Institutions – Evaluation and Inspections Division (24-041), February 2024.

Staff two-way radios, telephones and overhead announcements are unpredictable and contribute to the persistently high noise level. In addition to this are sounds from overhead lights or other electronic buzzing (e.g., stand alone or hand-held metal detectors). Most people can habituate to loud environments. People with ASD are frequently impaired in this area and are subject to being perpetually overwhelmed. It is well documented that up to 95% of individuals with ASD experience atypical responses to sensory stimuli.

ii. Prisons have strong smells such as body odor from reduced bathing by choice or prison schedules. Often urine and feces can be detected because cells have not been properly cleaned between housing assignment changes, limited availability of cleaning resources not infrequently intentionally withheld, or because behaviorally disordered or mentally ill inmates engage in fecal misuse. Food preparation, whether in the formal dining hall or informally with canteen items in microwaves within housing units, generate strong odors.

iii. Lighting serves security needs and is frequently unaligned with the natural light dark cycle common outside of prison. For example, lights outside of prison building are very bright and remain on all night. They often shine in cell windows and inmates have no means to block them out. Although an inmate generally turns off his cell light at night this can be overridden by any staff member and interrupt normal sleep cycles. Officers making rounds throughout the night shine bright

8

flashlights into cells to ensure the presence and well-being of inmates. This process is also very disruptive, and a small number of officers may use it as an informal means of harassment or "get-even" for perceived slights with some inmates. Inmates with ASD may become considerably agitated and/or disoriented.

c. Isolation

    i. According to the Department of Inspector General, "…inmates with mental illness spend disproportionately longer periods of time in restrictive housing then do their peers.[2] " This separation from general population exacerbates a broad range of psychological distress as evidenced by hopelessness, helplessness, paranoia, functional impairment, impaired motivation and suicidality. It also reduces the ability to access peer supports and delegitimizes the idea that inmates with a mental illness can function independently albeit with some targeted interventions.

    ii. It is well documented that inmates with ASD spend more time in restrictive housing. This may be driven by peculiar and idiosyncratic behaviors and rituals that are not socially acceptable or tolerated by the larger prison population. In prison vernacular they may be run-in. If their rituals are considered more extreme, bizarre or challenging to the overall culture the consequences may be more immediate and extreme.

    iii. Inmates with ASD may be anxious and fearful and isolate in restrictive housing out of an abundance of caution. These fears may appear

---

[2] DOJ-OIG. "Review of the Federal Bureau of Prisons' Use of Restrictive Housing for Inmates With Mental Illness." July 2017.

unfounded to many but often reflect challenges in understanding the complex formal and informal social hierarchies and exchanges of prison life.

d. Disruption of routines
   i. A characteristic of ASD is cognitive rigidity or the inability to think about things in a different way. Prison is generally considered as a place that affords structure and predictability. When examined more closely though this does not account for common and sudden changes (e.g., transfers, lockdowns, discharge of firearm, fights and assaults, etc.) that inject instability and unpredictability. For anyone with ASD these incidents can cause outsized levels of anxiety and stress and atypical behavioral responses.

e. Relationships with staff and other inmates.

   i. Inmates with ASD experience difficulties in being able to read the emotional expression on other people's faces which can lead to confusion. Making and maintaining eye contact is a known issue for people with ASD and in prison they may be perceived as uninterested or as being overly aggressive or challenging. Both issues can have life altering consequences. Additionally, they may not understand the unwritten social rules in the prison environment such as the need to maintain proper body spacing.

   ii. Due to a general under appreciation of the nuances of how people with ASD present and process information, correctional staff generally afford them less empathy, patience, assistance and support than they

10

require. This exacerbates their adjustment issues and leads to further isolation and difficulty adjusting to prison.

f.  Violence Prone Characteristics

    i.  Deprivation of material goods. The correctional setting controls inmate's access to resources such as telephones, email, commissary (e.g., food, clothing and healthcare/hygiene items), employment, showers, and housing (e.g., cells). By controlling access to limited resources, staff create competition among inmates and incentivize underground economies. Like all human beings, inmates strongly resist impoverishment and loss of self-image, and will go to extremes to mitigate material deprivation. For example, even when staff provide an inmate with a cell or desirable employment, Mr. Adducci may have to pay a financial, commissary, safety or sexual fee to other inmates or risk losing what he has so tenuously gained.

    ii.  High risk of victimization. Survival in a correctional setting is predicated on understanding and adapting to the many formal prison rules along with the informal and ever-evolving ethos established by the inmate population. Inmates will view Mr. Adducci as easy prey because he is identified as someone convicted of a sex offense and has a mental health concerns and neurodevelopmental challenges. As a result, he will draw predatory attention and need to develop strategies to ensure his safety. This is especially dangerous when peers are motivated by power

11

and status without consideration for a person's mental health needs or other pro-social concerns.

iii. Loss of Personal Autonomy. Incarceration is characterized by severely limited self-determination. Inmates are told when, where and how quickly they can walk, what programming they must attend, where and with whom they will live, what they will eat, when to sleep and wake, and how they must dress, comport and interact with others. Any inmate's actions are subject to the scrutiny and judgement of any staff member at any time. With such restricted autonomy inmates are sensitized to the balance of power between them and other inmates, the imbalance of power with staff, and whether power is legitimate.

iv. Lack of non-violent routes for resolving conflicts. Inmates lack formal avenues to resolve disputes nonviolently. There are no impartial dispute mediators, opportunities to negotiate win-win solutions, or safe settings to address grievances. These absences leave inmates reliant on what they bring with them from outside as well as what the predominate inmate culture imposes.

## ADJUSTMENT TO PRISON

20. Dr. Keating makes clear that:

The challenge for Mr. Adducci, and others like him, is meeting the day-to-day demands of life where a range of executive functioning skills are required. In individuals with typical development, adaptive skills are generally equitable to their intellectual ability. However, in individuals with autism, intelligence is a relatively weak predictor of adaptive behavior. Executive functioning (EF) abilities (e.g., planning, impulse control, initiating, self-monitoring, organization, and flexibility of thought and action) predict adaptive and social skills more readily than IQ in autistic individuals. Mr. Adducci's parents have a lengthy history of interceding on

12

his behalf. His parents continue to provide prompting or help for a wide range of tasks.

21. Mr. Adducci will be confused by the unwritten rules and the sub-culture established by inmates. Survival in a correctional setting is predicated on understanding and adapting to formal prison rules along with the informal and ever-evolving ethos established by the inmate population. It is likely that Mr. Adducci will have difficulty adapting to unwritten inmate rules and be more prone to inadvertently breaking the rules when pressured and spending time in the Special Housing Unit (SHU). This is especially dangerous in a correctional setting when those peers are motivated by power and status without consideration for a person's health needs or other pro-social concerns.

22. People like Mr. Adducci are at an increased risk for victimization, sexual assault, exploitation (e.g., financial, material goods, protection, etc.) and a range of other negative outcomes because of how they present to others and their diminished understanding of the emotional aspects of interactions. Mr. Adducci may struggle to consistently and successfully adapt his behavior in ways which would be protective. This same dynamic will manifest itself in his relationship with staff who purportedly exist to afford him safety and guidance.

23. Inmates will view Mr. Adducci as easy prey because he is weak, awkward, and socio-emotionally unsophisticated. As a result, he will be ostracized and isolated. Mr. Adducci's social awkwardness, underdeveloped communication skills, and his inability to read/interpret non-verbal cues make him much more susceptible to abuses by gang members, sexual predators, and criminal miscreants one encounters in the correctional setting.

24. As a result of his neurodevelopmental and mental health problems, he is likely to face significant risks to his physical safety, challenges to establishing appropriate, reasonable, and reliable staff and inmate relationships, and an elevated risk of being victimized physically, mentally, and emotionally, by stronger, more skilled, socially adept, and manipulative inmates.

25. Due to naiveté and behavioral oddities, it is probable Mr. Adducci will subjectively experience a harsher sentence than other offenders by orders of magnitude. Inmates are deliberate about the complex, unspoken social dynamics that focus on the accumulation of power and influence using violence, sexual predation, contraband, gang affiliation and illicit schemes. Complicating this is Mr. Adducci's social and emotional challenges.

26. If a lengthy sentence of incarceration is imposed, Mr. Adducci will probably be exposed to inmate machinations and may be preyed upon due to his eccentricities, social awkwardness, standoffishness, and difficulty reading and responding to emotional cues. This is a highly significant consideration when making designation and treatment recommendations where inmates are constantly evaluating each other to determine social dominance roles. In simplified terms one is either prey or victimizer.

27. The SHU is a specialty housing unit primarily to separate inmates from the general population for disciplinary, safety and security purposes. Whatever the reason it is universally understood to be aversive and negatively contributes to inmate well-being. When housed in SHU inmates are afforded limited recreation opportunities, increased risk of violence, significantly reduced agency and ability to protect themselves, reduced staff accessibility and interaction, and an overall degradation of psychological well-being. For an individual such as Mr. Adducci, who would arrive in SHU with

14

considerable deficits and challenges, it is easy to appreciate its considerable detrimental effects.

28. If Mr. Adducci spends considerable time in the SHU due to ASD associated conflicts, misunderstandings, and difficulties with staff and inmates, as is predicted, it would directly affect his ability to complete recommend programming. This is another example of how his sentence will be notably worse.

29. Due to Mr. Adducci's diagnoses and sexual offense he will face enhanced scrutiny and rejection when he is considered for residential reentry placement (e.g., halfway house.) This will be due to several factors such as limited RRCs with a specialty in working with inmates who are neurodiverse and have been convicted of a sex offense.

30. The BOP will offer assurances that they will consider judicial recommendations for a facility, treatment program and other considerations. However, they will also assert that in the end they have final decision-making authority. Mr. Adducci's diagnosis and its downstream consequences will have little impact on the ultimate decision made about where he is designated.

## TREATMENT AVAILABLE TO MR. ADDUCCI

31. At this time the BOP does not have a treatment program targeted to address the specific needs of people with ASD. The most relevant residential treatment resource is the Skills Program that exists at two facilities (e.g., FCC Coleman Medium and FCI Danbury Low). This is a residential treatment program designed to improve institutional adjustment for those who have intellectual and social impairments. The Skills Program may offer some limited assistance with Mr. Adducci's social and emotional needs.

32. As noted below, the BOP continues to experience persistent staffing problems. This includes the hiring and retention of Psychologists[3], Treatment Specialists, Unit Team staff, and Correctional Officers for mental health treatment programs such as the Skills Program. Reduced staffing impacts the routine availability of programming, full implementation of treatment protocols, and implementation of milieu learning with necessary staff mentoring. The BOP has addressed this problem by creating waiting lists for entry into the programs as well as reducing the number of participants who can participate in treatment at any given time. These solutions create significant treatment log jams as treatment capacity never catches up with treatment need. The priority for the BOP is always agency need and it supersedes the safety considerations, treatment needs and quality of life considerations of inmates.

33. An additional concern is if Mr. Adducci is lucky enough to be designated to the Skills Program is that the BOP will not provide any assurances as to when it will occur. Mr. Adducci, even if he receives a judicial recommendation or is identified within the BOP as likely benefiting from the Skills Program, may not arrive for months or even years into his sentence. This negates any safety, and treatment benefits the BOP advertises.

## BOP SYSTEMIC CHALLENGES

34. The BOP continues to experience well publicized examples of staffing shortages that result in lapses of professionalism such as misconduct and policy failures with expected negative consequences. The resultant physical, emotional and psychological harms result in unjust but preventable suffering. Staffing shortages mean that inmates receive less frequent, lower quality services in everything from medical care, safety from self

---

[3] https://www.themarshallproject.org/2026/01/26/mental-health-federal-prisons-staffing-shortages

16

and others, case management, and psychological care. Without routine contact and investment in the well-being of Mr. Adducci it is likely he will withdraw and may be subject to unnecessary inmate exploitation outside of the awareness of correctional staff.

35. BOP staff struggle to build affirming, positively reinforcing and engaged professional relationships with inmates. Optimally, these model pro-social attitudes and negate the most corrosive effects of incarceration such as isolation, boredom and overexposure to criminality. The BOP did not always have these problems and many factors such as position eliminations, Congressional underfunding, staffing shortages, an unspoken belief in the irredeemability of individual inmates, a refusal to integrate academic knowledge into practical correctional approaches, widespread training deficiencies, and a cultural affinity for emotionally driven retribution have contributed to profound failures within the BOP. Mr. Adducci's crime, behavioral oddities, and socio-emotional deficits will likely cause him to be neglected in ways that exacerbate the worst tendencies of agency staff.

## CONCLUSION

36. The BOP routinely answers inquiries about their ability to manage and treat people like Mr. Adducci referring to care levels, medical centers, doctoral level psychologists and the Skills Program. It is also true that there is no developed expertise in treating Neurodevelopmental Disorders in the BOP to include intensive residential programming or structured non-residential interventions as detailed in Dr. Keating's psychological evaluation report. What expertise may exist tends to be random rather than the result of centralized planning and training.

17

37. Deficits in social communication and social interaction are routinely considered low risk, low priority problems that do not pose significant security and management concerns. Resources to optimize interventions such as trained, certified, collaborative, resourced and well-intentioned teams made up of Psychology Services, Health Services and Correctional Services are usually fragmented and minimally effective due to overwork, competing interests and inadequate resource allocation. Medication, environmental contingencies, and individualized treatment are rarely agreed upon due to reduced staffing, reluctance to support long term, complex treatment by institutional, regional and agency leadership and a cultural unwillingness to accept that good treatment is good security.

38. As an inmate convicted of a sex offense with neurodevelopmental concerns such as Mr. Adducci is highly likely to be groomed and subjected to bullying, social exclusion, extortion and, at worst, physical and sexual assault in prison. This could possibly lead to protective custody, isolation in the Special Housing Unit and ultimately transfer to another facility.

39. It is widely accepted that the loss of freedom that results when a period of incarceration is imposed should be the sole punishment. Additional pains of incarceration (e.g., death/serious injury due to assault, sexual exploitation, reduced custodial safety, programming, or visitation, chronic understaffing, etc.) will place complex burdens upon Mr. Adducci, who has a very limited ability to improve his lot. This stacked punishment is considerable, unnecessary, and excessive.

40. As noted earlier, Mr. Adducci is considered to have a low risk of reoffending if the court will consider an alternative and orders outpatient treatment that addresses ASD associated vulnerabilities, behavioral activation to increase interpersonal comfort and effectiveness,

18

monitored electronic device usage, preventative treatment to reduce the risk of suicide and sex offender treatment.

Signed on this 10th day of March 2026 by:

*Robert Nagle*
_____
Robert W. Nagle, PsyD

**EXHIBIT A**
**Robert William Nagle, Psy.D.**

Prisonology

Info@Prisonology

617-858-5008

**WORK EXPERIENCE:**

Middleton Psychology Services – Private Contractor, Clinical Psychologist     10/2022 – Present
Frederick, MD

Duties and Skills:
- Provide psychological services for adults eighteen years of age and older who have a broad range of motivations and interests to change. Recognize clients and their unique sociocultural contexts, experiences, and needs, offering psychotherapy of depth, insight and relationship, from an interpersonal perspective, to help them live out lives of integrity, wholeness and beauty.

Prisonology – Mental Health Consultant, Clinical Psychologist     1/2024 - Present
- Mitigation strategies for clients facing sentencing considering mental health needs and situational demands of the correctional environment.

Bureau of Prisons – Central Office, *Chief of Mental Health Services*     5/2020 – 12/2023
Washington DC

Supervisor: Alison Leukefeld, Ph.D., Psychology Services Branch Administrator

Duties and Skills:

- National oversight responsibilities for all agency staff and inmate mental health.
- Supervised seven doctoral level psychologists and one master level treatment specialist with
- Identified mental health treatment program needs, requested new programs, secured sites, and collaborated on development and construction.
- Improved integrated treatment approaches between mental health, substance use and sexual offending components.
- Collaborated with Congressional and Executive Branch partners.
- Provided responses to media inquiries.
- Developed national mental health training.
- Developed and executed budget for national mental health programs.
- Conceived, wrote, negotiated, and implemented agency mental health policies.
- Identified vulnerabilities in national mental health services and created strategic plans to remediate them.
- Consulted and collaborated with Regional Psychology Administrators to assess needs and develop interventions.

20

- Represented the agency with other government entities.
- Mentored and developed Psychology Services psychologists.
- Participated in cross section initiatives such as recruitment and retention strategies and interpersonal violence intervention program and training development.
- Acted for Psychology Services Branch Administrator.
- Organized strategic problem-solving approaches across the agency.

Bureau of Prisons - Central Office, *National Suicide Prevention Coordinator.*   1/2013 – 5/2020
Washington DC

Duties and Skills:
- Oversaw the national suicide prevention program for the agency.
- Wrote national suicide prevention policy.
- Collaborated with national psychology leaders on suicide prevention measures.
- Monitored trends of self-directed violence and developed intervention approaches to disseminate to treatment providers.
- Led psychological reconstruction teams following inmate deaths to improve suicide prevention, assessment and treatment.  Reports inform staff training, policy development, and legal questions.
- Developed national training modules and provided in-person and online training for psychologists.
- Identified suicide prevention treatment professionals and organized training for agency psychologists.
- Created mental health and suicide prevention training material for agency wide development of staff.
- Mentored, developed and supported agency chief psychologists.
- Consulted with agency professionals to enhance suicide prevention (e.g., Residential Reentry, Privatization).
- Represented the agency with other governmental entities.
- Provided on-site technical assistance visits.
- Participated in Program Reviews (Quality Control Auditing).

Bureau of Prisons – Mid-Atlantic Regional Office, *Mid-Atlantic Region Psychology Services Administrator*                                                      3/2010 - 1/2013

Annapolis Junction, MD

Duties and Skills:
- Remotely supervised and developed psychologists at sixteen correctional facilities with approximately 27,000 inmates.
- Conducted psychological reconstructions, evaluated self-directed violence trends, and reviewed all suicide risk assessments.
- Provided case consultations, clinical conceptualizations and treatment and management strategies with service providers.
- Direct supervision of the Regional Psychology Treatment Program Coordinator.
- Recruited and developed clinical staff for advancement in the agency.

21

- Advised Regional and Deputy Regional Director in technical and professional matters related to Psychology Services.
- Participated in an acting capacity for the Deputy Regional Director and Wardens as requested.
- Managed the Regional Psychology Services budget.  Identified and requested funding for institutional needs.
- Organized and provided annual training for regional chief psychologists.

Bureau of Prisons – Federal Correctional Complex Petersburg, *Chief Psychologist*

6/2006 - 3/2010

Petersburg, VA

Duties and Skills:
- Supervised twenty-three mental health staff which included nine psychologists, one psychology technician, eleven drug treatment specialists and two sex offender management program treatment specialists.
- Coordinated primary, secondary and tertiary mental health services at a federal correctional complex with minimum, low and medium security facilities with 2,200 inmates.
- Provided group and individual treatments with the inmate population.
- Directed two Residential Drug Abuse Treatment Programs, three Non-Residential Drug Abuse Treatment Programs, a Sex Offender Management Programs, and a Pre-Doctoral Psychology Internship.
- Managed the Suicide Prevention Program targeting prevention of self-directed violence and treatment of complex suicidal behavior in inmates with serious mental illness and severe personality disorders.
- Administered the Employee Assistance Program.
- Interpreted and implemented Federal Bureau of Prisons policy to meet local needs.
- Provided professional support to complex executive staff.
- Acted for Associate Warden and Regional Psychology Administrator.

Federal Bureau of Prisons – United States Penitentiary Atwater, *Chief Psychologist*

12/2004 - 5/2006

Atwater, CA

Duties and Skills:
- Supervised a Psychology Services department of four doctoral level psychologists, one drug treatment specialist and two Challenge Program treatment specialists in a high security male institution with 1,000 inmates.
- Organized and provided crisis services to inmates with lethal behavioral and emotional dysregulation.
- Provided group and individual treatments with the inmate population.
- Developed and implemented behavior management plans to manage self-directed violence with inmates who experienced serious mental illness and severe personality disorders.

22

- Consulted with executive staff on matters of psychological expertise relevant to the safe, secure, and orderly running of the institution.
- Generated and implemented a comprehensive plan to improve clinical services of the Psychology Department, including the CHALLENGE (High Security Substance Use and Mental Health) and Drug Abuse Programs, following a program review highlighting areas requiring immediate change.
- Administered the Employee Assistance Program.
- Acted for the Associate Warden.

Bureau of Prisons – Federal Correctional Complex Coleman, *Chief Psychologist*

4/2002 - 11/2004

Coleman, FL

Duties and Skills:
- Directed a Psychology Department inside a medium security male correctional setting with 1,800 inmates and a minimum-security female facility with 510 inmates.
- Provided comprehensive mental health services to include crisis intervention and management of inmates with serious mental illnesses and personality disorders.
- Provided group and individual treatments with the inmate population.
- Supervised four doctoral level psychologists and two drug treatment specialists and one Skills Program treatment specialist.
- Managed, implemented, and provided direct clinical services to the Suicide Prevention Program to monitor, assess and treat self-directed violence and elevated suicide risk.
- Administered the Employee Assistance Program.

St. Leo University - *Adjunct Professor*

1/2002 - 8/2004

Ocala & Gainesville Florida Campuses

Duties and Skills:

- Created lesson plans, instructed and graded undergraduate classes in Forensic Psychology, Developmental Psychology, and Independent Seminars.

Bureau of Prisons – Federal Correctional Complex Coleman, *Skills Program Coordinator*

1/1999 - 4/2002

Coleman, FL

Duties and Skills:
- Collaborated on writing policy and starting a new national treatment program serving inmates with cognitive deficits.
- Completed comprehensive psycho-educational, personality and intellectual assessments and developed treatment plans.
- Provided group and individual treatments for the inmate population.
- Supervised the Skills Program Treatment Specialist and Special Learning Needs

23

Teacher.

- Operated a residential treatment program with sixty-four inmate participants and sixty four inmate mentors.
- Coordinated crisis management for inmates with self-directed violence risk and behavioral dysregulation.
- Acted for Chief Psychologist

Florida State Hospital, *Psychologist*                                    8/1998 - 1/1999

Chattahoochee, FL

Duties and Skills:

- Participated and collaborated with professionals on multi-disciplinary treatment teams on a long term unit with persons experiencing severe mental illness.
- Provided group and individual psychotherapy.
- Assessed, treated, and documented suicide risk.
- Created, implemented, monitored, and evaluated individualized behavior management plans.

Florida State Hospital, *APA Approved, Pre-Doctoral Intern*

9/1997 - 8/1998

Chattahoochee, FL                                    Supervisor: Ellen Resch, Ph.D.

Duties and Skills:

- Completed clinical rotations in civil admissions, medium security forensic, maximum security admission forensic units, and assisted with community evaluations to determine mental status at the time of the offense and competency to proceed status.
- Evaluated competency to proceed and wrote reports for courts.
- Completed violence risk assessments, personality and intellectual testing, neuropsychological screening, NGRI discharge determinations, crisis intervention and wrote reports.

**EDUCATION:**

University of Denver - Graduate School of Professional Psychology Denver, Colorado

- Doctor of Psychology – August 1998
- Major: Clinical Psychology

Montclair State University Upper Montclair, New Jersey

- Bachelor of Arts – December 1991
- Major: Psychology

24

- Honors: Cum Laude

**AFFILIATIONS:**
- National Register of Health Service Providers in Psychology
- International Society for the Psychological Treatments of the Schizophrenia and Other Psychoses
- Maryland Psychological Association
- International Society For The Science of Existential Psychology

**CREDENTIALS:**

- Licensed Clinical Psychologist, Maryland #05521 - Active
- Licensed Clinical Psychologist, Florida PY6374 - Inactive
- Licensed Clinical Psychologist, Virginia #0810003814 - Inactive

## EXHIBIT B

BP-337 INMATE LOAD AND SECURITY DESIGNATION FORM | FEDERAL BUREAU OF PRISONS

**INMATE LOAD DATA**

1. REGISTER NUMBER:  92863-511

| 2. LAST NAME Adducci | 3. FIRST NAME John | | 4. MIDDLE | 5. SUFFIX |
|---|---|---|---|---|
| 6. RACE B/W/A/I | 7. SEX M/F | 8. ETHNIC ORIGIN O/H | 9. DATE OF BIRTH | |

10. OFFENSE/SENTENCE

| 11. FBI NUMBER | | 12. SSN NUMBER |
|---|---|---|
| 13. STATE OF BIRTH | 14. OR COUNTRY OF BIRTH | 15. CITIZENSHIP |

16. ADDRESS-STREET

| 17. CITY | 18. STATE | 19. ZIP | 20. OR FOREIGN COUNTRY |
|---|---|---|---|
| 21. HEIGHT FT ___ IN ___ | 22. WEIGHT ___ LBS | 23. HAIR:BA/BK/BD/BN/GY/RD/SD/WH | 24. EYE: BK/BL/BN/GY/GN/HL/XS/PK/SC |

25. ARS ASSIGNMENT:  A-Admin  RS

| 1. JUDGE | 2. REC FACILITY | 3. REC PROGRAM | 4. USM OFFICE | |
|---|---|---|---|---|
| 5. VOLUNTARY SURRENDER STATUS          0 = NO          (-3) = YES<br>IF YES, MUST INDICATE: 5a. V/S DATE: _____          5b. V/S LOCATION: _____ | | | | -3 |
| 6. MONTHS TO RELEASE | | | | |
| 7. SEVERITY OF          0 = LOWEST          3 = MODERATE          7 = GREATEST<br>CURRENT OFFENSE          1 = LOW MODERATE          5 = HIGH | | | | 5 |
| 8. CRIMINAL HISTORY POINTS:   0   0 = 0-1   4 = 4-5   8 = 10-12<br>                               2 = 2-3   6 = 7-9   10 = 13+<br>8a.Source Document Date: _____   8a. SOURCE OF DOCUMENTED   X   - PSR or ____ - NCIC | | | | 0 |
| 9. HISTORY OF          NONE   >15 YEARS   10-15 YEARS   5-10 YEARS   <5 YEARS<br>VIOLENCE   MINOR   0   1   1   3   5<br>           SERIOUS   0   2   4   6   7 | | | | 0 |
| 10. HISTORY OF          NONE   >15 YEARS   >10 YEARS   5-10 YEARS   <5 YEARS<br>ESCAPE OR   MINOR   0   1   1   2   3<br>ATTEMPTS   SERIOUS   0   3 (S)   3(S)   3(S)   3(S) | | | | 0 |
| 11. TYPE OF          0 = NONE          3 = MODERATE          7 = GREATEST<br>DETAINER          1 = LOWEST/LOW MODERATE   5 = HIGH | | | | 0 |
| 12. AGE          0 = 55 AND OVER          4 = 25 THRU 35<br>          2 = 36 THRU 54.          8 = 24 OR LESS | | | | 2 |
| 13. EDUCATION   0 = Verified High School Degree or GED<br>LEVEL          1 = Enrolled in and making satisfactory progress in GED Program<br>          2 = No verified High School Degree/GED and not participating in GED Program | | | | 2 |
| 13a. HIGHEST GRADE COMPLETED | | | | |
| 14. DRUG/ALCOHOL ABUSE          0 = Never/>5 Years          1 = <5 Years          U = Unknown | | | | 0 |
| 15. TOTAL | | | | 6 |
| 16. PUBLIC   A-NONE                                          I-SENTENCE LENGTH (males only)<br>SAFETY   B-DISRUPTIVE GROUP (males only)          K-VIOLENT BEHAVIOR (females only)<br>FACTORS   C-GREATEST SEVERITY OFFENSE (males only)   L-SERIOUS ESCAPE<br>          F-SEX OFFENDER                          M-PRISON DISTURBANCE<br>          G-THREAT TO GOVERNMENT OFFICIALS        N-JUVENILE VIOLENCE<br>          K-DEPORTABLE ALIEN                     O-SERIOUS TELEPHONE ABUSE | | | | F |

17. REMARKS
SEVERITY OFF - Possession of child pornography
Education - not verified

18. OMDT REFERRAL: (YES/NO) SCRN LEVEL: MD=_____   MH=_____   SENT TO OMDT ON: _____   Consider RDAP? Y or N/A

Med:

Drug HX:

# EXHIBIT 9

Sentence Imposed Relative to Guideline Range

| Sentence Range | 2015 N | % | 2016 N | % | 2017 N | % | 2018 N | % | 2019 N | % | 2020 N | % | 2021 N | % | 2022 N | % | 2023 N | % | 2024 N | % |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Grand Total | 58 | 100.0% | 62 | 100.0% | 34 | 100.0% | 33 | 100.0% | 41 | 100.0% | 25 | 100.0% | 31 | 100.0% | 21 | 100.0% | 40 | 100.0% | 53 | 100.0% |
| Within Range | 12 | 20.7% | 8 | 12.9% | 8 | 23.5% | 7 | 21.2% | 10 | 24.4% | 4 | 16.0% | 10 | 32.3% | 9 | 42.9% | 10 | 25.0% | 15 | 28.3% |
| Downward Departure Govt Motion | - | | 1 | 1.6% | - | | - | | - | | - | | - | | - | | - | | - | |
| Non-Govt Downward Departure | 3 | 5.2% | 1 | 1.6% | 1 | 2.9% | - | | 1 | 2.4% | - | | 1 | 3.2% | - | | - | | 2 | 3.8% |
| Upward Variance | - | | - | | 1 | 2.9% | 1 | 3.0% | 1 | 2.4% | 1 | 4.0% | - | | 1 | 4.8% | - | | 1 | 1.9% |
| Downward Variance Govt Motion | 4 | 6.9% | 2 | 3.2% | 2 | 5.9% | 2 | 6.1% | 2 | 4.9% | 1 | 4.0% | 1 | 3.2% | 3 | 14.3% | 2 | 5.0% | 4 | 7.5% |
| Non-Govt Downward Variance | 39 | 67.2% | 50 | 80.6% | 22 | 64.7% | 23 | 69.7% | 27 | 65.9% | 19 | 76.0% | 19 | 61.3% | 8 | 38.1% | 28 | 70.0% | 31 | 58.5% |

FILTER:
Fiscal Year: 2015 - 2024; Crime Type: Child Pornography; Guideline: §2G2.2 Circuit: 11th Circuit; State: All; District: Florida, Middle; Race: All; Gender: All; Age: All; Citizenship: All; Education: All; Crime Type: Child Pornography; Guideline: §2G2.2; Drug Type: All; Criminal History: 1; Career Offender Status: All

SOURCE: This was produced using the U.S. Sentencing Commission's Interactive Data Analyzer (IDA) (https://ida.ussc.gov).